C-570-107
Remand
Slip Op. 22-45
POI:  01/01/2018 – 12/31/2018
**Public Document**
E&C/OV:  BNB

***Dalian Meisen Woodworking Co., Ltd. v. United States***
**Court No. 20-00110; Slip Op. 22-45 (CIT May 12, 2022)**
**Wooden Cabinets and Vanities and Components Thereof**
**from the People's Republic of China**

**FINAL RESULTS OF REDETERMINATION**
**PURSUANT TO COURT REMAND**

## I.  SUMMARY

The U.S. Department of Commerce (Commerce) has prepared these final results of redetermination pursuant to the remand opinion and order of the U.S. Court of International Trade (the Court) issued on May 12, 2022.[1]  These final results of redetermination concern the final determination in *Wooden Cabinets and Vanities and Components Thereof from the People's Republic of China:  Final Affirmative Countervailing Duty Determination*, 85 FR 11962 (February 28, 2020) (*Final Determination*), and accompanying Issues and Decision Memorandum (IDM).  In its *Remand Order*, the Court remanded Commerce's application of facts otherwise available with an adverse inference (AFA) with respect to the Export Buyer's Credit (EBC) program for two respondents in the underlying investigation:  The Ancientree Cabinet Co., Ltd. (Ancientree); and Dalian Meisen Woodworking Co., Ltd. (Meisen).[2]  Specifically, the Court directed Commerce to find a practical solution to verify the non-use

---

[1] *See Dalian Meisen Woodworking Co., Ltd. v. United States*, Court No. 20-00110, Slip Op. 22-45 (CIT May 12, 2022) (*Remand Order*).
[2] A third respondent, Rizhao Foremost Woodwork Manufacturing Co., Ltd, is not a party to this action.  *See Remand Order*, Slip Op. 21-45 at 3 (fn. 1).  The petitioner in the underlying investigation is the American Kitchen Cabinet Alliance.

information on the record relating to the EBC program, or to recalculate the respondents' subsidy rates to remove the portion of the rate associated with the program.

As detailed below, in this remand proceeding, Commerce reopened the record of the investigation and attempted to verify non-use of the program for Ancientree and Meisen. Because the parties did not provide complete information, or did not comply with Commerce's request for information, we were unable to verify non-use of the program.  Accordingly, we continue to determine that Ancientree and Meisen used and benefited from the EBC program despite Commerce attempting to collect additional information from these respondents and to verify the non-use information, because there continues to be a gap in the record based on the Government of the People's Republic of China (China) (GOC) withholding necessary information that was requested of it.  Therefore, we have made no revisions to the subsidy rates from the *Final Determination*.

## II.    BACKGROUND

In the *Final Determination*, Commerce determined, based on AFA, that the respondents used and benefited from the EBC program because the GOC failed to adequately respond to Commerce's requests for information about the program.  Specifically, Commerce determined that the program was used, despite certifications from the respondents' U.S. customers claiming non-use,[3] because the GOC failed:  (1) to provide an adequate explanation of the operation of the program; (2) to provide 2013 Revisions to the administrative rules regulating the program (2013 Revisions) (including information concerning the elimination of a two million dollar contract threshold between the respondents and their customers for participation in the EBC program);

---

[3] *See* Ancientree's Letter, "Wooden Cabinets and Vanities from the People's Republic of China:  Section III Questionnaire Response," dated July 11, 2019 (Ancientree IQR), at Exhibit II-12; *see also* Meisen's Letter, "Wooden Cabinets and Vanities from the People's Republic of China:  Section III Questionnaire Response," dated July 11, 2019 (Meisen IQR), at Exhibit 14.

and (3) to provide a list of partner/correspondent banks that the GOC relies on as intermediaries in implementing the program.[4]  Commerce concluded that this information was necessary to verify the respondents' claims that neither they, nor their U.S. customers, had used or benefited from the EBC program.[5]  Ancientree, Meisen, and U.S. importer Cabinets to Go, LLC challenged Commerce's finding, based on AFA, that Ancientree and Meisen received benefits under the EBC program.

On May 12, 2022, the Court remanded the *Final Determination* to Commerce, holding that "Commerce's finding that necessary information is missing from the record, such that there is a gap in the factual record that requires the use of 'facts otherwise available' under {section 776(a) of the Tariff Act of 1930, as amended (the Act)} is contrary to the statute and lacks the support of substantial evidence."[6]  The Court found that because Commerce's use of facts otherwise available to find that the respondents' U.S. customers used the EBC program was unlawful, the first step of the two-step process has not been satisfied, and Commerce's AFA finding that the respondents benefited from the program cannot be sustained.[7]  The Court directed Commerce to "either (1) find a practical solution to verify the non-use information on the record, such as the reopening of the record to issue supplemental questionnaires to respondents and their U.S. customers; or (2) recalculate the countervailing duty rates for Meisen and Ancientree to exclude the subsidy rate for the Export Buyer's Credit Program, and recalculate the all-others rate accordingly."[8]

---

[4] *See Final Determination* IDM at 24-29.
[5] *Id.* at 35.
[6] *See Remand Order* at 18.
[7] *Id.*
[8] *Id.* at 21.

On May 19, 2022, and in light of the Court's remand and the fact that both respondents provided non-use certifications for all U.S. customers during the original investigation,[9] Commerce issued supplemental questionnaires to both respondents regarding customers' non-use claims.[10]  In June 2022, the respondents submitted questionnaire responses.[11]  Subsequently, Commerce issued a second supplemental questionnaire to Meisen.[12]  Meisen responded on June 21, 2022.[13]

Commerce released the Draft Results on July 14, 2022.[14]  In the Draft Results, we continued to find that the respondents used and benefited from this program during the period of investigation (POI).  The petitioner, Ancientree, and Meisen submitted comments on the Draft Results on July 21, 2022.[15]

## III.    COUNTERVAILABILITY OF THE EBC PROGRAM

Pursuant to the Court's directive in the *Remand Order*, Commerce attempted to verify the respondents' claims of non-use of the EBC program.  Commerce reopened the record of the investigation and issued questionnaires to the respondents, seeking information relating to their

---

[9] *See* Ancientree IQR at Exhibit II-12; *see also* Meisen IQR at Exhibit 14.

[10] *See* Commerce's Letters, "Remand Redetermination for the Countervailing Duty Investigation of Wooden Cabinets and Vanities and Components Thereof from the People's Republic of China:  Export Buyer's Credit Supplemental Questionnaire," both dated May 19, 2022 (EBC Supplemental Questionnaire).

[11] *See* Meisen's Letter, "Export Buyer's Credit Supplemental Questionnaire Response," dated June 10, 2022 (Meisen June 10, 2022 SQR); *see also* Ancientree's Letter, "Export Buyer's Credit Supplemental Questionnaire Response," dated June 13, 2022 (Ancientree June 13, 2022 SQR).

