C-570-107
Remand
Slip Op. 23-57
POI:  01/01/2018 – 12/31/2018
**Public Version**
E&C/OV:  RG

### *Dalian Meisen Woodworking Co., Ltd. v. United States*, Court No. 20-00110, Slip Op. 23-57 (CIT April 20, 2023) Wooden Cabinets and Vanities and Components Thereof from the People's Republic of China

### FINAL RESULTS OF REDETERMINATION PURSUANT TO COURT REMAND

## I.     SUMMARY

The U.S. Department of Commerce (Commerce) has prepared these final results of redetermination pursuant to the remand opinion and order of the U.S. Court of International Trade (the Court) issued on April 20, 2023.[1]  These final results concern the final determination in the countervailing duty investigation of wooden cabinets and vanities and components thereof from the People's Republic of China (China).[2]  In its *Second Remand Order*, the Court sustained in part, and remanded in part,[3] Commerce's *First Remand Redetermination*.[4]  Although the Court upheld Commerce's application of facts otherwise available with an adverse inference (AFA) with respect to the Export Buyer's Credit Program (EBCP) as it related Dalian Meisen Woodworking Co., Ltd. (Meisen), the Court remanded Commerce's approach to the application

---

[1] *See Dalian Meisen Woodworking Co., Ltd. v. United States*, Court No. 20-00110, Slip Op. 23-57 (CIT Apr. 20, 2023) (*Second Remand Order*).

[2] *See Wooden Cabinets and Vanities and Components Thereof from the People's Republic of China:  Final Affirmative Countervailing Duty Determination*, 85 FR 11962 (February 28, 2020) (*Final Determination*), and accompanying Issues and Decision Memorandum (IDM).

[3] *See Second Remand Order* at 16.

[4] *See* Final Results of Redetermination Pursuant to Court Remand, *Dalian Meisen Woodworking Co., Ltd. v. United States*, Court No. 20-00110, Slip Op. 22-45 (CIT May 12, 2022), dated August 5, 2022 (*First Remand Redetermination*), available at https://access.trade.gov/resources/remands/22-45.pdf.

of AFA to The Ancientree Cabinet Co., Ltd. (Ancientree).[5]  The Court instructed Commerce to "attempt to verify Ancientree's submissions to the extent {Commerce} finds appropriate, and if that is successful, either accept the *pro rata* adjustment proposed by Ancientree or conclude that the {EBCP} was not used at all, and recalculate Ancientree's rate and the all-others rate accordingly."[6]

As detailed below, although Commerce attempted to verify non-use of the program for Ancientree, we were unable to successfully verify key information submitted by Ancientree regarding the purported non-use of the EBCP.  Accordingly, we continue to determine that there is a gap in the record resulting from the Government of China (GOC) withholding necessary information that was requested of it, and further determine that the information proffered by Ancientree and its customers has not filled that gap.  Therefore, we have made no revisions to the subsidy rates from the *Final Determination*.

## II.    BACKGROUND

In the *Final Determination*, Commerce determined, based on AFA, that respondents Ancientree and Meisen used and benefited from the EBCP because the GOC failed to adequately respond to Commerce's requests for information about the program.  Specifically, Commerce determined that the program was used, despite certifications from the respondents' U.S. customers claiming non-use,[7] because the GOC failed to provide:  (1) an adequate explanation of the operation of the program; (2) the 2013 Revisions to the administrative rules regulating the program, including information concerning the elimination of a two million dollar contract threshold between the respondents and their customers for participation in the EBCP; and (3) a

---

[5] *See Second Remand Order* at 16.
[6] *Id.*
[7] *See* Ancientree's Letter, "Section III Questionnaire Response," dated July 11, 2019 (Ancientree IQR), at Exhibit II-12; and Meisen's Letter, "Section III Questionnaire Response," dated July 11, 2019 (Meisen IQR), at Exhibit 14.

list of partner/correspondent banks that the GOC relies on as intermediaries in implementing the program.[8]  Commerce concluded that this information was necessary to verify the respondents' claims that neither they, nor their U.S. customers, had used or benefited from the EBCP.[9] Ancientree, Meisen, and U.S. importer Cabinets to Go, LLC challenged Commerce's finding, based on AFA, that Ancientree and Meisen received benefits under the EBCP.

