PUBLIC VERSION

## UNITED STATES COURT OF INTERNATIONAL TRADE

**BEFORE: The Honorable Richard K. Eaton, Senior Judge**

_____

|  |  |  |
|---|---|---|
| DALIAN MEISEN WOODWORKING CO., LTD., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | PUBLIC VERSION |
| and | ) | |
| | ) | Ct No. 20-00110 |
| CABINETS TO GO, LLC, and | ) | |
| THE ANCIENTREE CABINET CO., LTD. | ) | |
| | ) | |
| Plaintiff-Intervenors | ) | |
| v. | ) | |
| | ) | |
| UNITED STATES, | ) | |
| Defendant, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| AMERICAN KITCHEN CABINET ALLIANCE, | ) | |
| | ) | |
| Defendant-Intervenor. | ) | |

_____

### PLAINTIFF-INTERVENOR THE ANCIENTREE CABINET CO., LTD.'s REMAND COMMENTS

Gregory S. Menegaz
J. Kevin Horgan
Alexandra H. Salzman
**DeKieffer & Horgan, PLLC**
Suite 1101
1156 Fifteenth Street N.W.  20005
Tel: (202) 783-6900
email:  gmenegaz@dhlaw.com
_Counsel to The Ancientree Cabinet Co., Ltd._

Dated: January 5, 2024

PUBLIC VERSION

**TABLE OF CONTENTS**

I.      Background ................................................................................................2

II.     The Record in its Entirety Does Not Support a Finding of Use of the EBC
        program .....................................................................................................5

III.    The Department Continues to Refuse to Examine the Information on the
        Record .....................................................................................................14

IV.     Conclusion and Request to Directed Remand Results ...........................16

PUBLIC VERSION

## TABLE OF AUTHORITIES

**Cases**

*ABB, Inc. v. United States*, 273 F. Supp. 3d 1186 (Ct. Int'l Trade 2017).....................................18

*Archer Daniels Midland Co. v. United States* 917 F. Supp. 2d 1331 (2013) ...............................13

*Changzhou Hawd Flooring Co. v. United States*, 324 F. Supp. 3d 1317 (Ct Int'l Trade 2018)....17

*Changzhou Trina Solar Energy Co. v. United States*, 255 F. Supp. 3d 1312 (Ct. Int'l Trade 2017) ..........................................................................................................................................13

*Diamond Sawblades Mfrs. Coalition v. United States*, 986 F.3d 1351 (Fed. Cir. 2021)...............16

*Diamond Sawblades Manufacturers' Coalition v. United States*, 547 F. Supp. 3d 1323 (Ct Int'l Trade 2021) ......................................................................................................................16

*Lucent Techs., Inc. v. Gateway, Inc.*, 580 F.3d 1301 (Fed. Cir. 2009) ..........................................7

*Jilin Forest Indus. Jinqiao Flooring Grp. Co. v. United States*, 519 F. Supp. 3d 1224 (2021) ....13

*Risen Energy Co. v. United States*, 2023 Ct. Intl. Trade LEXIS 52 ...............................................13

*Risen Energy Co. v. United States*, 2023 Ct. Intl. Trade LEXIS 164 ................................. 9-10, 18

*Risen Energy Co. v. United States*, 2023 Ct. Intl. Trade LEXIS 149 .....................................10, 18

*Royal Thai Gov't v. United States*, 850 F. Supp. 44, 51 (Ct. Int'l Trade 1994)...........................18

*Yama Ribbons & Bows Co. v. United States*, 2023 Ct. Intl. Trade LEXIS 129.............................5

**Statute**

19 U.S.C. § 1677e(a)....................................................................................................................16

**Administrative Authorities**

*Wood Mouldings and Millwork Products From the People's Republic of China: Final Results and Partial Rescission of Countervailing Duty Administrative Review; 2020–2021*, 88 Fed. Reg. 62,319 (Sep. 11, 2023)................................................................................................................11

*Risen Energy Co. v. United States*, CIT 22-23, Draft Remand (December 12, 2023)..................10