[12] *See* Commerce's Letter, "Remand Redetermination for the Countervailing Duty Investigation of Wooden Cabinets and Vanities and Components Thereof from the People's Republic of China:  2nd Export Buyer's Credit Supplemental Questionnaire," dated June 15, 2022 (2nd EBC Supplemental Questionnaire).

[13] *See* Meisen's Letter, "Wooden Cabinets and Vanities from the People's Republic of China:  2nd Export Buyers Credit Supplemental Questionnaire Response," dated June 21, 2022 (Meisen June 21, 2022 SQR).

[14] *See* Draft Results of Redetermination Pursuant to Court Remand, *Dalian Meisen Woodworking Co., Ltd. v. United States*, Court No. 20-00110; Slip Op. 22-45 (CIT May 12, 2022) (Draft Results).

[15] *See* Petitioner's Letter, "Wooden Cabinets and Vanities and Components Thereof from China:  Comments on Draft Redetermination," dated July 21, 2022 (Petitioner Comments); Ancientree's Letter, "Wooden Cabinets and Vanities from the People's Republic of China:  Comment on the Draft Remand Determination," dated July 21, 2022 (Ancientree Comments); and Meisen's Letter, "Wooden Cabinets and Vanities from the People's Republic of China: Comments on the Draft Remand Redetermination," dated July 21, 2022 (Meisen Comments).

customers' traditional and non-traditional financing.[16]  Neither respondent provided complete

information in response to our questionnaire nor complied with Commerce's request for

information.  Thus, while we reopened the record to issue supplemental questionnaires to the

respondents and their U.S. customers in accordance with the Court's directive in the *Remand*

*Order*, we were unable to verify non-use of the program via the respondents' information

because the respondents did not submit complete information that would permit Commerce to

conduct verification.  Therefore, we continue to find that the GOC is the only party that can

answer questions about the internal administration of this program and that the unverifiable non-

use certificates cannot replace the cooperation of the GOC.  Thus, there continues to be a gap in

the record based on the GOC's failure to cooperate to the best of its ability.  Accordingly, as

AFA, we find that both respondents used and benefited from the EBC program despite claims of

non-use.  In addition, due to the lack of cooperation from the GOC, we continue to find, as AFA,

that the program constitutes a financial contribution pursuant to section 771(5)(D) of the Act and

is specific pursuant to section 771(5A)(A) and (B) of the Act.

   A.  **Legal Standard**

      In a countervailing duty (CVD) proceeding, Commerce requires information from both

the government of the country whose merchandise is under investigation and the foreign

producers and exporters.  When the government fails to provide requested information

concerning alleged subsidy programs, Commerce may rely on AFA to find that a financial

contribution exists under the alleged program and/or that the program is specific.[17]  However,

where possible, Commerce will rely on the responsive producer/exporter's records to determine

---

[16] *See* EBC Supplemental Questionnaire; *see also* 2nd EBC Supplemental Questionnaire.
[17] *See, e.g.*, *Hardwood and Decorative Plywood from the People's Republic of China:  Final Affirmative Countervailing Duty Determination; 2011*, 78 FR 58283 (September 23, 2013), and accompanying IDM, at Comment 3.

the existence and amount of the benefit, to the extent that those records are useable and verifiable.

Section 776(a) of the Act provides that Commerce, subject to section 782(d) of the Act, shall select from the "facts otherwise available" if: (1) necessary information is not on the record; or (2) an interested party or any other person withholds information that has been requested; fails to provide information within the deadlines established, or in the form and manner requested by Commerce, subject to subsections (c)(1) and (e) of section 782 of the Act; significantly impedes a proceeding; or provides information that cannot be verified as provided by section 782(i) of the Act.

Where Commerce determines that a response to a request for information does not comply with the request, section 782(d) of the Act provides that Commerce will so inform the party submitting the response and will, to the extent practicable, provide that party an opportunity to remedy or explain the deficiency. If the party fails to remedy or satisfactorily explain the deficiency within the applicable time limits, subject to section 782(e) of the Act, Commerce may disregard all or part of the original and subsequent responses, as appropriate.

Section 776(b) of the Act provides that Commerce may use an adverse inference in selecting from the facts otherwise available when a party fails to cooperate by not acting to the best of its ability to comply with a request for information. In so doing, Commerce is not required to determine, or make any adjustments to, a countervailable subsidy rate based on any assumptions about information an interested party would have provided if the interested party had complied with the request for information. Further, section 776(b)(2) of the Act states that an adverse inference may include reliance on information derived from the petition, the final

determination from the CVD investigation, a previous administrative review, or other information placed on the record.[18]

Section 776(c) of the Act provides that, in general, when Commerce relies on secondary information rather than information obtained in the course of an investigation or review, it shall, to the extent practicable, corroborate that information from independent sources that are reasonably at its disposal.[19]  Secondary information is defined as information derived from the petition that gave rise to the investigation, the determination concerning the subject merchandise, or any previous review under section 751 of the Act concerning the subject merchandise.[20]

Finally, under section 776(d) of the Act, when using an adverse inference in selecting from the facts otherwise available, Commerce may use a countervailable subsidy rate applied for the same or similar program in a CVD proceeding involving the same country, or if there is no same or similar program, use a countervailable subsidy rate for a subsidy program from a proceeding that Commerce considers reasonable to use.[21]  When selecting from the facts otherwise available with an adverse inference, Commerce is not required to estimate what the countervailable subsidy rate would have been if the interested party failing to cooperate had cooperated or to demonstrate that the countervailable subsidy rate reflects an "alleged commercial reality" of the interested party.[22]

### B.  Analysis

We continue to find that the GOC failed to cooperate by not acting to the best of its ability to comply with Commerce's requests for information.  Nonetheless, in accordance with

---

[18] *See* 19 CFR 351.308(c).
[19] *See* 19 CFR 351.308(d).
[20] *See* Statement of Administrative Action Accompanying the Uruguay Round Agreements Act, H.R. Doc. No. 103-316, Vol. (1994), at 870.
[21] *See* section 776(d)(1) of the Act.
[22] *See* section 776(d)(3) of the Act.

the *Remand Order*, we reopened the record and issued supplemental questionnaires to the respondents and their U.S. customers, regardless of the respondents' relationships to those customers, to collect additional information, and to attempt to verify the non-use information the respondents had voluntarily submitted in an effort to remediate the deficiencies resulting from the GOC's refusal to cooperate during the investigation.  The respondents made certain efforts to respond to Commerce's requests for information regarding their non-use claims of the EBC program, but neither provided all of the information necessary for Commerce to be able to conduct verification.  Accordingly, we continue to rely on AFA for our analysis of the program, for the reasons outlined below.

In the initial questionnaire, we requested that the GOC provide original and translated copies of laws, regulations, or other governing documents for the EBC program.[23]  This request included the 2013 Revisions to the EBC program; however, the GOC did not provide the 2013 amendment to these laws.[24]  In a supplemental questionnaire, we provided the GOC with another opportunity to provide this information,[25] and the GOC again failed to provide the information requested, stating that it was unable to proffer the information because such information is not public.[26]  Therefore, in the context of its response to Commerce's initial and supplemental questionnaires, the GOC twice refused to provide the requested information concerning the 2013 Revisions, which is necessary for Commerce to analyze how the program functions.