On May 12, 2022, the Court remanded the *Final Determination* to Commerce, holding that "Commerce's finding that necessary information is missing from the record, such that there is a gap in the factual record that requires the use of 'facts otherwise available' under {section 776(a) of the Tariff Act of 1930, as amended (the Act)} is contrary to the statute and lacks the support of substantial evidence."[10]  The Court directed Commerce to "either (1) find a practical solution to verify the non-use information on the record, such as the reopening of the record to issue supplemental questionnaires to respondents and their U.S. customers; or (2) recalculate the countervailing duty rates for Meisen and Ancientree to exclude the subsidy rate for the {EBCP}, and recalculate the all-others rate accordingly."[11]

On May 19, 2022, in light of the *First Remand Order*, and in consideration of the fact that both respondents provided non-use certifications for all U.S. customers during the underlying investigation,[12] Commerce issued supplemental questionnaires to both respondents regarding their customers' non-use claims.[13]  In June 2022, the respondents submitted

---

[8] *See Final Determination* IDM at 24-29.
[9] *Id.* at 35.
[10] *See Dalian Meisen Woodworking Co., Ltd. v. United States*, Court No. 20-00110, Slip Op. 22-45 (CIT May 12, 2022) (*First Remand Order*), at 18.
[11] *Id.* at 21.
[12] *See* Ancientree IQR at Exhibit II-12; *see also* Meisen IQR at Exhibit 14.
[13] *See* Commerce's Letters, "Export Buyer's Credit Supplemental Questionnaire," both dated May 19, 2022 (EBCP Supplemental Questionnaire).

questionnaire responses.[14]  Subsequently, Commerce issued a second supplemental questionnaire to Meisen.[15]  Meisen responded on June 21, 2022.[16]

On August 5, 2022, Commerce issued the *First Remand Redetermination*.[17]  We continued to find that the respondents used and benefited from the EBCP during the period of investigation (POI), January 1, 2018, through December 31, 2018.  Specifically, we found that Meisen failed to provide the requested loan information for its customers, despite multiple requests, and we determined that Ancientree failed to provide such information for numerous customers.[18]  Therefore, notwithstanding Commerce's reopening of the record, the responses provided by the respondents did not provide a basis to overcome the GOC's lack of cooperation with respect to the EBCP in the investigation.[19]  Accordingly, Commerce determined that it had no grounds to depart from its initial finding regarding the program.

On April 20, 2023, the Court issued the *Second Remand Order*, sustaining in part, and remanding in part,[20] Commerce's *First Remand Redetermination*.  The Court observed that Ancientree and Meisen complied to different degrees with Commerce's information requests, *i.e.*, the supplemental EBCP questionnaires issued in the remand proceeding.[21]  Meisen unilaterally determined that much of the requested information was irrelevant and failed to provide complete/verifiable information; accordingly, the Court found that the continued application of AFA was appropriate with respect to the company.[22]  However, the Court found

---

[14] *See* Meisen's Letter, "Export Buyer's Credit Supplemental Questionnaire Response," dated June 10, 2022; and Ancientree's Letter, "Export Buyer's Credit Supplemental Questionnaire Response," dated June 13, 2022 (Ancientree June 13, 2022 SQR).
[15] *See* Commerce's Letter, "2nd Export Buyer's Credit Supplemental Questionnaire," dated June 15, 2022.
[16] *See* Meisen's Letter, "2nd Export Buyers Credit Supplemental Questionnaire Response," dated June 21, 2022.
[17] *See First Remand Redetermination* at 30-31.
[18] *Id*.
[19] *Id*.
[20] *See Second Remand Order* at 16.
[21] *Id*. at 11.
[22] *Id*. at 11-12.

that Ancientree "provided complete loan information for more than half of its U.S. customers {… including} its largest customers, representing approximately 90% of its U.S. sales (by volume and by value) during the {POI}."[23]  In light of these facts, the Court directed Commerce to "attempt to verify Ancientree's submissions to the extent {Commerce} finds appropriate, and if that is successful, either accept the *pro rata* adjustment proposed by Ancientree or conclude that the {EBCP} was not used at all, and recalculate Ancientree's rate and the all-others rate accordingly."[24]

## III.   ANALYSIS

Consistent with the *Second Remand Order*, Commerce attempted to verify Ancientree's submissions, but was unable to successfully verify significant portions of the non-use information provided by Ancientree on behalf of its U.S. customers.  Accordingly, we continue to find that application of AFA based on the GOC's noncooperation is warranted, and that Ancientree used the EBCP during the POI.

As Commerce has noted in the past, it cannot verify non-usage of the EBCP by only examining a portion of a respondent's importers/customers, because doing so would provide the respondent with an opportunity to evade Commerce's scrutiny by providing responses only from importers/customers that have not used the EBCP.  Nonetheless, we recognize that the Court, in the *Second Remand Order*, found that the record contained evidence indicating that "more than half of {Ancientree's} U.S. customers" which represented "approximately 90% of its U.S. sales (by volume and by value) during the {POI}" did not use the EBCP.[25]  Commerce attempted verification of such information pursuant to the Court's *Second Remand Order*.  As a result of

---

[23] *Id*. at 11.
[24] *Id*. at 16.
[25] *Id*. at 11-12.

this process, however, Commerce was unable to successfully verify that "the *pro rata* adjustment proposed by Ancientree" was accurate.  Instead, as detailed further below, we found that significant portions of the reported information were either inaccurate or unverifiable.  Therefore, Commerce finds that the information on the record is insufficient to compensate for the deficiencies that stem from the GOC's withholding of necessary information.