PUBLIC VERSION

Plaintiff-intervenor The Anciertree Cabinet Co., Ltd. ("Anciertree") comments on the Department's Remand Results. *See* Remand Results (December 6, 2023); ECF 130; *see Dalian Meisen Woodworking Co., Ltd. v. United States*, Court No. 20-00110, Slip Op. 23-57 (CIT April 20, 2023). The CIT remanded one issue for the second time to the Department, finding that the Department's inclusion of an adverse facts available rate for the Export Buyer's Credit ("EBC") program when calculating individual countervailing duty rates for Anciertree is not supported by substantial evidence and is otherwise not in accordance with law. Slip Op. 23-57 at 15. In the first remand opinion, the Court, citing to the record information of non-use by the respondents' customers, ordered the Department to either "(1) find a practical solution to verify the non-use information on the record, such as the reopening of the record to issue supplemental questionnaires to respondents and their U.S. customers; or (2) recalculate the countervailing duty rates for Meisen and Anciertree to exclude the subsidy rate for the Export Buyer's Credit Program, and recalculate the all-others rate accordingly." Slip. Op. 22-24 at 21. In the second remand, after the Department did reopen the record and issued supplemental questionnaires but refused to verify this information, the Court ordered the Department to attempt verification and "if that is successful, either accept the *pro rata* adjustment proposed by Anciertree or conclude that the Export Buyer's Credit Program was not used at all, and recalculate Anciertree's rate and the all-others rate accordingly." Slip Op. 23-57 at 16.

On this second remand, while the Department did proceed with verification, its approach was far from "a practical solution to verify the non-use." Ultimately, the Department used the same excuse as the earlier remand and investigation that Anciertree had not *perfectly* filled the gap and thus it was appropriate to apply AFA for this program entirely as to all importers/export buyers. The Department continues to act contrary to law and the Court's remand instructions.

PUBLIC VERSION

The Court should order the Department to either find Ancientree did not benefit from the EBC rate or apply a pro rata adjustment to Ancientree's EBC rate.

## I.        Background

In the underling investigation, all of Ancientree's customers certified to non-use of the EBC program. The GOC provided corroborating evidence that Ancientree's customers did not benefit from this program, that Ancientree would have known if this program was being used, and that wooden cabinets are not the type of products contemplated by this program. Nonetheless, the Department found as AFA to GOC's failure to provide certain information, that Ancientree did benefit from this program. This appeal ensued.  In agreement with the substantial court precedent finding the Department's reasoning was not supported by the record, the Court remanded to the Department to verify non-use of the information on the record.

On the first remand, the Department issued a supplemental questionnaire on the EBC program.  The questionnaire requested information from the respondents' customers on all loans/financing outstanding during the POI, information on how the customers confirmed they did not receive export buyer's credits, and further questions on the EBC program if the customer did benefit.  The questionnaire was very burdensome, requesting completely unaffiliated companies to provide highly confidential information on not only whether they had loans or financing related to the EBC program, but to report all loans/financing outstanding during the POR including supporting documentation on the loans, non-public financial statements, and charts of accounts.  This is the type of information requested from respondents that are parties to a proceeding; but the Department requested this information from completely unaffiliated U.S. customers 5 years after they conducted the relevant business with Ancientree back in 2018, which itself was highly problematic and prejudicial.  Nonetheless, in full cooperation, Ancientree

PUBLIC VERSION

reached out to its customers and after several rounds of communication and discussions with Counsel at the various customers, was able to obtain cooperation and responses from customers covering approximately 90% of Ancientree's POI exports by quantity and by value.  *See* Ancientree Supp EBC Qre (June 13, 2022), Rem. CD6-15, Rem. PD14, at Exhibit 1.  Notably, this information only corroborated what Ancientree and its customers had maintained and certified to all along—non-use of the EBC program overall.

Nonetheless, in the first remand, the Department found because Ancientree could not provide answers from every single unaffiliated customer, that the Department could not verify non-use of the program and continued to apply the total AFA rate.  After considering the extent of information provided by the unaffiliated customers and Ancientree's cooperative actions to obtain this information, the Court remanded back to the Department ordering them to attempt verification.

On remand, the Department again took a completely unprecedented step and decided to verify every single unaffiliated customer of Ancientree that had sufficiently answered the EBC supplemental questionnaire—thirteen unaffiliates companies scattered across the United States.  Normally, the Department would verify a sample of the largest by volume or value.  The Department requested that Ancientree approach each of its customers, again from 5 years prior, and report back to the Department on availability for an in person verification at each unaffiliated customer lasting 1-2 days.  Ancientree and its Counsel spent significant time discussing this request with various staff or management at the unaffiliated customer companies from Viriginia to Hawaii, who could not comprehend why the United States government would be taking the resources to audit their small and relatively unsophisticated companies on a program that they had already not only certified they did not use, but also provided highly

confidential financial data in corroboration.  For these reasons and the amount of resources and time imposed on the customer by preparing and going through an in person verification, three of the customers did refuse verification and a fourth one withdrew during verification.