---

[23] *See* Commerce's Letter, "Countervailing Duty Investigation of Wooden Cabinets and Vanities and Components Thereof from the People's Republic of China:  Countervailing Duty Questionnaire," dated May 31, 2019 (Initial Questionnaire), at Section II (33-34).
[24] *See* GOC's Letter, "Wooden Cabinets and Vanities and Components Thereof from the People's Republic of China, Case No. C-570-107:  Initial Questionnaire Response," dated July 12, 2019 (GOC IQR), at 71.
[25] *See* Commerce's Letter, "Wooden Cabinets and Vanities and Components Thereof from the People's Republic of China:  Request for Additional Information," dated July 17, 2019, at 6.
[26] *See* GOC's Letter, "Wooden Cabinets and Vanities and Components Thereof from the People's Republic of China, Case No. C-570-107:  First Supplemental Questionnaire Response," dated July 23, 2019 (GOC SQR), at 8.

Instead, the GOC provided the *Administrative Measures of Export Buyer's Credit of the Export-Import Bank of China* (*Administrative Measures*) and *Detailed Implementation Rules Governing Export Buyer's Credit of the Export-Import Bank of China* (*Implementing Rules*) and explained that, in accordance with the requirements set forth in these documents, the Chinese exporter should be aware of the buyer's receipt of loans and should be involved in the loan evaluation proceeding and in the post-lending loan management.[27]   The GOC argued that the Chinese exporter is, accordingly, in a position to verify and confirm the existence of any sales contracts that were supported by the EBC program.  Specifically, the GOC explained that, in accordance with the *Implementing Rules*:  (1) the China Export-Import (Ex-Im) Bank must investigate and verify the performance capability of the Chinese exporters in its loan evaluation and approval proceeding; (2) in making decisions on loan approval, the China Ex-Im Bank also pays great attention to the credit level of the exporters; and (3) for post-lending management, for securing loan recovery, the China Ex-Im Bank may do necessary supervision and inspection of the loan usage, contacting the Chinese exporter after the issuance of loans to confirm the funds are properly used.[28]   However, the GOC stated that the 2013 Revisions and Commerce's request for a list of all partner/correspondent banks involved in disbursement of funds under the EBC program is not available or applicable because none of the mandatory respondents' U.S. customers obtained export buyer's credits during the POI, January 1, 2018, through December 31, 2018.[29]

---

[27] *See* GOC IQR at 72 and Exhibits EXPORT-2 and EXPORT-3.
[28] *Id.* at 73.
[29] *Id.* at 71-72; *see also* GOC SQR at 8-9.

Information obtained in a prior CVD proceeding indicates that the GOC revised the *Administrative Measures* regarding this program in 2013.[30] This information indicates that, under the 2013 Revisions, the China Ex-Im Bank may disburse export buyer's credits directly or through third-party partner and/or correspondent banks and that the threshold for potential loans is no longer two million U.S. dollars (USD).[31] Because of the complicated structure of loan disbursements for the EBC program, it is essential that Commerce has a complete understanding of how this program is administered.

Commerce explained in the remand redetermination issued in the *Clearon* litigation that, if the EBC program continues to be limited to two million USD contracts between a mandatory respondent and its customers, this is "an important limitation to the universe of potential loans under the program and can assist us in targeting our verification of non-use."[32] However, if the program is no longer limited to two million USD contracts, this increases the difficulty of verifying loans without any such parameters. Therefore, by refusing to provide the requested information, and instead providing unverifiable assurances that other rules regarding the program remained in effect, the GOC impeded Commerce's understanding of how this program operates and how it can be verified.[33] We also stated in the *Clearon Remand* that:

> {g}iven the complicated structure of loan disbursements which can involve various banks for this program, Commerce's complete understanding of how this program is administered is necessary to verify claims of non-use. Thus, the GOC's refusal to provide the 2013 revisions, which provide internal guidelines for how this program is administrated by the China Ex-Im Bank, as well as other requested information, such as key information and documentation pertaining to the application and approval process, interest rates, and partner/correspondent

---

[30] *See Countervailing Duty Investigation of Certain Amorphous Silica Fabric from the People's Republic of China: Final Affirmative Determination*, 82 FR 8405 (January 25, 2017), and accompanying IDM, at 11-14.
[31] *Id.*
[32] *See Clearon Corp. v. United States*, 359 F. Supp. 3d 1344 (CIT 2019) (*Clearon*) (quoting *Final Results of Redetermination Pursuant to Court Remand, Clearon Corp. v. United States*, Court No. 17-00171, Slip Op. 19-13 (CIT January 25, 2019), dated May 16, 2019 (*Clearon Remand*), at 14).
[33] *Id.*

banks, impeded Commerce's ability to conduct its investigation of this program and to verify the claims of non-use by {the respondent's} customers.[34]

Furthermore, in order to verify non-use of the EBC program as indicated in the non-use certificates submitted by the respondents, Commerce would be required to know the names of the intermediary partner/correspondent banks.  We further explained in the *Clearon Remand* that:

> {i}t would be their names, not the name 'China Ex-Im Bank,' that would appear in the subledgers of the U.S. customers if they received the credits.  As explained recently in the investigation of aluminum sheet:

> Record evidence indicates that the loans associated with this program are not limited to direct disbursements through the China Ex-Im Bank.  Specifically, the record information indicates that customers can open loan accounts for disbursements through this program with other banks, whereby the funds are first sent to ... the importer's account, which could be at the China Ex-Im Bank or other banks, and that these funds are then sent to the exporter's bank account.

> In other words, there will not necessarily be an account in the name 'China Ex-Im Bank' in the books and records (*e.g.*, subledger, tax return, bank statements) of the U.S. customer.  Thus, if we cannot verify claims of non-use with the GOC, having a list of the correspondent banks is critical for us to perform verification at the U.S. customers.[35]

The GOC, however, refused to provide requested information, including all laws, regulations or governing documents for the program, or a list of partner/correspondent banks, both of which are necessary for Commerce to understand how the program operates and to be able to verify claims of non-use.  Absent this information, we have no way to differentiate ordinary commercial lending from GOC-supported credit in the books and records of the respondents' U.S. customers, or to differentiate disbursements of funds to the respondents themselves pursuant to ordinary lending from GOC-supported credit.

---

[34] *Id.* at 17.
[35] *Id.* at 17-18 (citing *Countervailing Duty Investigation of Common Alloy Aluminum Sheet from the People's Republic of China:  Final Affirmative Determination*, 83 FR 57427 (November 15, 2018), and accompanying IDM, at 30 (internal quotations and citations omitted)).