At the outset, we note that – of Ancientree's 27 U.S. customers – 12 provided no response to Commerce's EBCP questionnaire when we reopened the record on remand.[26]  Further, while two additional customers (herein referred to as "Customer N" and "Customer M")[27] nominally provided information, these submissions were plainly unresponsive and did not provide any of the requested data relating to the customers' POI financing.  Specifically, Customer N's response summarily stated that:  "{t}he pre-acquisition, legacy financial records of Customer N are disorganized" and "{i}t would take company personnel significant time and effort to try to locate and decipher 2018 {POI} financial records … if they even exist."[28]  With respect to Customer M, Ancientree stated that "we are omitting Customer M's narrative and related exhibit{s} because they are not finalized."  Thus, Customers M and N did not provide complete or verifiable non-use information, and – before the verification process even began – less than half of Ancientree's customers provided a response to Commerce's EBCP questionnaire.[29]

---

[26] *See* Ancientree June 13, 2022 SQR at Exhibit 1.
[27] Customers are referenced herein with letters.  These are public name designations, and a concordance is contained in Exhibit 1 of Ancientree's June 13, 2022 SQR.
[28] *Id*. at Exhibit 15.
[29] *Id*. at Exhibit 14.  We acknowledge that these customers technically provided a communication to Ancientree (and were identified as "Response (Y/N)" = "Yes" in Ancientree's June 13, 2022 SQR at Exhibit 1).  We assume that the Court included these communications in its figures when stating that the record contained information for "over half" of Ancientree's customers.

Three of the remaining 13 customers would not agree to verification.  Customers F and G stated that they would not participate in Commerce's verification process prior to any verification arrangements being made.[30]  Customer H initially consented to verification but, two days prior to the scheduled start date, stated that it would no longer be participating.[31]

Of the 10 remaining customers, we were unable to verify non-use for two companies (Customer B and Customer E).  With respect to Customer B, Commerce officials arrived at the customer's location on September 18, 2023, and began examining the items set forth in the verification agenda that was circulated to Ancientree and the customer in advance.[32]  During the on-site verification process, a company official asked the Commerce team to step out of the conference room.  At that time, a company official entered the verification room and took several key documents that Commerce officials had collected as exhibits.  The company representative stated that Customer B would no longer be providing the information.[33]  The verification process was halted at this time.[34]

Customer E did permit Commerce officials to conduct the verification process.[35] However, during the verification procedure, Customer E failed to provide crucial documentation that was requested prior to verification.[36]  Specifically, Customer E did not provide the underlying loan agreement(s) and/or application(s) relating to the line of credit that was outstanding during the POI; this represents the type of documentation that would permit

---

[30] See Memorandum, "Correspondence Regarding EBCP Verification," dated November 9, 2023 (containing emails between Commerce officials and counsel for Ancientree).
[31] Id.
[32] See Verification Report, "Export Buyer's Credit Program Questionnaire Response Verification (Customer B)," dated October 12, 2023, at 1.
[33] Id. at 4.
[34] Id.
[35] See Verification Report, "Export Buyer's Credit Program Questionnaire Response Verification (Customer E)," dated November 6, 2023 (Customer E Verification Report), at 1.
[36] Id. at 4.

Commerce officials to analyze the basis for the loan(s) and any restrictions or requirements relating to the lending.[37]  Such information was requested in Commerce's EBCP Supplemental Questionnaire.[38]  Customer E provided "Change in Terms" agreements for the credit facility, which operated to extend the duration of the loan, but it did not provide the underlying loan documentation itself.[39]  This is significant, because the "Change in Terms" agreements incorporate by reference the underlying [     ] loan documentation.  For instance, they reference the terms set forth in an underlying [

                                                                              ].  Similarly, Customer E's numerous draw requests under the [                    ] reference the underlying documents, noting that such requests are made [

                                                            ].[40]  These documents were necessary for Commerce's analysis.  Accordingly, in the verification agenda issued prior to the on-site verification process, we identified the loan agreement and application as key documentary support for Customer E's reporting.[41]  Nonetheless, these documents were not provided at verification, restricting Commerce's ability to examine the company's usage of the EBCP.[42]

---

[37] *Id.*
[38] *See* EBCP Supplemental Questionnaire at 4 ("Provide translated copies of your U.S. importers'/customers' applications for assistance, any documentation from the lender that describes the loan or credit facility and/or requirements for approval, and the approval document received.").
[39] *See* Ancientree June 13, 2022 SQR at Exhibit 6.4.
[40] *Id.* at Exhibit 6.5.
[41] *See* Commerce's Letter, "Export Buyer's Credit Program Questionnaire Response; Verification," dated September 19, 2023, at 5-6 ("Commerce will … {e}xamine the application, lending agreement, and proof of payment (*i.e.*, bank statements) for the following pre-selected financing.").
[42] *See* Customer E Verification Report at 4.