However, nine of the customers representing over 81% of the sales value of Ancientree during the POI did cooperate with the in person verifications.  Over the course of several months, the Department flew all over the United States to verify these customers, spending one to two days at each customer.  During the course of each verification, the Department found no shred of evidence whatsoever of the EBC program being used.

Nonetheless, the Department found that because some customers had refused verification, the verification was not successful and thus it did not need to consider the pro rata rate of the program as instructed by the Court.  After 3.5 years of litigation with multiple remands and 5 years after the actual POR, on this remand the Department has continued to do what it has done since the original investigation, and ignored the record evidence from the Customers.  In each remand, the Department has only taken the opportunity to try to justify its original decision rather than actually consider and comply with the Court's orders.  At each remand, the Department has made more unprecedented requests of these unaffiliated Customers, becoming more and more problematic given the ever lengthening gap in time from the review period. For some Customers, the commercial relationship with Ancientree was a distant memory.  The Department's remand is wholly unsupported by the record, Court precedent generally, and the specific remand orders of the Court.  Under these circumstances, Ancientree respectfully requests that this Court take more directed action on this remand and order the Department to either find Ancientree did not benefit from the EBC rate or apply a pro rata adjustment or company-specific EBC rate.

PUBLIC VERSION

## II.     The Record in its Entirety Does Not Support a Finding of Use of the EBC program.

Ancientree again reiterates that there is no information on this record to support any finding of the EBC program nor has there been any evidence in any review or investigation of any Order that this program has ever been used.   Every single one of Ancientree's U.S. customers provided signed certifications of non-use of the EBC program.  *See* Ancientree's Initial Section III Response at 27-28 & Ex. II-12 (July 11, 2019), PD495-496 CD189-190.  These certifications were from U.S. customers that signed to the accuracy of their statement in full understanding that the statement was before a U.S. government agency.  Further, nothing on this record has undermined the reliability of these certifications.  Rather, all additional information on the record has only corroborated these certifications.

As a threshold matter, the information on the record about the program demonstrates that these wooden cabinets sales could not meet the basic requirements of this program.  *Yama Ribbons & Bows Co. v. United States*, 2023 Ct. Intl. Trade LEXIS 129, *28-29 (discussing that even if there were internal guidance changes to the program that are not on the record, it is speculative to presume that the modifications would be so substantive as to remove the USD 2 million contract or change that the exporter would know if the program was used).  Further, in the original proceeding, the GOC corroborated Ancientree's and its customers' non-use by searching the customers' names in China Ex-Im Bank's loan database. GOC's Initial Questionnaire Response at 69-73 & Ex. EXPORT 1-3 (July 12, 2019), PD505-559.  Next, the information in the EBC supplemental questionnaires covering 90% of Ancientree's sales value corroborated non-use of the program.  The customers either had no loans/financing or no loans/financing that could possibly be connected to the EBC program or the purchase of subject merchandise at all.  *See* Ancientree EBC Qre, Rem. CD6-15, Rem. PD14.  These unaffiliated

customers provided in this supplemental questionnaire, not only further certification that they had never applied or benefitted from the EBC program, but also provided a list of all loans/financing outstanding in the POI and highly confidential corroborating information such as the chart of accounts, loan terms, financials, or tax returns.

Lastly, on this second remand, nine customers covering 81% of Ancientree's POI sales consented to a wholly unprecedented and highly sensitive verification.  The Department verified all loans and financing at each of these companies, queried their systems generally, and verified their sales process with Ancientree.  The Department reviewed an extensive amount of information at each of these companies, and found no evidence of use of the EBC program at each.  Each of the cooperating customers' responses and verifications is corroborating evidence of all of the customers' declarations that they did not benefit from the EBC program.  No evidence to the contrary is on the record.