In addition, by withholding necessary information concerning the operation of this program, the GOC has impeded not only Commerce's ability to determine whether the provision of the credit constitutes a financial contribution and whether such credits are specific, but also Commerce's ability to reach a verifiable conclusion regarding usage of the program. Pursuant to sections 776(a)(1), (a)(2)(A), and (a)(2)(C) of the Act, when an interested party withholds necessary information requested by Commerce and/or significantly impedes a proceeding, Commerce uses facts otherwise available to reach a determination. Because the GOC withheld the requested information described above, thereby impeding this proceeding, we determine that the use of facts available is appropriate. Furthermore, pursuant to section 776(b) of the Act, we find that the GOC, by virtue of its withholding information that was within its control, failed to cooperate by not acting to the best of its ability. Accordingly, the application of AFA is warranted.

Regarding specificity, although the record regarding this program suffers from significant deficiencies, we note that the GOC's description of the program and supporting materials (albeit found to be deficient) demonstrate that, through this program, state-owned banks, such as the China Ex-Im Bank, provide loans at preferential rates for the purchase of exported goods from China.[36] In addition, the program was alleged by the petitioner as a possible export subsidy,[37] and Commerce has found this program to be an export subsidy in the past.[38] These considerations are consistent with our *Final Determination*, as AFA, that this program

---

[36] *See* GOC IQR at 72-73.
[37] *See* Petitioner's Letter, "Wooden Cabinets and Vanities from the People's Republic of China: Petitions for the Imposition of Antidumping and Countervailing Duties," dated March 6, 2019, at Volume III (pages 115-16).
[38] *See, e.g.*, *Countervailing Duty Order on Certain Passenger Vehicle and Light Truck Tires from the People's Republic of China: Final Results of Countervailing Duty Administrative Review; 2016*, 84 FR 17382 (April 25, 2019), and accompanying IDM, at Comment 16.

constitutes a financial contribution pursuant to section 771(5)(D) of the Act, and is specific

within the meaning of section 771(5A)(B) of the Act.

Regarding benefit, it continues to be Commerce's position that the GOC is the only party

that can answer questions about the internal administration of this program and that non-use

certificates cannot replace the cooperation of the GOC.  The GOC's refusal to provide the 2013

Revisions to the *Administrative Measures*, which provide internal guidelines for how this

program is administered by the China Ex-Im Bank, and a list of partner/correspondent banks that

are used to disburse funds through this program, constitutes withholding necessary information,

which impeded our ability to analyze the program's operation and/or determine how the program

could be properly verified.  Thus, the GOC's failure to provide the requested information further

undermines our ability to verify the respondents' claims of non-use.

Nonetheless, we recognize that the Court in this case observed that there is evidence of

non-use of the program by the respondents' customers on the record, and that "Commerce's

argument that the operational information is necessary to verify the accuracy of the non-use

information because without it, verification is unreasonably burdensome using its typical

procedure, rings hollow when Commerce fails to even try."[39]  The Court held that Commerce's

finding that necessary information is missing, such that there is a gap in the record, was contrary

to the statute and lacks support of substantial evidence, and thus, it directed Commerce to find a

practical solution to verify the non-use information, such as reopening the record to issue

supplemental questionnaires, or to recalculate the rates for the respondents to exclude the subsidy

rate for the EBC program.[40]  We note that the Court has also directed Commerce in other

decisions to consider whether any available information provided by respondents may be

---

[39] *See Remand Order* at 17.
[40] *Id.* at 17-18 and 21.

sufficient to fill the gap of missing record information in considering claims of non-use for the EBC program.[41]

Commerce has taken these steps in other cases.  For example, in *Mobile Access Equipment*, Commerce found non-use of the EBC program after questioning and verifying the non-use certifications submitted by the respondents' U.S. customers.[42]  *Mobile Access Equipment from China* is an example of Commerce's refinement of its practice regarding the EBC program in light of litigation.  Another recent example of our current practice is *Forged Steel Fittings from China*.[43]  These decisions indicate that Commerce continues to apply AFA for the GOC's failure to cooperate, but that — when the full universe of a respondent's U.S. customers voluntarily supplies certifications of non-use — Commerce has determined to take additional steps toward ultimate verification of such certifications, despite the GOC's continued refusal to provide certain information.  Specifically, we may issue supplemental questions seeking complete lending information from the U.S. customers and then take steps to verify the customers' responses where the voluntary information provided covers the full universe of financing for all of a respondent's U.S. customers, which allows Commerce to meaningfully conduct its tracing and completeness tests at verification.  In both *Mobile Access Equipment from China* and *Forged Steel Fittings from China*, these steps resulted in findings of non-use of the program by a given respondent because the complete information for all of the respondents' U.S.

---

[41] *See, e.g.*, *Guizhou Tyre Co. v. United States*, 399 F. Supp. 3d 1346, 1348 (CIT 2019); *Clearon*, 359 F. Supp. 3d at 1358-60; *Jiangsu Zhongji Lamination Materials Co. v. United States*, 405 F. Supp. 3d 1317, 1324 (CIT 2019) (*Jiangsu Zhongji*); and *Changzhou Trina Solar Energy Co. v. United States*, 255 F. Supp. 3d 1312, 1313 (CIT 2017).

[42] *See Certain Mobile Access Equipment and Subassemblies Thereof from the People's Republic of China:  Final Affirmative Countervailing Duty Determination*, 86 FR 57809 (October 19, 2021) (*Mobile Access Equipment from China*), and accompanying IDM, at Comment 5.

[43] *See Forged Steel Fittings from the People's Republic of China:  Final Results of Countervailing Duty Administrative Review; 2019*, 87 FR 35498 (June 10, 2022) (*Forged Steel Fittings from China*), and accompanying IDM, at Comment 2.

customers allowed Commerce to conduct these tests in the verification context, and to compensate for the gaps caused by the GOC's continued non-cooperation.[44]  Unfortunately in this case, despite Commerce's attempt to verify by re-opening the record for additional information, we still lack the complete information that enabled verification in those proceedings, as further discussed below.

In its *Remand Order* in this case, the Court held that the first step of the two-step process in applying AFA has not been satisfied (*i.e.*, that a gap exists in the factual record requiring the use of facts available), and that Commerce shall either find a practical solution to verify the non-use certifications of the respondents' customers, or recalculate the CVD rates to exclude the subsidy rate for the EBC program.[45]  As a result, we took the initial step in an attempt to verify the respondents' non-use information for the EBC program by issuing supplemental questionnaires to the respondents and their U.S. customers, requesting additional information regarding their financing activities.  This process is consistent with Commerce's approach in other recent administrative proceedings where a respondent has provided non-use certificates from all of its U.S. customers (an approach that Commerce had not adopted at the time of the underlying investigation in this proceeding).[46]

In this remand redetermination, we did not receive a complete response to Commerce's supplemental questionnaire from the respondents.  Specifically, the respondents did not provide complete information regarding financing activities for all of their U.S. customers, which means that Commerce has an insufficient basis on which to take further steps – such as conducting

---

[44] *See Mobile Access Equipment from China* IDM at Comment 5; and *Forged Steel Fittings from China* IDM at Comment 2.
[45] *See Remand Order* at 18.
[46] *See Forged Steel Fittings from China* IDM at Comment 2; *see also Mobile Access Equipment from China* IDM at Comment 5.

verification of their non-use claims.  The partial information on non-use provided here does not leave Commerce with a path towards further investigating, completely verifying, or ultimately determining non-use of this program for either respondent.  Accordingly, the processes and outcomes in *Mobile Access Equipment from China* and *Forged Steel Fittings from China* are distinguishable from this remand.