After accounting for the difficulties identified above, we were unable to verify non-use of the EBCP for more than 70 percent of Ancientree's customers.  Further, while we found no explicit usage of the program for the remaining eight customers during the POI, these eight customers accounted for far less than Ancientree's claim of  "approximately 90 {percent}" of POI sales."[43]  Given that a clear majority of the customers that provided certifications of non-use in this proceeding declined, or otherwise were unable, to support such certifications with verifiable information, we do not find that this level of completeness is sufficient to overcome the GOC's non-cooperation, and to permit a finding of non-use here.

Commerce continues to emphasize that it is not applying AFA to Ancientree *as a result of the failure to cooperate by its customers or importers*.  Rather, we are considering whether a respondent provided complete information to "fill the gaps" which stem from the GOC's failure to cooperate, for which Commerce is applying AFA.  Therefore, whether Ancientree was cooperative in its attempts to procure information from its importers/customers is irrelevant; rather, the relevant question is whether the information on the record is sufficient to establish that all of Ancientree's customers, and, therefore, Ancientree, did not use the EBCP during the POI. We find that it is not.

With respect to calculating a *pro rata* adjustment for Ancientree regarding the EBCP, upon remand, the Court ordered that Commerce could elect to attempt verification of Ancientree's submissions and "if that is successful" should accept the *pro rata* adjustment

---

[43] We note that the customer-specific quantity and value figures that Ancientree provided in support of its proposed *pro rata* adjustment remain largely unverified.  Although Commerce verified Ancientree's overall sales figures as part of the underlying investigation, it did not – and had no reason to – verify such figures on a customer-specific basis.  *See* Verification Report, "Verification of the Questionnaire Responses of The Ancientree Cabinet Co., Ltd.," dated January 7, 2020, at 3-4.  During our verification of Ancientree's customers, we examined the quantity/value of acquisitions from Ancientree.  In some cases, the customer's reporting approximated the Ancientree figures; in others, the figures were not close to those reported by Ancientree.  *See, e.g.*, Verification Report, "Export Buyer's Credit Program Questionnaire Response Verification (Customer J)," dated August 29, 2023, at 1.

proposed by Ancientree or conclude that the EBCP was not used at all.[44]  As detailed above, over 70 percent of Ancientree's customers – which accounted for a significant percentage[45] of Ancientree's U.S. sales during the POI, by volume – declined or otherwise failed to be fully verified.  Thus, Commerce concludes that verification of Ancientree's submissions was not successful within the meaning of the Court's instructions and it is, therefore, not necessary or appropriate to apply a *pro rata* adjustment as sought by Ancientree or to conclude that Ancientree did not use the EBCP.

## IV.    INTERESTED PARTY COMMENTS

On November 9, 2023, we issued the Draft Results and provided interested parties an opportunity to comment.[46]  The petitioner[47] and Ancientree provided comments on the Draft Results.[48]  We address these comments below.

*Petitioner's Comments*[49]

- Commerce should make no changes to the Draft Results and should continue to apply total AFA for the EBCP for Ancientree.  Although Commerce attempted to verify non-use of the program for Ancientree, it was unable to successfully verify key information submitted by Ancientree regarding the purported non-use of the EBCP.  Thus, the information on the record remains insufficient to compensate for the deficiencies that stem from the GOC's withholding of necessary information.

---

[44] *See Second Remand Order* at 16.
[45] As noted above, this specific figure has not been verified.
[46] *See* Draft Results of Redetermination Pursuant to Court Remand, *Dalian Meisen Woodworking Co., Ltd. v. United States*, Court No. 20-00110, Slip Op. 23-57 (CIT April 20, 2023), issued November 9, 2023 (Draft Results).
[47] The petitioner is the American Kitchen Cabinet Alliance.
[48] *See* Petitioner's Letter, "Comments on Draft Redetermination," dated November 16, 2023 (Petitioner Comments); and Ancientree's Letter, "Comment on Draft Second Remand Determination," dated November 16, 2023 (Ancientree Comments).
[49] *See* Petitioner Comments at 2-4.