While some customers ultimately declined verification, the circumstances of the verification must be considered.  As explained above, the Department's verification request was very expansive and onerous.  These are not large companies, and as evidenced by the sales values, did not necessarily have a significant amount of monetary interest in the case.  In the case of the customers that declined to verify, the fact that they are no longer importing from Ancientree was also a key consideration in weighing the effort and highly confidential nature of the Department's verification and the benefit to the company.  One company in particular explained that they are a small company with staff shortages and no longer purchases from Ancientree.  *See* Customer H Letter, 2nd Rem. CD7 2nd Rem. PD9.  The customer explained the difficulty in accessing any information from 2018 and that the people involved in purchasing from Ancientree no longer even work with the company.  Customer H explained it would not be

feasible for their staff to conduct the verification given their work load and interests.  *Id*.  These difficulties were echoed by all of the customers in communicating with Ancientree's Counsel over the potential verification.

Indeed, this was also experienced by Customer B that started verification, but once it was underway and they truly understood the expansive nature and confidential documentation involved in the proceeding decided to withdraw their consent to the verification.  *See* Customer B Verification Report; 2nd Rem. CD79 2nd Rem. PD43.  Customer B had proceeded with the verification with no Counsel or advice from Counsel familiar with the Department's proceeding, and thus did not understand the procedure until it was underway and only at that time decided this was not something the company wished to participate in.  The documentation that was reviewed for Customer B nonetheless gave no indication of anything related to the EBC program.

With respect to Customer E, Ancientree also objects to the Department's characterization that the verification was not successful.  Customer E explained why it no longer had access to certain loan documentation.  Remand Results at 8.  Customer E provided all information it could to the Department, including the Change in Terms documentation for several years and its records of using the [                                                    ].  Customer E Verification Report at 5, 2nd Rem. CD82 2nd Rem. PD47.  Nothing in any of the documentation inferred anything other than the plain understanding of this financing: it was [

                                    ].  It is pure speculation, and contrary to all other record information including the extensive information taken at verification, to presume by the lack of an application or lending agreement that somehow this U.S. bank and [          ] was secretly funneling Export buyer's credit money from the China Ex-Im Bank to this customer.

PUBLIC VERSION

*Lucent Techs., Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1327 (Fed. Cir. 2009) ("It is well established that speculation does not constitute substantial evidence."). The Department may have wished for more complete information to verify the financing, but the information it obtained from the company demonstrates what the Department's purpose in verifying was-- non-use of the EBC program. Ancientree submits therefore that Customer E was successfully verified as to non-use of the program, but even if the Department does not agree, then this means that the other eight customers that were successfully verified still account for 79% of the value of Ancientree's POI sales.

    In response to these comments on the highly unusual and burdensome step to verify the unaffiliated customers, the Department attempts to describe these verifications as requesting routine information collected and a very limited verification outline. Remand Results at 16. But this fails to properly place these verifications in their true context. Requesting this type of information from respondents is common and expected, but requesting these from completely unaffiliated customers is unprecedented. There have been a couple instances where the Department has verified a single affiliated U.S. importer for the EBC program. But in Counsel's expansive experience, the Department has never proceeded with in person verification of unaffiliated U.S. customers until this case. Indeed, the only other instance known where the Department has taken this approach was in the solar cells from China 2017 countervailing remand that closely mirrored the facts and timing of this verification, the Department took the same unprecedented step at the same time to attempt in person verification of the customers. In that case, when one customer refused verification, the Department declined to verify any of the customers and continued to apply AFA to the respondent, Risen, for this program. Back at

PUBLIC VERSION

Court, the Court harshly criticized the Department approach and ordered the Department to find

non-use:

> Risen itself has filled the gap caused by the GOC's non-compliance with Commerce's questionnaire. It has both certified its non-involvement in the program and produced non-party customer certifications and back-up financial data from those customers, all demonstrating non-use.  For the reasons set forth below, the court concludes that Commerce did not attempt a reasonable level of further verification of that information. In considering this issue, the court is mindful that Risen's customers are unaffiliated businesses sharing sensitive information years after relevant transactions with Risen may have ended.  The court is also mindful that asking a private entity with no legal obligation to do so to allow government officials to inspect its records is asking for something that can be both expensive and time consuming. This new request for in-person verification, coming more than six years after the POR, has already caused one customer to decline to participate in unlimited verification proceedings.  At this point, the gap that Commerce alleges exists—the unverifiable information from the drop-out customer that is a result of non-compliance with Commerce's verification request—is a new circumstance that has emerged late in the process as a result of Commerce's newly crafted verification requirements. When the process of verification itself becomes the source of new non-compliance, courts should consider whether the process, as laid out by Commerce, is reasonably necessary or whether it has become so onerous as to impede good faith efforts by respondents to comply. Here, the factors laid out all together—non-use certificates and supporting records followed by requests for in-person visits of several days and government intrusion into all financial records on the premises of U.S. customer companies, all taking place six years after the POR, nearly four years after submission of the certificates, and in a world in which no verification efforts have ever produced evidence of the use of this program — add up to an onerous unnecessary level of verification.