In our supplemental questionnaire on the EBC program, we asked the respondents to report "all loans/financing to each of your U.S. importers/customers that were received and/or outstanding during the {POI}, regardless of whether you consider the financing to have been provided under the {EBC} program," and requested that the parties "{s}ubmit the information requested in the Loan Template as an attachment to your response and in electronic format using Microsoft Excel."[47]  In addition, the EBC Supplemental Questionnaire explicitly indicated that such reporting should include non-traditional forms of financing.[48]

After granting several extensions of the deadline to submit responses to the EBC Supplemental Questionnaire, Ancientree was unable to provide a complete response for all of its U.S. customers.[49]  Specifically, Ancientree explained that it "was not able to obtain the responses from all 27 unaffiliated {U.S.} customers {during} the POI."[50]  Because Ancientree was unable to provide a response for all of its U.S. customers, Commerce could not take further steps toward verification that all of its customers did not, in fact, receive credits from the China Ex-Im Bank, directly or indirectly.  In the absence of evidence from all of Ancientree's U.S. customers, we cannot conduct verification to determine whether Ancientree's U.S. customers used the EBC

---

[47] *See* EBC Supplemental Questionnaire at 3.
[48] *Id.* (stating that the respondent should "{e}nsure that you report all forms of financing received and/or outstanding during the POI, not only traditional loans").
[49] *See* Ancientree June 13, 2022 SQR at 1.
[50] *Id.*

program or not.  Therefore, we find that Ancientree did not provide sufficient support for its claim of non-use of the EBC program.

As explained above, we similarly requested for Meisen to report all of its loans/financing, including non-traditional financing, in the loan template, and to "{p}rovide documentation for the five largest loans for each U.S. importer/customer that are reported in the Loan Template."[51] However, Meisen did not provide a complete loan template for its U.S. customers and elected not to provide any additional information regarding non-traditional forms of financing that several of its U.S. customers received because it believed "{n}one of these companies had any relevant loans/financing outstanding during the {POI}."[52]  In addition, Meisen stated that "the loan template is not applicable and Meisen has provided the relevant information for {Commerce} to conclude that its U.S. importers/customers did not use the program in this submission."[53] Notably, despite the fact that Meisen's customers' records show outstanding lending during the POI, Meisen declined to provide information on such financing.[54]

Therefore, Commerce determined to issue a second supplemental questionnaire to Meisen.  In that second supplemental questionnaire we requested that "regardless of whether Meisen may offer an explanation as to why the lending is unrelated to the Export Buyer's Credit program – please complete the Loan Template for each customer with outstanding lending during the POI, as initially requested," and to "{p}rovide documentation for the five largest loans for each U.S. importer/customer that are reported in the Loan Template."[55]  In response, Meisen elected not to provide all of the information requested by Commerce, explaining that

---

[51] *See* EBC Supplemental Questionnaire at 3-4.
[52] *See* Meisen June 10, 2022 SQR at 1-3.
[53] *Id.* at 3.
[54] *Id.* at Exhibit 2.
[55] *See* 2nd EBC Supplemental Questionnaire at 3.

"{w}e have excluded loans from shareholders, loans between related parties, vehicle or property financing, and any transactions that were not related to actual loans or financing, such as prepayments to suppliers or interest expenses on credit card balances.  These excluded transactions are not relevant to the program."[56]  Meisen stated that "there are no relevant loans to report" and the loan template that Meisen provided only reported "NA" across all the fields.[57]  In other words, Meisen unilaterally determined what forms of financing were (and were not) relevant to Commerce's assessment.  Without this information, and considering that the GOC failed to provide necessary information regarding this program, we cannot conduct verification to determine whether Meisen's U.S. customers used the EBC program.

A complete response for all customers, including a response to the loan template, is necessary to properly verify Meisen's alleged non-use of the EBC program.  In the loan template, we requested that *all* loans be reported by the U.S. customer.  Specifically, we requested the names of lenders, date of the loan agreement, date of loan receipt, purpose of the loan, initial loan amount, currency of the loan, life of the loan, type of interest (*i.e.*, fixed or variable rate), interest rate specified on the loan agreement, date of principal payments, amount of principal payments, dates of interest payment, amounts of interest paid, principle balance to which each interest payment applies, and the total number of days each interest payment covers for each loan with interest payments during the POI.[58]  The loan template is necessary for Commerce to examine subledgers or bank statements containing the details of all individual loans.  By tying or tracing the subledgers or bank statements to the total amount of outstanding lending derived from the balance sheets, Commerce could be assured that the subledgers were

---

[56] *See* Meisen June 21, 2022 SQR at 3.
[57] *Id.* at 4 and Attachment 1.
[58] *See* EBC Supplemental Questionnaire at Loan Template.

complete and that Commerce, therefore, had the entire universe of loan information available for further scrutiny.

After examining the subledgers for references to the state-owned banks (for example, "Account 201-02: Short-term lending, Industrial and Commercial Bank of China"), as part of its verification procedures, Commerce would select specific entries from the subledger and request to see underlying documentation, such as applications and loan agreements, in order to confirm the accuracy of the subledger details. Only then could Commerce reasonably assess whether or not a particular financing instrument was provided under the EBC program. Therefore, confirmation that a complete picture of relevant information is in front of the verifiers, by tying relevant books and records to audited financial statements or tax returns, is critical.

In addition, there is no documentation on the record to determine whether Meisen's customers' lending is related to the EBC program because Meisen declined to provide such documentation. For instance, although Meisen summarily concludes that the loans shown in the provided documents are unrelated to the EBC program, a lack of loan documentation prevents us from ascertaining whether the loans are in fact the type of lending asserted by Meisen. Meisen suggests that the loan titles appearing in the customer's tax returns and/or trial balances are dispositive to the loans' relevance and exempt it from reporting requirements. We disagree. The entire purpose of the information collection exercise is for Commerce to have and use a respondent's and its customers' complete and accurate information on the record.[59] As explained, this data is neither complete nor accurate. As a result, Commerce does not have the complete information necessary to further investigate the financing activities of Meisen's U.S.