- From the outset, only 13 of Ancientree's 27 customers actually provided responses to Commerce's requests for information relating to potential use of the EBCP that would permit verification. The other 14 refused to cooperate altogether or provided an unusable response. Three of the remaining 13 customers refused verification. The information submitted by two additional customers could not be successfully verified. Thus, Commerce was unable to verify non-use of the EBCP for more than 70 percent of Ancientree's customers.

- Commerce fully complied with the *Second Remand Order*. The Draft Results are supported by substantial evidence and otherwise in accordance with law. Accordingly, Commerce should make no changes to its analysis in the final results of redetermination.

*Ancientree's Comments*[50]

- On this second remand, while Commerce did proceed with verification as contemplated by the Court, its approach was far from "a practical solution to verify the non-use."[51] Commerce used the same rationale presented in the earlier remand and investigation, finding that Ancientree had not perfectly filled the gap in the record and, thus, it was appropriate to apply an AFA plug rate, in its entirety, for this program. This approach is contrary to law and the Court's remand instructions.

- Commerce's requests for information in these remand proceedings were very burdensome, asking completely unaffiliated companies to provide highly confidential information on all loans/financing outstanding during the POI (including supporting documentation on the loans, financial statements, and charts of accounts). Commerce

---

[50] *See* Ancientree Comments at 4-14.
[51] *Id*. at 4 (citing *First Remand Order* at 21).

requested this information from the customers five years after the customers had conducted the relevant business with Ancientree in 2018.

- In this remand, Commerce took the unprecedented step of attempting to verify every customer that responded to Commerce's questionnaire (*i.e.*, 13). On-site verification and extensive document requests are burdensome and, ultimately, four customers refused verification either prior to, or during, Commerce's examination. However, Commerce should consider the size of Ancientree's customers and/or their current level of business with Ancientree in analyzing their respective non-participation during the verification process.

  o Customer H explained that it would not be feasible for its staff to conduct the verification given its ongoing workload and business interests.

  o Customer B had proceeded with the verification with no counsel and, thus, did not understand the procedure until it was underway -- at that time it decided that the verification procedures were not acceptable.

  o Commerce's characterization of the Customer E verification as not successful was unwarranted. Customer E explained why it no longer had access to certain loan documentation, and it provided all the information it could, including the Change in Terms documentation for the lending in question. Commerce may have wished for more complete information to verify the financing, but the information it did obtain from the company was consistent with finding non-use of the EBCP.

- Despite making on-site visits to nine companies, Commerce found no evidence of usage of the EBCP. The record, therefore, does not support finding usage of the program. Each of the cooperating customers' responses and verifications is corroborating evidence of all

of the customers' declarations that they did not benefit from the EBCP.  Further, in the original investigation, the GOC corroborated Ancientree's and its customers' non-use by searching the customers' names in China Ex-Im Bank's loan database.

- Ancientree exercised maximum effort to obtain cooperation from its unaffiliated customers during these remand proceedings, and the responses of the majority of its customers reflect these efforts.  Although Commerce asserts that it is applying AFA to the GOC, it is actually applying AFA to Ancientree, a cooperating party, and Commerce should seek to avoid such an impact if relevant information exists elsewhere on the record.[52]  Consistent with *Risen v. United States*, Ancientree's level of cooperation must also be considered in light of the particular facts of this case; here, Commerce is requesting that unaffiliated customers allow Commerce to verify information in their books and records.[53]

- Commerce's approach in this remand incorrectly presumed that a "successful" verification (within the meaning of the Court's remand instructions) must cover all customers.[54]  The fact that the Court proposed a *pro rata* adjustment at all demonstrates that perfect cooperation was not required.

- Commerce's reasoning, *i.e.*, that it needed full cooperation to apply a *pro rata* rate, is illogical.  Each customer's use of the EBCP stands alone.  As such, a *pro rata* adjustment based on the POI sales of the customer is reasonable.

    o  In this regard, Commerce also attempts to undermine the reliability of the quantity and value figures that Ancientree provided, and it notes that they remain largely

---

[52] *Id*. at 10-11 (citing *First Remand Order* at 13) (internal citations omitted).
[53] *Id*. at 11 (citing *Risen v. United States*, Court No. 20-03912, Slip Op. 23-48 (CIT April 11, 2023) (*Risen v. United States*), at 11).
[54] *Id*. at 12 (quoting *Second Remand Order* at 16).

unverified.  They only remain unverified because Commerce elected not to verify this information.

   o  With respect to discrepancies within those data, Ancientree provided the individual customer breakdown based on its own accounting records, whereas the customers would have used their own entry and accounting information.  As a result, some differences across figures are reasonable and expected due to the timing difference between the exporter's booking dates and the importer's entry dates.  Indeed, the only customer that had a large difference in its reported sales figures was Customer J, which was a very small customer.