> Risen produced non-use certificates two years after the POR, in early 2020.  Those certificates have been on the record since that time.  Commerce also has the financials of each of the third-party customers that produced a non-use certificate.  Commerce has expressed no doubts about the financials. Both the non-use certificates and the financial records produced by the third-parties represent evidence of non-use that supports Risen's own statement that its sales were not involved in the EBCP program. No evidence presented to the court suggests that these statements are not punishable under 18 U.S.C. § 1001 if either Risen or a customer is lying. Commerce, nonetheless, sought to complete burdensome verification procedures presumably in order to determine whether or not the statements are true. Commerce has presented no evidence to the court that these companies are lying about their financials. Commerce has presented no evidence to indicate that the companies do not know what they are talking about.

> At this stage, every piece of evidence presented to Commerce and to the court supports the conclusion that Risen's sales were not aided by the EBCP. In the face of substantial evidence of non-use from Risen and its customers, and no evidence of use supported by actual evidence or any reasonable AFA inference, Commerce must not include a subsidy amount for EBCP.

*Risen Energy Co. v. United States*, 2023 Ct. Intl. Trade LEXIS 164, *11-13 (internal citations omitted).

Further, in the subsequent solar review, like in this case, the Department had not issued the EBC supplemental questionnaire during the course of the review and found use of the program based on AFA.  The Court ordered the Department to take a reasonable approach to verifying the program, giving specific warning not to unduly burden the unaffiliated customers:

> Throughout the long history of EBCP litigation in the court there has been an absolute dearth of evidence that any U.S. customer has ever used the program. No party has ever demonstrated that a U.S. customer has received financing through the EBCP. Thus, if Commerce chooses to attempt verification, the court expects that Commerce will not pursue onerous verification requirements. Commerce is attempting to verify non-use by U.S. companies that Commerce has no statutory right to investigate, many of whom are unaffiliated with respondents, and years after the customers conducted business with the respondents. If there were more evidence that Commerce would find anything relevant in the records of the non-affiliate customers, then perhaps rigorous verification would be necessary. Although why onsite visits would be helpful has not been explained. For now though, the court is unconvinced that Commerce would find any EBCP use. Commerce may attempt to verify but only to the extent it does not overly burden voluntary participants.

*Risen Energy Co. v. United States*, 2023 Ct. Intl. Trade LEXIS 149, *10-11.  In response, the Department found it could not issue the supplemental questionnaire or attempt an in person verification due to the requirement not to overly burden the unaffiliated customers.  Rather, the Department found non-use, albeit under protest, based solely on the certifications.  *Risen Energy Co. v. United States*, CIT 22-23, Draft Remand (December 12, 2023) at 3.  In another review of a different product, *Wood Mouldings from China*, where the respondent's customers were able to

provide sufficient responses to the supplemental EBC questionnaire, the Department found non-use of the program even without Court intervention.  The Department did not pursue in person verification or make any statement that such an unprecedented, burdensome approach was necessary.  *Wood Mouldings and Millwork Products From the People's Republic of China: Final Results and Partial Rescission of Countervailing Duty Administrative Review; 2020–2021*, 88 Fed. Reg. 62,319 (Sep. 11, 2023) and accompanying IDM at Comment 1.  Rather, the Department found it could verify the non-use information based on the record itself.  *Id.* ("[B]ased on the supplemental responses submitted by Yinfeng, we continue to find that Yinfeng has provided information consistent with that which Commerce has found to be a sufficient basis upon which to conduct verification. Specifically, this information is sufficient to indicate that the financing used by its customers was unrelated to the EBCP and, thus, continue to find, based on FA, that this program was not used by Yinfeng in these final results.").