---

[59] A company's assignment of a title to certain loans does not provide a complete and demonstratively accurate description of the underlying loan. Moreover, there are multiple loans in Meisen's documents with ambiguous titles that do not identify a source of the lending, EBC-based or otherwise.

customers.  Moreover, as we stated in the *Jiangsu Zhongji Remand*, "without additional information about the operation of the program, the entities that participate in the program, and the kind of paper trail that is generated by the program, Commerce's verification of a U.S. customer would be futile."[60]

In summary, in accordance with the Court's instructions, we attempted to find a practical solution to verify the non-use information on the record and reopened the record to issue supplemental questionnaires to the respondents and their U.S. customers.  We did not receive sufficient information from the respondents to be able to proceed with verification in a meaningful way.  Thus, consistent with our practice, we continue to find as AFA, pursuant to sections 776(a) and (b) of the Act, that the record of this remand redetermination does not support a finding of non-use of the EBC program for the respondents.[61]  We determine that such an application of AFA is warranted in assessing the countervailability of the EBC program because the GOC did not provide information requested, which was needed to allow Commerce to analyze this program fully and provide it with the operational framework to conduct a meaningful verification of the non-use claims.  In addition, given the lack of complete responses from the respondents and their U.S. customers, Commerce concludes that the incomplete information would not, for purposes of verification and an ultimate determination, overcome the deficiencies in the program caused by the GOC's non-cooperation.

We note that Commerce detailed in the *Final Determination*, as well as in findings on the same program in several other recent proceedings, the important practical challenges that arise in

---

[60] *See Final Results of Redetermination Pursuant to Court Remand, Jiangsu Zhongji Lamination Materials Co., Ltd. v. United States*, Slip Op. 19-122 (CIT 2019), dated January 27, 2020 (*Jiangsu Zhongji Remand*), at 13.
[61] *See Countervailing Duty Investigation of Certain Crystalline Silicon Photovoltaic Products from the People's Republic of China:  Final Affirmative Countervailing Duty Determination*, 79 FR 76962 (December 23, 2014), and accompanying IDM, at Comment 16; and *Countervailing Duty Investigation of Certain Aluminum Foil from the People's Republic of China:  Final Affirmative Determination*, 83 FR 9274 (March 5, 2018), and accompanying IDM, at Comment 6.

attempting to verify non-usage of this program in the absence of the information we routinely request of the GOC – requests that the GOC routinely ignores.  First, the nature of a non-usage finding for a program is that it is generally a yes or no proposition; Commerce generally does not make findings of "partial non-use" with respect to a particular program for a given respondent.[62] Moreover, Commerce does not rely on partial, potentially self-selected information as a basis for finding non-use.[63]  Among other reasons, to do so would contradict the "completeness" aspect that is so fundamental to any verification.  The fact that the respondents in this remand did not provide complete responses for all their U.S. customers guaranteed that the record would remain incomplete as to usage information, thus, rendering futile any efforts to verify non-usage.  For this reason, Commerce took no further steps to verify non-use from respondents with respect to those U.S. customers that did provide complete responses, including the loan template, since Commerce could not reasonably expect that the incomplete information gathered would yield a meaningful basis for verification.  Consequently, as noted above, the respondents' incomplete information would not, for purposes of verification and an ultimate determination, overcome the deficiencies in the program information due to the GOC's non-cooperation.  Therefore, Commerce must continue to find usage of the program on an AFA basis.

Accordingly, we continue to find that necessary information is missing from the record, and that the GOC withheld information requested of it and significantly impeded the proceeding, within the meaning of sections 776(a)(1), (a)(2)(A) and (a)(2)(C) of the Act.  Additionally, in accordance with section 776(b) of the Act, we find that the GOC failed to act to the best of its

---

[62] There may be some exceptions to this general rule where, for example, Commerce finds there are various sub-components to a program that may provide different types of contributions and/or are governed by different regulatory measures.  Evidence on this record about the EBC program does not suggest such exceptions would apply here.

[63] This is particularly true of a program such as the EBC program, regarding which Commerce is already stymied in understanding how the program operates and what the full universe of the participants is due to the GOC withholding relevant information.

ability in providing the requested information by withholding requested information based on its

own assessment of what Commerce needed for its analysis.  Critically, despite Commerce's

efforts to take steps toward verification, the respondents' inability to provide, or election not to

provide, the information in response to the EBC-specific questionnaires in this remand segment

means that there is, as a factual matter, no way in which Commerce is able to conduct a

verification of missing information, and, therefore, no basis on which to overcome the GOC's

lack of cooperation.  Therefore, as AFA, we continue to find that the respondents used and

benefited from this program during the POI.

## IV.   COMMENTS ON DRAFT RESULTS

As noted above, Commerce released the Draft Results on July 14, 2022.[64]  On July 21,

2022, the petitioner, Ancientree, and Meisen submitted comments.[65]

*Petitioner Comments*

- Commerce should issue the final remand determination without modification.  The

  respondents did not provide complete information in response to Commerce's initial EBC

  questionnaire, and Meisen did not comply with Commerce's second request for

  information, which was necessary for Commerce to verify non-use of the EBC program.

  Commerce first asked the respondents about the program in May of 2019; more than two

  years later, Commerce still has little more than bald assertions that the program was not

  used.  Commerce should rely on AFA to countervail the program.[66]

---

[64] *See generally* Draft Results.
[65] *See* Petitioner Comments; Ancientree Comments; and Meisen Comments.
[66] *See* Petitioner Comments at 1-2.

*Ancientree Comments*

- In response to Commerce's EBC questionnaire issued in this remand, Ancientree contacted all 27 of its unaffiliated U.S. importers/customers and encouraged them to respond to the questions in the questionnaire.  Although Ancientree was not able to obtain the information for all customers, it received responses for customers accounting for over 90 percent of Ancientree's POI exports by quantity and value.  Commerce's insistence that it requires complete responses from all customers to verify non-use is not practical.[67]

- Certain POI customers no longer have a business relationship with Ancientree, and others declined to cooperate despite Ancientree's requests.  Commerce should consider the efforts that Ancientree put forward to obtain this information and should find that the responses from cooperative customers (which reflect a substantial percentage of the POI sales), should be deemed representative of the entire pool of POI customers.[68]  In addition, the Court has rejected the application of AFA where, as here, the respondent is not in a position to induce cooperation by its customers.[69]

- At the most, Commerce should find that Ancientree demonstrated partial non-use.  As approximately 90 percent of Ancientree's buyers responded to the EBC questionnaire, Commerce should apply only ten percent of the EBC program's AFA rate of 10.54 percent (*i.e.*, 1.054 percent) as the AFA rate to Ancientree for this program.[70]

---

[67] *See* Ancientree Comments at 4-5.
[68] *Id.* at 7-8.
[69] *Id.* at 9.
[70] *Id.* at 10.