• If Commerce declines to *pro rate* the AFA rate, Commerce could set up customer-specific rates for the case, with no EBCP subsidy rate included in the rate assigned to the customers that were successfully verified for non-use.

• Commerce must follow the Court's instructions and find that either Ancientree did not benefit from the EBCP or apply a *pro rata* adjustment (or customer-specific rates) reflecting non-use of the EBCP.

**Commerce's Position**:  As explained above, Commerce attempted to verify the purported non-use information provided by Ancientree on remand, which was an avenue explicitly contemplated by the Court.  Nonetheless, we were unable to successfully verify significant portions of the information.  Accordingly, we continue to find that application of AFA based on the GOC's noncooperation is warranted and that Ancientree used the EBCP during the POI.

At the outset, we note that the evidentiary gap present here is now over twice as large as it was in the *First Remand Redetermination*, where the gap accounted for an estimated 10 percent of Ancientree's sales.  Commerce concludes that these facts undermine a finding of non-

use for the EBCP.  Although Ancientree argues that the record contains sufficient evidence to support an overall finding of non-use for the EBCP, we disagree.

First, Ancientree claims that it need not "perfectly" fill the gap in the record and asserts that Commerce's requests for information were very burdensome.[55]  Whether Ancientree must flawlessly fill the gap created by GOC noncooperation is not at issue in this remand, because the gap here is substantial.  The majority of Ancientree's customers did not respond to Commerce's questionnaire on remand, and several other companies provided responses without permitting them to be verified or which contained unverifiable information.  Under section 782(e)(2) of the Act, Commerce is not required to rely on information which cannot be verified.  Thus, contrary to Ancientree's claims, the record does not support a finding that Ancientree and all its customers did not use this program during the POI.

Further, we disagree with Ancientree's characterization that the information we solicited on remand was excessively burdensome.  As we noted in the *First Remand Redetermination*, Commerce has refined its EBCP practice to permit respondents/customers to provide gap-filling information to overcome the GOC's failure to provide necessary information.  Accordingly, we began issuing EBCP-specific questionnaires for this purpose.[56]  We adhered to that practice here, and we issued our standard set of EBCP questions to permit meaningful analysis and verification of whether customers/importers benefitted from the EBCP.  Although Ancientree suggests that the information requests were "very burdensome" and required the presentation of "highly confidential" information, the Court has permitted – and affirmed – this approach in broad terms, including within the context of this proceeding.  In the *Second Remand Order*, for instance, the

---

[55] *See* Ancientree Comments at 4 and 6.
[56] *See First Remand Redetermination* at 13-15.

Court determined that Meisen failed to properly respond to the EBCP questionnaire on behalf of its customers, and this failure warranted the continued application of AFA for the program.[57]

With respect to the confidentiality of such information, there was nothing unusual regarding the proprietary nature of the information requested here—financial statements, accounting records, and supporting documentation (*e.g.*, loan agreements) reflect the type of documentation that is routinely requested by Commerce in its administrative proceedings. Further, Commerce permitted information submitted during the course of this remand to be (and often was) designated as business proprietary information, only to be viewed by individuals with access to such information under a properly-drawn administrative protective order. Commerce routinely relies on such measures to protect information and facilitate participation in its proceedings.

Ancientree also claims that Commerce should consider the size of Ancientree's customers and/or their current level of business with Ancientree in assessing their non-participation during the verification process. In this regard, we emphasize that Commerce was flexible with respect to scheduling verification and reached out to Ancientree's counsel to arrange for verification at times that were mutually convenient for Commerce, the customer, and counsel (where applicable). Moreover, Ancientree's arguments regarding the purported burden of verification are misplaced. We provided a short, targeted verification agenda in advance of the onsite verification procedures to Ancientree and/or directly to the customers. The agenda covered two sections: (1) "General Issues", which related to (i) minor corrections to be

---

[57] *See Second Remand Order* at 11-12 ("Meisen failed to provide the information Commerce asked for in the form and manner requested. ... Moreover, instead of providing the information Commerce asked for, which Meisen believed was irrelevant to its U.S. customers (all of which were affiliates), it provided other information. After Commerce sent Meisen a supplemental questionnaire again asking the company to use the loan template, Meisen indicated, in the template, that the information requested in each of the line items was "not applicable.").