In light of all the above, the Department's position that it had to verify these unaffiliated customers in person is not substantiated.  Indeed, these procedures were not at all typical or simple for companies that are not respondents in this proceeding.  At verification, the Department requested to discuss and document how their accounting system worked, allowing the Department to trace transactions through their accounting system, reconcile and demonstrate how their accounting systems ties to their financials and tax return, provide a detailed chart of accounts, show the accounts where loans and interest are recorded, and generally open up their accounting to the Department's queries.  The Department also requested explanation and documentation on the POI sales and invoicing process with Ancientree, from negotiation, to purchase orders, invoices, ledger excerpts, shipment documents, bank payments, etc. The Department selected several invoices in person at each to test.  At verification, the Department

PUBLIC VERSION

also closely scrutinized the loans/financing, examining the financials, tax returns, and accounting

system for any other accounts to show that all loans/financing were fully reported. If the

company had loans/financing, the Department further queried all documentations concerning the

loan/financing such as application, terms, payment and requested the company to fully reconcile

all payments and interest to their accounting ledgers and financial.  This is not a simple, common

procedure that unaffiliated customers were at all expected to undergo by purchasing from

Ancientree.  These customers, many of which are very small companies, had to make their

company officials, accounting staff, and sales staff available not only to the Department for the

scheduled days, but also in advance to prepare the documents requested.  Some of the customers

sought assistance from Ancientree's counsel and several others determined due to the

confidential nature of the information, they must hire outside counsel or accountants to assist for

the verification.  All of these requests were further burdensome because the information related

to very old fiscal years.

 This unreasonable, burdensome approach to this case must be the lens through which the

Court considers most of the companies by value nonetheless cooperated with this request and in

considering what the impact, if any, may be of the few companies that refused or did not

successfully verify.  Given these facts, the lack of any information to the contrary, and the highly

sensitive and overreaching request by the Department, the fact that some smaller customers

declined verification does not amount to a reasonable inference that these customers somehow

used the EBC program without Ancientree's or the GOC's knowledge.  .

 Ancientree exercised maximum efforts to obtain cooperation from its unaffiliated

customers, and the responses of the majority of its customers reflect these efforts and

corroborated the consistent certifications and documentation of non-use.  The Department

"emphasize[s]" that "it is not applying AFA to Ancientree as a result of the failure to cooperate

by its customers or importers" but rather it was considering whether Ancientree filled the gap left

by the GOC's failure to cooperate.  Remand Results at 9.  However, the Court still ordered the

Department to consider this program differently because it is in reality applying AFA to a

cooperating party, Ancientree.  Specifically, this Court reminded the Department:

> The focus of subsection (b) is respondent's *failure to cooperate to the best of its ability,* not its failure to provide requested information." (alteration in original)). Importantly, the use of facts available generally requires a finding of missing information. The application of an adverse inference is based on a respondent's efforts to comply with Commerce's requests for information. The purpose of the application of adverse facts available is to encourage respondents to comply with Commerce's requests…
>
> Under such circumstances, the Federal Circuit has upheld the use of adverse facts available even where it may adversely impact a cooperating party, *e.g.*, respondents that have cooperated with Commerce's requests for information. *See id.* at 1371-73 (citing *KYD, Inc. v. United States*, 607 F.3d 760 (Fed. Cir. 2010)).This Court and the Federal Circuit have stated, though, that "Commerce should seek to avoid such impact if relevant information exists elsewhere on the record."

Slip. Op. 22-24 at 13; *citing Jilin Forest Indus. Jinqiao Flooring Grp. Co. v. United States*, 519

F. Supp. 3d 1224, 1239-40 (2021), *Archer Daniels Midland Co. v. United States*, 37 CIT 760,

769, 917 F. Supp. 2d 1331, 1342 (2013), *Fine Furniture*, 748 F.3d at 1372.

In the *Risen* litigation that is addressing essentially the same fact pattern and which the

Court drew heavily in its last remand, also held:

> Considering that the POR was five years ago, that Commerce changed its policy, and that Risen complied to the best of its ability, the court concludes it is unreasonable for Commerce to require perfection. All of the record evidence points to nonuse of the program at issue. Commerce's concern about potentially hiding the use of EBCP in the nonresponding companies is not reasonable when considering the collateral impact of AFA on the fully cooperating Risen, the age of this case, and the still-relevant initial complete set of nonuse declarations, which has not been seriously undermined. Substantial evidence does not support Commerce's continued application of AFA to Risen's detriment on this record.

*Risen Energy Co. v. United States*, 2023 Ct. Intl. Trade LEXIS 52, *14; *see also Changzhou*

*Trina Solar Energy Co. v. United States*, 255 F. Supp. 3d 1312, 1318 (Ct. Int'l Trade 2017) ("In

light of the customer declarations provided by JA Solar certifying non-use of the program and

the lack of evidence to the contrary, the mere possibility that one of JA Solar's customers

participated in the program is not enough…").  The cooperation efforts and the enormous

amount of cooperation Ancientree was able to obtain must also be considered in light of the

particular facts of this case where the Department is requesting that unaffiliated customers,

Ancientree's customers many years ago, allow the Department to verify their books and records.