*Meisen Comments*

- Commerce should revise the Draft Results to conclude that Meisen's U.S. importers/customers did not benefit from the EBC program.[71]  Commerce's Draft Results are contrary to the Court's *Remand Order* and are, thus, unlawful.  Commerce unreasonably declined to accept declarations and information from Meisen's customers indicating that they did not use the program, and, moreover, Commerce did not find a practical solution to verify the non-use information.[72]

- The Court has consistently rejected Commerce's application of AFA to find a benefit was received under the EBC program where respondents provided declarations of non-use.[73]  Commerce can only apply facts available when necessary information is not available on the record or an interested party withholds information or significantly impedes a processing.[74]  The application of adverse inferences is not justified in this case because there are no gaps in the record that need to be filled.  All the requisite information is on the record to make a non-use finding, and any information which was allegedly not supplied by the GOC was not necessary.[75]

- Declarations of non-use are plainly sufficient, consistent with Commerce's practice with respect to other programs.  Commerce has always permitted respondents to state that they do not use a particular subsidy program without providing any additional evidence of this non-use.[76]

---

[71] *See* Meisen Comments at 1.
[72] *Id.*
[73] *Id.* at 2-3 (citing *Guizhou Tyre Co. v. United States*, 348 F. Supp. 3d 1261, 1270 (CIT 2018); *Clearon Corp. v. United States,* 359 F. Supp. 3d 1344 (CIT 2019); *Clearon Corp. v. United States,* 474 F. Supp. 3d 1339 (CIT 2020); and *Changzhou Trina Solar Energy Co. v. United States*, 352 F. Supp. 3d 1316, 1322 (CIT 2018)).
[74] *Id.* (citing *Jiangsu Zhongji*, 405 F. Supp. 3d 1317, 1333).
[75] *Id.*
[76] *Id.* at 4.

- The Court instructed Commerce to find a practical solution to verify non-use information, but Commerce has insisted that there can only be one method of verification.  However, the method employed by Commerce is unreasonably burdensome and seems to be designed to ensure that almost all customers will not be able to meet Commerce's requirements.  In particular, Commerce requests that the U.S. importers/customers complete a loan template, which requires information on every loan or other form of financing outstanding during the POI.  Additionally, Commerce requests that each importer/customer submit an extensive amount of documentation, including their chart of accounts, income statements and balance sheets, trial balance or general ledger, a reconciliation of interest expenses and loan amounts to the general ledger, and documentation on the five largest loans of every importer/customer.  Requesting this volume of information is burdensome and exceeds Commerce's standard spot check verification procedures.[77]

- The information that Meisen provided was adequate.  All importers/customers provided their tax returns and trial balances where the value of outstanding POI financing and interest expenses were recorded.  Moreover, they provided a description of the loans and interest expenses reported therein, most of which relate to loans from shareholders or vehicle financing.[78]

- Commerce, focusing on form over substance, faults Meisen for not providing a complete loan template.  However, Meisen did submit the loan template in its second supplemental questionnaire response, and it indicated that the companies had no relevant forms of loans or financing.  While Commerce faults Meisen for not reporting additional information on

---

[77] *Id*. at 5-6.
[78] *Id*. at 7.

certain nontraditional forms of financing, Commerce "fails to explain how any of the financing at issue could possibly be related to the EBC program."[79]

- With respect to supporting documentation, although Meisen's U.S. importers/customers did not keep a chart of accounts and did not have audited financial statements or balance sheets, Meisen submitted their income tax returns and trial balances.  Commerce could easily have reviewed the documents to identify any loans or interest expenses, and ask follow-up questions or request additional documentation for specific transactions.

However, Commerce refused to take this path forward, and improperly applied AFA.[80]

**Commerce's Position:**

For the reasons stated below, we continue to find that necessary information is missing from the record, and that the GOC withheld information requested of it and significantly impeded the proceeding, within the meaning of sections 776(a)(1), (a)(2)(A) and (a)(2)(C) of the Act.  Additionally, in accordance with section 776(b) of the Act, we find that the GOC failed to act to the best of its ability in providing the requested information by withholding requested information based on its own assessment of what Commerce needed for its analysis.  Despite Commerce's reopening of the record – in an effort to take steps toward verification – the partial/incomplete responses of the respondents provide no basis to overcome the GOC's lack of cooperation in finding non-use of the EBC program.

Meisen asserts that Commerce has not complied with the Court's precedent by failing to explain:  (1) exactly what information is missing from the record that is necessary to verify non-use; (2) how the withheld information creates this gap by explaining why the information the GOC refused to give was necessary to verify claims of non-use; and (3) why other information,

---

[79] *Id.*
[80] *Id.* at 8-9.

on the record or accessible by respondents, is insufficient to verify non-use.[81]  As explained at

length above,[82] Commerce requires information on the operation of the EBC program in order to

properly verify it.  In particular, the GOC's refusal to provide the 2013 Revisions, which provide

internal guidelines for how this program is administrated by the China Ex-Im Bank, as well as

other requested information, such as key information and documentation pertaining to the

application and approval process, interest rates, and partner/correspondent banks, impeded

Commerce's ability to verify the claims of non-use by the respondents' customers.  This

information is necessary to track the disbursement of funds to U.S. customers and/or respondents

and to differentiate between lending types.

  Moreover, with respect to the requests for information that Commerce issued in this

remand segment in an attempt to verify the respondents' non-use information, in accordance with

the *Remand Order*, we did not receive a complete response for all customers from Ancientree,

and we received only a partial response from Meisen for numerous customers (despite

Commerce's second requests to Meisen for the same information).  Above, Commerce provided

a detailed explanation of the ways in which the incomplete information provided by the

respondents/customers did not overcome the deficiencies caused by the GOC's non-cooperation,

and consequently, Commerce could not conduct verification of the alleged non-use of the

program in a meaningful way.[83]

  Next, Meisen asserts that Commerce "has always permitted respondents to state that they

do not use a particular subsidy program without providing any additional evidence of this non-

use," and describes a circumstance in which Commerce declined to inquire further into a

---

[81] *See* Meisen Comments at 3 (citing *Jiangsu Zhongji* at 8).
[82] *See supra*, pages 8-13.
[83] *See supra*, pages 15-19.

reportedly non-used program.[84]  As an initial matter, Commerce is not required to examine or verify (with respect to non-use or otherwise) all programs in an identical manner, within or across proceedings.  Therefore, Commerce's inquiry into the EBC program is not limited by the scope of our analysis/verification of another program; this point is particularly critical in the current scenario, where Commerce is being asked to examine whether the purported non-use has been demonstrated in a manner that overcomes a reporting failure of a government respondent (*i.e.*, the GOC) that resulted in AFA.  In any case, as Meisen readily acknowledges, Commerce is entitled to verify the information provided in this remand and in the underlying investigation. Here, Commerce sought to verify the information and the respondents did not provide complete information that would make such a verification possible.