submitted by the customer (if any), (ii) an accounting system overview from the company, and (iii) an explanation of the company's sales process and POI sales figures; and (2) the EBCP-specific section, which covered (i) loan documentation and (ii) certain reconciliations of loan payments to supporting documents, *i.e.*, to ensure that the company fully reported all outstanding lending.  The agenda that Commerce provided to the very first customer scheduled for verification was unchanged in substance for each of the ensuing verifications.[58]  Moreover, where verification was permitted, Commerce completed the verification procedures in less than a day and a half, and in many cases in a single day.  Finally, while Ancientree notes that the investigation took place five years ago, Ancientree and its customers should have been aware that key records must be maintained, given that Ancientree itself challenged Commerce's determination regarding the EBCP.  In this regard, we also note that Commerce reopened the record on May 19, 2022, to issue its EBCP Supplemental Questionnaire soliciting loan information and, therefore, Ancientree and each of its customers knew, for over a year, not only the type of documentation that Commerce would request for its analysis but also that this documentation was subject to verification.

Commerce's solicitation of information on remand regarding the EBCP was done to afford participants an opportunity to provide information that is missing from the record due to the non-cooperation of a mandatory respondent in such proceedings (*i.e.*, the GOC).  To this end, we need substantially complete information to be able to proceed with verification in a meaningful way, and we cannot simply accept assertions that the submitter refuses to support with documentation and/or verification.

---

[58] *Compare* Commerce's Letter, "Export Buyer's Credit Program Questionnaire Response; Verification," dated July 13, 2023, *with* Commerce's Letter, "Export Buyer's Credit Program Questionnaire Response; Verification," dated September 19, 2023.

It is irrelevant that Ancientree exerted maximum effort to acquire the requested information from its customers or to have the customers agree to verification of such certifications. Ancientree submitted these certifications of non-use on its own without any prompting from Commerce,[59] fully knowing that they could be subject to verification. Indeed, the "General Instructions and Information" section of Commerce's CVD Questionnaire notified Ancientree that all of its submitted information is subject to verification, and that submitted information which Commerce is not able to verify may impact Commerce's findings and determinations.[60] Commerce did not require Ancientree to provide non-use certifications from its customers; Ancientree voluntarily provided these certifications in an attempt to fill the gaps caused by the GOC's non-cooperation. To the extent that Ancientree contends that it cannot compel certain customers to provide verifiable information, we emphasize that Ancientree's true concerns lie with the GOC (for not providing information requested by Commerce), and not with its customers. We reiterate that, contrary to Ancientree's assertion,[61] Commerce is not applying AFA to Ancientree as a result of the failure to cooperate by its customers or importers. Rather, Commerce considered whether Ancientree provided complete information to "fill the gaps" stemming from the GOC's failure to cooperate, for which Commerce is applying AFA, and we determined that it did not.

Ancientree emphasizes that every customer provided a non-use certification and states that "nothing on this record has undermined the reliability of these certifications … all additional information on the record has only corroborated these certifications."[62] However, that is an

---

[59] *See* Ancientree IQR at Exhibit II-12.
[60] *See, e.g.*, Commerce's Letter, "Countervailing Duty Questionnaire," dated May 31, 2019 (CVD Questionnaire), at Section I (page 10).
[61] *See* Ancientree Comments at 10.
[62] *Id*. at 7.

unsupported conclusion to draw from the facts on this record, given that the majority of

Ancientree's customers failed to support their non-use certifications with a questionnaire

response and even more companies failed to permit Commerce to verify their submissions.  It is

not in dispute that, of Ancientree's 27 U.S. customers, 14 provided no response to Commerce's

EBCP questions (or provided a wholly cursory/unusable response) when we reopened the record

on remand.  Of the 13 remaining companies, three refused verification (*i.e.*, Customers F, G, and

H).  One customer (Customer B) plainly interfered with Commerce's verification process and

stopped cooperating in the middle of the procedures.  And one customer (Customer E) failed to

substantiate its non-use claim with supporting documentation.  With respect to this latter

customer, we disagree with Ancientree that the information Commerce obtained from the

company was sufficient to demonstrate non-use.[63]  As noted above, Commerce requested the

underlying loan agreement, which governed the lending in question, in its initial EBCP

Supplemental Questionnaire.[64]  Despite the fact that Customer E did not supply this document,

we afforded the company another opportunity to provide the agreement at verification, after

flagging in advance the document as one of the essential documents to be reviewed during our

on-site procedures.[65]  Customer E again did not provide the agreement, and the documents that it

proffered as alternatives were insufficient to demonstrate the purpose of the loan, the parties/co-

parties to the loan, and any conditions imposed on funds received pursuant to the lending in

---

[63] *Id*. at 9-10.
[64] *See* EBCP Supplemental Questionnaire at 4 ("Provide translated copies of your U.S. importers'/customers' applications for assistance, any documentation from the lender that describes the loan or credit facility and/or requirements for approval, and the approval document received.").
[65] *See* Commerce's Letter, "Export Buyer's Credit Program Questionnaire Response; Verification," dated September 19, 2023, at 5-6 ("Commerce will … {e}xamine the application, lending agreement, and proof of payment (*i.e.*, bank statements) for the following pre-selected financing.").

question.[66]  Without such information, we were unable to confirm whether the lending was related to the EBCP.