### III.     The Department Continues to Refuse to Examine the Information on the Record.

The Department's determination that it need not consider non-use of the EBC program or

applying a pro rata adjustment because verification was not successful is contradictory to the

meaning of the Court's instructions.  Nothing in the Court's opinion defined "successful" as

meaning that all of Ancientree's customers must be verified in person in order for any one of

them to have a successful verification.  Indeed, the very fact that the Court was addressing a pro

rata rate of 90% was because 10% of Ancientree's customers had not provided the EBC

supplemental questionnaire.  As such, the Court was directly addressing that a pro rata rate

would be appropriate specifically because not all could be verified (i.e. at a minimum the 10%

that did not provide a supplemental questionnaire).

Indeed, the Department's reasoning that it needed full cooperation to apply a pro rata rate

is also wholly illogical.  Each customer's use of the EBC program stands alone.  In other words,

*in arguendo*, if one customer did use the EBC program, that has absolutely no bearing on

whether another customer used the EBC program.  Indeed, the majority by value of the

customers were successfully verified with no use of the EBC.  Accordingly, even if assuming as AFA (which for the reasons discussed above, would still not be supported by the record) that the customers that were not verified successfully did benefit from the EBC program, the Department must find non-use of the EBC program by the other customers that completed verification.  This is the precise situation contemplated by applying a *pro rata* adjustment.  The EBC program concerns financing to purchase subject merchandise; therefore, a customer's use of the program certainly cannot exceed the amount of subject merchandise they purchased from Ancientree.  As such, the pro rata adjustment based on the sales value of the customer as already discussed in the last remand and sanctioned by the Court, is wholly logical.

The Department also attempts to undermine the reliability of the quantity and value figures that Ancientree provided in the first remand to support the pro rata adjustment.  Remand Results at 9-10.  The Department notes that it remains "largely unverified." *Id*.  It only remains unverified because the Department did not request or verify this information.  Ancientree's export value was verified successfully by the Department.  *See* Ancientree Verif. Rpt (January 7, 2020) at 4, CD544 PD808.  The Department did verify the sales quantity and value at the verifications it did conduct and found some small discrepancies, however this is to be expected.  Ancientree provided the individual customer breakdown for the POI period based on its own accounting records while the customer's would have used their own entry and accounting information, so some difference is reasonable and expected due to the timing difference between exporter booking and importer's entry dates.  Indeed, the only customer that had a larger difference was Customer J, which was a very small customer.  The other customers' sales value and quantity, representing the majority of Ancientree's sales, were close and approximate to the Ancientree figures.

PUBLIC VERSION

Accordingly, the sales value is a reliable basis to make a pro rata adjustment. Alternatively, the Department could set up customer specific rates for the case, with no EBC program included in the rate for the customers that were successfully verified for non-use. The Department has set up such customer specific liquidation instructions in certain cases, and under the circumstances can do so now if it deems the pro rata adjustment not proper.

Indeed, the Department cannot use "facts otherwise available" under 19 U.S.C. § 1677e(a) or apply adverse inference under § 1677e(b) because necessary information is not missing from the record. At a minimum, for the customers that had a successful verification, the Department has no basis to apply facts available because no necessary information is missing and the information is verifiable. *See also  Diamond Sawblades Mfrs. Coalition v. United States*, 986 F.3d 1351, 1366-1367 (Fed. Cir. 2021) (finding the Department's application of AFA to the entire sales database was not supported by substantial evidence when the missing information only involved 2.5% of the sales.); *see also Diamond Sawblades Manufacturers' Coalition v. United States*, 547 F. Supp. 3d 1323 (Ct Int'l Trade 2021) (Upholding the Department's application of AFA to only the 2.5% of the sales).