Meisen argues that "the method employed by {Commerce} is unreasonably burdensome and seems to be designed to ensure that almost all customers will not be able to meet {Commerce's} requirements."[85]  On the contrary, Commerce requested a response to its standard loan template and additional documentation of the type that is routinely relied on for reconciliation purposes (*e.g.*, trial balances and loan agreements).[86]  Moreover, Commerce provided Meisen with 33 days to respond to this request for information.[87]  In comparison, Commerce typically provides 37 days for an exporter to respond to an entire CVD questionnaire – covering sales values and program usage – in an investigation or administrative review.[88]  In

---

[84] *See* Meisen Comments at 4 and 6.
[85] *Id*. at 5.
[86] *See* EBC Supplemental Questionnaire.
[87] Commerce issued the initial supplemental questionnaire for this program in this remand on May 19, 2022.  *Id*. Following an extension of the deadline for the EBC Supplemental Questionnaire, as well as a reissuance of the same questions for which Meisen did not provide a response, Meisen submitted its (incomplete) response to these questions on June 21, 2022.  *See* Meisen June 21, 2022 SQR.
[88] *See, e.g.*, Initial Questionnaire.

this remand, Meisen had ample opportunity to respond to Commerce's request, but elected not to provide a complete response.

Meisen asserts that it "did submit the complete loan template in its 2nd supplemental questionnaire response, which indicated that it did not have any relevant forms of loans or financing."[89] This is incorrect. Meisen's response consisted of a single row of a spreadsheet containing "N/A" in all cells.[90] This response, in which Meisen provided a conclusory response without the details on the outstanding lending, defeated the purpose of the questionnaire. The entire purpose of the request for information was to inform Commerce of the details and nature of the financing that the company received in order to be able to perform a verification of the information. Similarly, Meisen states that it "provided a description of the loans and interest expenses ... most of which relate to loans from shareholders or vehicle financing."[91] The fact that Meisen's loans are described or labeled in a certain way in the company's internal documentation does not end Commerce's inquiry, and that is why Commerce requested details and supporting documentation for the lending.[92] As explained in the underlying investigation, to confirm the accuracy of a company's response regarding the EBC program, Commerce would "select specific entries from the subledger and request to see underlying documentation, such as applications and loan agreements, in order to confirm the accuracy of the subledger details."[93]

---

[89] *See* Meisen Comments at 7.
[90] *See* Meisen June 21, 2022 SQR at Attachment 1.
[91] *See* Meisen Comments at 7.
[92] Even if Commerce was to accept Meisen's descriptions of the financing without any supporting documentation, certain items have ambiguous names from which the type of lending cannot reasonably be gleaned. *See* Memorandum, "BPI Addendum," dated concurrently with these final results of redetermination. These examples illustrate why company-determined accounting entry titles/labels for any given line items provide an insufficient basis to draw a conclusion about the nature of the financing. This ambiguity also demonstrates why Commerce requested supporting documentation, such as loan agreements, in its EBC Supplemental Questionnaire.
[93] *See Final Determination* IDM at 30.

That is precisely what Commerce attempted to do here.  Meisen's response deprived Commerce of the ability to conduct such an analysis.

Throughout its comments, Meisen attempts to invert Commerce's requirement for verifiable data, contending that Commerce "fails to explain how any of the financing at issue could possibly be related to the Export Buyer's Credit Program."[94]  Commerce is not required to speculate about the nature or source of the funding.  Commerce attempted, pursuant to the Court's *Remand Order*, to verify non-use of the program.  Given the lack of information on the record, Commerce cannot do so here.  Similarly, to the extent that Meisen asks Commerce to "spot check" items at verification, the purpose of verification is to confirm the accuracy of information on the record, not to provide an additional opportunity to provide information that the party declined to provide during the course of the proceeding.[95]

Ancientree acknowledges that it was unable to provide responses for all customers but, nonetheless, asserts that it demonstrated partial non-use.[96]  As explained in the Draft Results, Commerce does not make findings of "partial non-use" for subsidy programs, except in limited circumstances that are inapplicable here.[97]  Moreover, Commerce does not rely on partial, potentially self-selected, information as a basis for finding non-use because doing so would contradict the completeness aspect that is so fundamental to any verification.[98]

Ancientree also asserts that the Court has rejected the application of AFA where a respondent is not in a position to induce cooperation of third parties who control the requested

---

[94] *See* Meisen Comments at 7.
[95] *See Hyundai Electric & Energy Systems Co., Ltd v. United States*, 466 F. Supp. 3d 1303, 1318 (n.22) (CIT 2020) ("The purpose of verification is to verify the accuracy and completeness of submitted factual information, 19 CFR 351.307(d), not collect new information." (Internal citations omitted)).
[96] *See* Ancientree Comments at 4-5.
[97] *See supra*, page 21.
[98] *See, e.g., Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, from the People's Republic of China:  Final Results and Partial Rescission of Countervailing Duty Administrative Review; 2019*, 87 FR 40491 (July 7, 2022), and accompanying IDM, at Comment 1.

information.[99]  The case cited by Ancientree, however, is distinguishable from this case.  In *Risen*, the Court determined that a cooperating respondent should not be penalized for the failure of unaffiliated suppliers to provide information to Commerce.[100]  Here, in contrast, the government respondent (*i.e.*, the GOC) failed to cooperate in this investigation and there continues to be a gap in the record, despite our attempts to collect additional information, in accordance with the *Remand Order*, from the non-government respondents to potentially overcome the deficiencies.  Thus, this is not a circumstance where otherwise cooperative respondents are being punished simply due to the failure of a third party.  As the U.S. Court of Appeals for the Federal Circuit has recognized, "{a}lthough it is unfortunate that cooperating respondents may be subject to collateral effects due to the adverse inferences applied when a government fails to respond to Commerce's questions, this result is not contrary to the statute or its purposes, nor is it inconsistent with this court's precedent."[101]

In conclusion, notwithstanding Commerce's reopening of the record, the responses provided by the respondents in this remand do not provide a basis to overcome the GOC's lack of cooperation with respect to the EBC program in the investigation.  Accordingly, Commerce has no grounds to depart from its initial finding regarding usage of the program.

## V.   FINAL RESULTS OF REDETERMINATION

For the reasons stated above, we continue to find that:  (1) there is a gap in the record and the application of AFA to the GOC for failure to provide necessary information on the EBC program is appropriate; and (2) despite Commerce's attempt to gather additional information in this remand in accordance with the *Remand Order*, the company respondents did not provide

---

[99] *See* Ancientree Comments at 9 (citing *Risen Energy Co. v. United States*, 477 F. Supp. 3d 1331, 1343-44 (CIT 2020) (*Risen*)).
[100] *Id.*
[101] *See Fine Furniture (Shanghai) Ltd. v. United States*, 748 F.3d 1365, 1373 (Fed. Cir. 2014).

31

non-use information that could permit verification and potentially overcome the GOC's reporting

failure.  Accordingly, we continue to apply an AFA rate for the EBC program to Ancientree and

Meisen, and the company rates remain unchanged from the investigation.

8/5/2022

X ~Elouaradia~

Signed by: ABDELALI ELOUARADIA

Abdelali Elouaradia
Deputy Assistant Secretary
 for Enforcement and Compliance