Ancientree argues that, because Commerce found no evidence of usage of the EBCP at verification, the record does not support finding usage of the program.  However, as noted above, we were unable to verify non-use of the EBCP for more than 70 percent of Ancientree's customers because a majority of the customers that provided certifications of non-use declined, or otherwise were unable, to support such certifications with verifiable information.  Thus, we do not find that this level of completeness is sufficient to overcome the GOC's non-cooperation, and to permit a finding of non-use here.

Ancientree also asserts that the GOC corroborated Ancientree's and its customers' non-use by searching the customers' names in China Ex-Im Bank's records.[67]  However, the GOC's claim was simply made in a submission to Commerce, unaccompanied by supporting information; given that the GOC response was inadequate (especially as it related to the EBCP), Commerce did not conduct a verification of the GOC's response in the investigation.  The GOC failed to comply with Commerce's request for information about the EBCP and, thus, its EBCP response was not verifiable.[68]  Thus, again, the record lacks the verified (or verifiable) information to fill the gap created by the GOC in the investigation.

---

[66] At the verification, a company official stated that the lending was related to "purchasing materials for the company's inventory such as countertops and cabinets" and further stated that the administering bank did not impose restrictions on the use of the proceeds.  *See* Customer E Verification Report at 5.  We requested the underlying loan agreement(s) and/or application(s) to verify this assertion; these documents were identified in the verification agenda and were also requested over a year prior in our EBCP Supplemental Questionnaire.  Customer E, however, only provided "Change in Terms" agreements, which operated to extend the duration of the lending, but did not provide the underlying loan agreement documentation (which we would examine to ascertain any conditions imposed regarding the purchases made with the funds and/or associated financing sources).  This was especially significant here, because, as noted above, the "Change in Terms" agreements explicitly incorporated by reference the underlying agreement.

[67] *See* GOC's Letter, "First Supplemental Questionnaire Response," dated July 24, 2019.

[68] *See, e.g.*, *Certain Lined Paper Products from India:  Final Results of Countervailing Duty Administrative Review; 2016*, 84 FR 23765 (May 23, 2019), and accompanying IDM at Comment 2 ("Furthermore, we disagree that

We also disagree with Ancientree's alternative arguments that:  (1) Commerce should apply a *pro rata* program rate for the EBCP or apply AFA only to non-responsive customer imports (by setting up customer-specific rates), because each customer's use of the EBCP stands alone; and (2) Commerce misunderstood the Court's instructions by failing to pro rate the final program rate.  The Court's directions to Commerce were very clear:  on remand, Commerce should attempt to verify Ancientree's submissions to the extent Commerce finds appropriate -- *and if that is successful* -- Commerce should either accept the *pro rata* adjustment sought by Ancientree or conclude that the EBCP was not used at all.  A plain reading of the Court's instructions shows that Commerce was accorded discretion in defining what would be a "successful" verification of Ancientree's submissions.  As described above, over 70 percent of Ancientree's customers that provided certifications of non-use, and that accounted for a significant percentage of Ancientree's U.S. sales during the POI, by volume, declined, or otherwise were unable, to support such certifications with verifiable information.[69]  Thus, we do not consider that the verification process in this case was successful under the circumstances.

## V.    FINAL RESULTS OF REDETERMINATION

For the reasons stated above, we continue to find that:  (1) there is a gap in the record that Ancientree has been unable to fill with verifiable information, and the application of AFA to the GOC for failure to provide necessary information on the EBCP is appropriate; and (2) despite Commerce's attempt to gather information following the *First Remand Order*, and our subsequent attempt to verify necessary information following the *Second Remand Order*, the record does not contain non-use information that overcomes the GOC's reporting failure.

---

Commerce is precluded from applying AFA to the GOI because of Commerce's decision not to conduct verification in this review.  Put simply, the GOI failed to respond to our questions regarding the programs at issue…").

[69] Additionally, as discussed above, Commerce was unable to verify the sales figures that form the basis of the pro rating sought by Ancientree.

Accordingly, we continue to apply an AFA rate for the EBCP in calculating a subsidy rate for Ancientree, and the company's rate remains unchanged from that calculated in the underlying investigation.

12/6/2023

X _____

Signed by: ABDELALI ELOUARADIA

Abdelali Elouaradia
Deputy Assistant Secretary
 for Enforcement and Compliance