### IV.    Conclusion and Request to Directed Remand Results

In light of the foregoing, the Department's Remand Results are not supported by substantial evidence or in accordance with the law or the remand instructions. As detailed above, the Department has avoided the record and contravened the clear directions from the Court. The Department's approach in the review and both remands are akin to delay and burden heaping tactics that have continued to harm Ancientree and its customers as the Department has made increasingly unreasonable demands from Ancientree's unaffiliated Customers years after the POR, given that it would become ever more problematic for the Customers to comply. When

PUBLIC VERSION

100% of Ancientree's customers provided certifications during the review, the Department ignored them and applied AFA.  Three more years later and four years after the customers' business with Ancientree, only in the Court proceeding after remand did the Department issue a supplemental EBC questionnaire, and Ancientree was able to get approximately 90% to respond, but the Department ignored this using the 10% as an excuse to apply AFA.  Almost a year later, this Court found again this was unreasonable.  Now five years after the customers' business with Ancientree, the Department demanded in person verifications of every single Customer.  Despite this extraordinary request, Ancientree was able to get all but three Customers to go through with two-day in person verifications.  While the Department claims that two of those verifications were not successful, the Department still successfully verified 79 percent of Ancientree's customers.  But the Department ignored this using the non-verified customers as an excuse to apply AFA.

Ancientree submits that with this pattern, another remand to reconsider will only continue these delay tactics and pile on more financial harm on the Customers.  The Customers have already demonstrated substantial cooperation in the EBC questionnaire responses in providing highly confidential information on their loans and financials to the record many years after the period of review and years after being a customer of Ancientree.  And the majority of the customers by value and quantity even went through laborious in person verifications.  As reiterated above, everything on the record has only corroborated the Customer's and Ancientree's statements all along that they did not use the EBC program.  Yet, the Department's decisions in the review and each remand have shown no true attempt to investigate this non-use.

Under these circumstances, Ancientree respectfully requests that this Court take  more directed action on this remand.  *Changzhou Hawd Flooring Co. v. United States*, 324 F. Supp. 3d

1317, 1328 (Ct Int'l Trade 2018) (ordering ab initio the Department to exclude voluntary respondents from the Order finding a remand for reconsideration is unnecessary and considering the delay of justice); *Royal Thai Gov't v. United States*, 850 F. Supp. 44, 51 (Ct. Int'l Trade 1994) (rejecting the Department's change in rationale after the court directed the Department to limit itself "to the evidence and analysis underlying the agency's [prior] decision."); *ABB, Inc. v. United States*, 273 F. Supp. 3d 1186, 1199 (Ct. Int'l Trade 2017) (discussing that the Court could have narrowed the scope of the remand.).  Indeed, for this very program in very nearly identical circumstances, this Court has recently ordered a directed verdict to the Department to find non-use of this program after years of inappropriate investigation by Commerce.  *Risen Energy Co. v. United States*, 2023 Ct. Intl. Trade LEXIS 164, *20; *see also Risen Energy Co. v. United States*, 2023 Ct. Intl. Trade LEXIS 149, *10-11 (while not directing the Department specifically to find non-use, the Department found no other alternative due to the Court's instructions not to pursue onerous verification of the unaffiliated customers).

The Court should <u>order</u> the Department to either find non-use of the Export Buyer's Credit Program *in toto* or to assign a *pro-rata* EBC rate based on the record as developed to date.

Respectfully submitted,

/s/ *Gregory S. Menegaz*
Gregory S. Menegaz
Alexandra H. Salzman
J. Kevin Horgan
**deKieffer & Horgan, PLLC**
Suite 1101
1156 Fifteenth Street., N.W., 20005
Tel: (202) 783-6900
email:  gmenegaz@dhlaw.com
Date: January 5, 2024                *Counsel to Ancientree*

PUBLIC VERSION

## WORD COUNT CERTIFICATE OF COMPLIANCE

This brief has been prepared utilizing Microsoft Word 2016 using a proportionally spaced typeface (12-point Times New Roman font).

In accordance with the Chambers Procedures of the United States Court of International Trade, the undersigned certifies that his brief complies with the word limitations set forth in the Chambers Procedures.  Specifically, excluding those exempted portions of the brief, as set forth in 2 B (1) of the Chambers Procedures, I hereby certify that this brief contains <u>5,857</u> words.  In accordance with the Chambers Procedures, this certified word count is based on the word count feature in the word processing system (Microsoft Word) used to prepare this brief.

/s/ Gregory S. Menegaz

Gregory S. Menegaz
**deKieffer & Horgan, PLLC**
Suite 1101
1156 Fifteenth Street N.W., 20005
Tel: (202) 783-6900
Fax:  (202) 783-6909
email:  gmenegaz@dhlaw.com
*Counsel to The Ancientree Cabinet Co., Ltd.*