Slip Op. 24-83

UNITED STATES COURT OF INTERNATIONAL TRADE

———————————————————————— :
                                                            :
DALIAN MEISEN WOODWORKING CO., LTD., :
                                                            :
                     Plaintiff,                            :
                                                            :
        and                                                :
                                                            :    Before: Richard K. Eaton, Judge
CABINETS TO GO, LLC, and                     :
THE ANCIENTREE CABINET CO., LTD.,      :    Court No. 20-00110
                                                            :
                     Plaintiff-Intervenors,           :    **PUBLIC VERSION**
                                                            :
        v.                                                  :
                                                            :
UNITED STATES,                                     :
                                                            :
                     Defendant,                          :
                                                            :
        and                                                :
                                                            :
AMERICAN KITCHEN CABINET ALLIANCE, :
                                                            :
                     Defendant-Intervenor.          :
———————————————————————— :

### OPINION AND ORDER

[U.S. Department of Commerce's remand results are remanded.]

Dated: July 22, 2024

*Stephen W. Brophy* and *Jeffrey S. Neeley*, Husch Blackwell, LLP, of Washington, D.C., for Plaintiff Dalian Meisen Woodworking Co., Ltd.

*Alexandra H. Salzman*, deKieffer & Horgan, PLLC, of Washington, D.C., argued for Plaintiff-Intervenor The Ancientree Cabinet Co., Ltd. With her on the brief were *Gregory S. Menegaz* and *J. Kevin Horgan*.

*Mark R. Ludwikowski*, Clark Hill, PLC, of Washington, D.C., for Plaintiff-Intervenor Cabinets to Go, LLC.

*Ioana C. Meyer*, Trial Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, D.C., argued for Defendant the United States. With her on the brief were *Brian M. Boynton*, Principal Deputy Assistant Attorney General, *Patricia M. McCarthy*, Director, and *Tara K. Hogan*, Assistant Director. Of Counsel on the brief was *Elio Gonzalez*, Senior Counsel, Office of the Chief Counsel for Trade Enforcement & Compliance, U.S. Department of Commerce, of Washington, D.C.

*Luke A. Meisner*, Schagrin Associates, of Washington, D.C., argued for Defendant-Intervenor American Kitchen Cabinet Alliance. With him on the brief was *Christopher T. Cloutier*.

Eaton, Judge: Before the court are the U.S. Department of Commerce's ("Commerce" or the "Department") second remand results pursuant to the court's order in *Dalian Meisen Woodworking Co. v. United States*, No. 20-00110, 2023 WL 3222683 (Ct. Int'l Trade Apr. 20, 2023) (not reported in Federal Supplement) ("*Dalian II*"), in the countervailing duty investigation[1] of wooden cabinets and vanities from the People's Republic of China ("China").[2] *See* Final Results of Redetermination Pursuant to Court Remand, PRR2 52, CRR2 85, ECF No. 130-1 ("Second Remand Results"); *see also Wooden Cabinets and Vanities and Components Thereof From the People's Republic of China*, 85 Fed. Reg. 11,962 (Dep't of Commerce Feb. 28, 2020) ("Final Determination") and accompanying Issues and Decision Mem. (Feb. 21, 2020), PR 846, ECF No. 33-6 ("Final IDM").

Plaintiff-Intervenor The Ancientree Cabinet Co., Ltd. ("Ancientree") opposes the court sustaining the Second Remand Results,[3] while the United States ("Defendant"), on behalf of

---

[1]    The investigation covered the period of July 1, 2018, through December 31, 2018. *See Wooden Cabinets and Vanities and Components Thereof From the People's Republic of China*, 85 Fed. Reg. 11,962, 11,963 (Dep't of Commerce Feb. 28, 2020).

[2]    Citations are to public and confidential documents on the original investigation record ("PR" and "CR"), the first remand record ("PRR1" and "CRR1"), and second remand record ("PRR2" and "CRR2").

[3]    Plaintiff-Intervenor Cabinets to Go, LLC "agrees with and incorporates by reference Ancientree's Comments" into its comments. *See* Cabinets to Go's Cmts. Opp'n Remand

Commerce, and Defendant-Intervenor (and petitioner) American Kitchen Cabinet Alliance (the "Alliance") ask the court to sustain them. *See* Ancientree Remand Cmts. ("Ancientree's Cmts."), ECF No. 134; *see also* Def.'s Resp., ECF No. 140; Def.-Int.'s Cmts., ECF No. 139.

For the following reasons, the court remands this matter a third time with instructions that, for each of Ancientree's U.S. customers whose non-use of the Export Buyer's Credit Program (the "Program") was verified, Commerce must determine a customer-specific rate that excludes a subsidy amount for the Program and recalculate Ancientree's final countervailing duty rate and the all-others rate.

## BACKGROUND

The court presumes familiarity with its two prior opinions in this case and limits its recitation of the facts to those relevant to the issues before it here, i.e., those pertaining to Ancientree's claims. *See Dalian Meisen Woodworking Co. v. United States*, No. 20-00110, 2022 WL 1598896 (Ct. Int'l Trade May 12, 2022) (not reported in Federal Supplement) ("*Dalian I*"); *Dalian II*, 2023 WL 3222683.

### I.    Final Determination in the Countervailing Duty Investigation

During its investigation, Commerce sent questionnaires to China seeking information about the Export Buyer's Credit Program.[4] *See* Initial Questionnaire Issued to Government of

---

Results at 1, ECF No. 136. No comments have been filed by Plaintiff Dalian Meisen Woodworking Co., Ltd. ("Meisen"); the issues related to Meisen's claims were decided in *Dalian II*. *See* 2023 WL 3222683, at *8 (sustaining "Commerce's use of adverse facts available to find that Meisen used and benefitted from the Export Buyer's Credit Program").

[4]    By its petition, Defendant-Intervenor the Alliance asked Commerce to investigate approximately thirty-eight alleged subsidy programs, including the Export Buyer's Credit

China (May 31, 2019) at 33-34, 36, PR 443. The Program, which is administered by China's Export-Import Bank, is designed to promote the sale of Chinese exports by providing loans at preferential rates to foreign purchasers (including, at least potentially, those in the United States), directly or through third-party banks. The information Commerce asked for included operational information about the Program, e.g., disbursement of funds through third-party banks and revisions that China made to the Program in 2013. *See id.*

China provided some, but not all, of the operational information that Commerce requested. For example, while it provided the "Administrative Measures of Export Buyers' Credit of the Export-Import Bank of China . . . and Detailed Implementation Rules Governing Export Buyers' Credit of the Export-Import Bank of China," China failed to provide "a list of all partner/correspondent banks involved in disbursement of funds under the [Program]." Government of China's Initial Questionnaire Resp. (July 15, 2019) at 71-72, PR 505. Instead, China responded that Commerce's question asking for the bank information was "not applicable" because the Program was not used by respondents or their U.S. customers. *See id.*; *see also* Final IDM at 26.

---

Program. The petition acknowledged the dearth of "reasonably available" information about the Program and China's unwillingness to cooperate with Commerce's requests for information regarding the Program in past proceedings. *See* Pet'n Vol. III, Part 1 at 115 (Mar. 6, 2019), PR 4 ("All importers of wooden cabinets and vanities from China are eligible for such benefit as long as the exported Chinese product meets a certain threshold of Chinese-made content. Additional information regarding subject producers' customers' receipt of Export Buyers' Credits is not reasonable [sic] available to Petitioners. Indeed, as a result of [China's] repeated failures to cooperate in prior investigations, even the Department has been unable to fully understand the operation of the program. Notwithstanding, as it has done in many prior cases, . . . the Department should initiate an investigation of this program."). The petition recited the elements of the countervailing duty statute, stating that buyer's credits constitute a "financial contribution" by an "authority" (the Chinese government) that gives rise to a "benefit" to the recipient, and that the subsidy is "specific." *Id.* at 116; *see* 19 U.S.C. § 1677(5)(B) (subsidy), (D) (financial contribution), (E) (benefit conferred), (5A) (specificity).

With respect to the 2013 Program revisions,[5] China responded that the information was internal to the Export Import Bank, not public, and not available for release, and further that it could not compel the Export Import Bank to give the information to Commerce. *See* Final IDM at 26-27. China further responded that it "had confirmed that 'none of the U.S. customers of the mandatory respondents has been provided with loans under this program,'" and, thus, answers to Commerce's questions were "not required." *Id.* at 26 (quoting Government of China's Initial Questionnaire Resp. at 70).

During the underlying investigation, Commerce conducted verification of questionnaire responses in China at the offices of Ancientree (and Plaintiff Meisen) from October 29, 2019, through November 15, 2019, as required by 19 U.S.C. § 1677m(i). *See id.* at 2; 19 U.S.C. § 1677m(i)(1) ("The administering authority shall verify all information relied upon in making . . . a final determination *in an investigation*." (emphasis added)). Though it verified the "non-use" of some of the subsidy programs[6] under investigation, Commerce did not attempt to verify the respondents' claims that they did not receive a benefit under the Program. *See, e.g.*, Ancientree Verification Rep. (Jan. 7, 2020) at 9, PR 808. Instead, Commerce stated that it was "unable to verify in a meaningful manner what little information there is on the record indicating non-use . . . with the exporters, U.S. customers, or at the China [Export Import] Bank itself, given

---

[5]       The revisions with respect to which Commerce asked for information pertained to an amendment that was apparently made to the Administrative Measures in 2013, which eliminated the $2 million minimum contract value requirement to apply for a loan under the Program. *See* Final IDM 24-25.

[6]       The subsidy programs under investigation included, for example, the provision of certain materials, like standing timber, cut timber, and veneers, for less than adequate remuneration. *See* Final IDM at 5-8.

the refusal of [China] to provide the 2013 revision and a complete list of correspondent/partner/intermediate banks." Final IDM at 34.

Based on this claimed inability to verify non-use, Commerce found that factual gaps in the record existed with respect to the operation of the Program, requiring the use of "facts otherwise available."[7] *See* 19 U.S.C. § 1677e(a); Final IDM at cmt. 3.

Perhaps anticipating, or being actually aware, that China would fail to provide the requested information, Ancientree had placed on the record sworn declarations by its U.S. customers stating that they did not use the Program to make purchases from Ancientree during the period of investigation.[8] *See* Ancientree's Initial Section III Resp. (July 11, 2019) at 27-28 & Ex. II-12, PR 495-496, CR 189-190. By providing customer declarations of non-use, Ancientree sought to demonstrate that the Program had not conferred a "benefit" on the company—a statutory

---

[7]    Commerce must use "facts otherwise available" if, during the investigation or review of a countervailing duty order, the Department determines that (1) "necessary information is not available on the record" or (2) "an interested party or any other person . . . withholds information that has been requested by [Commerce]," "fails to provide such information by the deadlines . . . or in the form and manner requested," "significantly impedes a proceeding," or "provides such information but the information cannot be verified." 19 U.S.C. § 1677e(a)(1)-(2). Where requested information is not made available on the record, regardless of the reason for the respondent's failure to provide it, the statute requires Commerce to use facts otherwise available to replace the missing information in order to complete the record. *See Nippon Steel Corp. v. United States*, 337 F.3d 1373, 1381 (Fed. Cir. 2003) ("The mere failure of a respondent to furnish requested information—for any reason—requires Commerce to resort to other sources of information to complete the factual record on which it makes its determination.").

[8]    Each declaration stated that the U.S. customer had "purchased subject wooden cabinets and vanities and components thereof from [Ancientree] during the period between January 1, 2018 and December 31, 2018"; had "not financed any purchases from [Ancientree] through the use of the Import-Export Bank of China's export buyer's credit program," and that the customer "has never used the Import Export Bank of China's financing (*i.e.*, 'Buyer's Credit program') in any way." *See* Ancientree's Initial Section III Resp. (July 11, 2019) at Ex. II-12, PR 495-496, CR 189-190.

precondition to the imposition of countervailing duties.[9] Thus, Ancientree maintained that the operational information that China failed to provide was irrelevant. No doubt Ancientree was familiar with case law indicating that a respondent could not be subject to the imposition of adverse facts available based on a gap created by the failure of a third party to answer questionnaires, where the requested information was available elsewhere on the record. *See, e.g.*, *GPX Int'l Tire Corp. v. United States*, 37 CIT 19, 58-59, 893 F. Supp. 2d 1296, 1332 (2013), *aff'd*, 780 F.3d 1136 (Fed. Cir. 2015); *Fine Furniture (Shanghai) Ltd. v. United States*, 36 CIT 1206, 1209, 865 F. Supp. 2d 1254, 1260 (2012), *aff'd*, 748 F.3d 1365 (Fed. Cir. 2014).

Commerce found that the customer declarations did not fill the gaps in the record left by China's failure to provide the requested operational information because, among other reasons, the declarations could not be verified without a "complete understanding" of how Program loans were distributed. *See* Final IDM at 30 ("Given the complicated structure of loan disbursements which can involve various banks for this program, Commerce's complete understanding of how this program is administrated is necessary to verify claims of non-use."). That is, Commerce found that the non-use information on the record could not fill the gaps left by China's failure to provide the information that the Department requested about the Program. Thus, Commerce found that,

---

[9]       Under the countervailing duty law, Commerce must determine where there is a subsidy, i.e., a financial contribution by an "authority" (such as a government) that gives rise to a benefit to the recipient, and that the subsidy is specific. *See* 19 U.S.C. § 1677(5)(B) (subsidy), (D) (financial contribution), (E) (benefit conferred), (5A) (specificity). "A benefit shall normally be treated as conferred where there is a benefit to the recipient, including . . . in the case of a loan, if there is a difference between the amount the recipient of the loan pays on the loan and the amount the recipient would pay on a comparable commercial loan that the recipient could actually obtain on the market." *Id*. § 1677(5)(E)(ii). Here, the benefit to Ancientree would result from its customers' cost of buying the subject wooden cabinets and vanities being reduced by the customers receiving preferential rates on loan proceeds used to buy the merchandise.

notwithstanding the non-use evidence, the declarations could not be verified (or Commerce would not endeavor to do so),[10] and the use of facts available was required to fill those gaps.

In addition, Commerce found that China failed to cooperate to the best of its ability with its requests for information about the Program, and so applied adverse inferences when selecting from among the facts otherwise available.[11] *See* Final IDM at 36 (finding "that an adverse inference is warranted in the application of facts available . . . because [China] did not act to the best of its ability in providing the necessary information to Commerce"); *see also* 19 U.S.C. § 1677e(b)(1).

Based on adverse facts available, Commerce then concluded that the Program was countervailable, that Ancientree's U.S. customers used the Program to finance their purchases of the subject wooden cabinets and vanities, and that thus Ancientree had benefitted from the Program. *See* Final IDM at cmt. 3; Final Determination, 85 Fed. Reg. at 11,963 (listing subsidy rates). As an adverse facts available rate for the Program, Commerce selected 10.54% *ad valorem*,

---

[10]     In the Final IDM, Commerce identified the gap more specifically:

In short, because the [Chinese government] failed to provide Commerce with information necessary to identify a paper trail of a direct or indirect export credits from the China Ex-Im Bank, we would not know what to look for behind each loan in attempting to identify which loan was provided by the China Ex-Im Bank via a correspondent bank under the [Program]. This necessary information is missing from the record because such disbursement information is only known by the originating bank, the China Ex-Im Bank, which is a government-controlled bank. Without cooperation from the China Ex-Im Bank and/or the [Chinese government], we cannot know the banks that could have disbursed export buyer's credits to the company respondents' customers. Therefore, there are gaps in the record because the [Chinese government] refused to provide the requisite disbursement information.

Final IDM at 34.

[11]     Where Commerce determines that the use of facts available is required, it may apply adverse inferences to those facts only if it makes the requisite additional finding that that party has "failed to cooperate by not acting to the best of its ability to comply with a request for information." 19 U.S.C. § 1677e(b)(1); *see Nippon Steel*, 337 F.3d at 1381.

the highest rate determined for, what Commerce found to be, a similar program in the *Coated Paper* proceeding. *See* Final IDM 37-38 (citing *Certain Coated Paper Suitable for High-Quality Print Graphics Using Sheet-Fed Presses From the People's Republic of China*, 75 Fed. Reg. 70,201, 70,202 (Dep't of Commerce Nov. 17, 2010) (amended final determination)); *see also* 19 U.S.C. § 1677e(d).

In *Dalian I*, the court remanded Commerce's adverse facts available finding that Ancientree (and Plaintiff Meisen) benefitted from the Program. *See Dalian I*, 2022 WL 1598896, at *8-9. The court found that remand was required because Commerce's use of facts available was not supported by substantial evidence, since the only actual record evidence was the uncontroverted sworn U.S. customer declarations of non-use:

> Here, as in other cases,[12] to justify the substitution of relevant evidence placed on the record by cooperating respondents with facts available, Commerce has constructed an argument that is difficult to credit—*i.e.*, that operational information was withheld by China and therefore there are gaps regarding the use of the program. The problem with this argument is that the withheld information is (at best) only indirectly related to alleged actual use of the program by Meisen's and Ancientree's U.S. customers. Moreover, Commerce's argument that the operational information is necessary to verify the accuracy of the non-use information because without it, verification is unreasonably burdensome using its typical procedure, rings hollow when Commerce fails to even try.

*Id.* at *8. The court thus directed that

> on remand, Commerce shall either (1) find a practical solution to verify the non-use information on the record, such as the reopening of the record to issue supplemental questionnaires to respondents and their U.S. customers; or (2) recalculate the countervailing duty rates for Meisen and Ancientree to exclude

---

12      The court noted that the Program had been vigorously litigated in this Court, but that the merits of these cases had not found their way to the Federal Circuit. *See Dalian I*, 2022 WL 1598896, at *9 ("As noted in prior cases, Commerce has never appealed this Court's rejection of the Department's facts otherwise available determination in the context of the Export Buyer's Credit Program." (citing *Clearon Corp. v. United States*, 44 CIT __, __, 474 F. Supp. 3d 1339, 1353 n.13 (2020)). This remains so, since Commerce's appeal in *Risen Energy Co. v. United States*, No. 2024-1524 (Fed. Cir. Feb. 27, 2024), was dismissed, pursuant to the agreement by the parties, on July 9, 2024. *See Risen Energy Co. v. United States*, No. 20-03912, ECF No. 145.

the subsidy rate for the Export Buyer's Credit Program, and recalculate the all-others rate accordingly.

*Id.* at \*11. A remand proceeding commenced thereafter.


## II.    **Commerce's First Remand Results**

On remand, Commerce reopened the record and sought to verify non-use of the Program by issuing a supplemental questionnaire. The supplemental questionnaire asked respondents to report "all loans/financing to each of your U.S. importers/customers that were received and/or outstanding during the period of investigation . . . regardless of whether you consider the financing to have been provided under the Export Buyer's Credit program," including non-traditional loans. *See, e.g.*, Export Buyer's Credit Suppl. Questionnaire, attach. (May 19, 2022) at 1, PRR1 1. Commerce asked that the parties "[s]ubmit the information requested in the ***Loan Template*** as an attachment to your response." *Id.* The loan template asked for: the names of lenders, the date of the loan agreement, the date of the loan receipt, the purpose of the loan, the initial loan amount, the currency of the loan, the life of the loan, the type of interest (i.e., fixed or variable rate), the interest rate specified in the agreement, the date of principal payments, amount of principal payments, dates of interest payment, amounts of interest paid, principal balance to which each interest payment applied, and the total number of days each payment covered, for each loan with interest payments during the period of investigation. *Id.*

In response to the supplemental questionnaire, Commerce received complete information for some, but not all, of Ancientree's U.S. customers. That is, Ancientree reported loan information for fifteen of its twenty-seven unaffiliated U.S. customers, which, according to the company, represented approximately 90% of its U.S. sales both by volume and by value during the period of investigation. *See* Ancientree Export Buyer's Credit Suppl. Questionnaire Resp. (June 13, 2022)

at 1, PRR 14, CRR1 6-15, ECF No. 97. Of the twelve U.S. companies whose loan information Ancientree failed to report, one had gone out of business. *Id.* With respect to the remaining eleven companies, representing approximately 10% of its U.S. sales both by volume and value, Ancientree stated that despite its efforts, it could not reach, or could not convince, those companies to provide the loan information that Commerce requested. *Id.* at 1-2.

In the remand results pursuant to *Dalian I*, Commerce found that without *complete* responses for *all* U.S. customers it would be futile to attempt to verify *any* of the non-use information placed on the remand record. *See* Final Results of Redetermination Pursuant to Court Remand, ECF No. 86-1 ("First Remand Results") at 21 ("The fact that the respondents in this remand did not provide complete responses for all their U.S. customers guaranteed that the record would remain incomplete as to usage information, thus, rendering futile any efforts to verify non-usage."). Because, for Commerce, none of the claims of non-use could be verified, gaps in the record persisted.

In *Dalian II*, the court sustained Commerce's First Remand Results, in part,[13] and remanded its use of facts available with respect to Ancientree. The court held that substantial evidence did not support Commerce's finding that the use of facts available was required based on Commerce's claim that without complete loan information from all of Ancientree's U.S. customers, the Department could not verify any of the loan information that Ancientree had placed on the remand record. *Dalian II*, 2023 WL 3222683 at *6-7. Accordingly, the court ordered

> that, on remand, Commerce attempt to verify Ancientree's submissions to the extent the Department finds appropriate, and if that is successful, either accept the *pro rata* adjustment proposed by Ancientree or conclude that the Export Buyer's Credit Program was not used at all, and recalculate Ancientree's rate and the all-others rate accordingly.

---

[13]    The court sustained Commerce's finding, based on adverse facts available, that Plaintiff Meisen used and benefitted from the Program. *Dalian II*, 2023 WL 3222683, at *8.

*Id.* at *8. A second remand proceeding thus commenced.

### III.    **Commerce's Second Remand Results**

During the second remand proceeding, Commerce made efforts to verify the non-use

information that Ancientree placed on the record in response to the supplemental questionnaire.

As noted, Ancientree reported loan information for fifteen of its twenty-seven unaffiliated U.S.

customers. For ten of the fifteen customers, Commerce was able to conduct in-person verification

at the customers' offices. *See* Public Verification Reports of Customers A (PRR2 34),

B (PRR2 43), C (PRR2 42), D (PRR2 35), E (PRR2 47), I (PRR2 39), J (PRR2 17), K (PRR2 18),

L (PRR2 46), and O (PRR2 45).

Of the ten U.S. customers with respect to which Commerce conducted in-person

verification, Commerce "found no explicit usage of the [P]rogram for . . . eight customers during

the [period of investigation]." Second Remand Results at 8-9. Nonetheless, Commerce found that

verification, as a whole, was unsuccessful because it was "unable to verify non-use of the

[Program] for more than 70 percent of Ancientree's customers." *Id.* at 20. Commerce stated, by

way of explanation, its reasons for finding that the verification was unsuccessful:

> At the outset, we note that – of Ancientree's 27 U.S. customers – 12
> provided no response to Commerce's [Export Buyer's Credit Program]
> questionnaire when we reopened the record on remand. Further, while two
> additional customers (herein referred to as "Customer N" and "Customer M")
> nominally provided information, these submissions were plainly unresponsive and
> did not provide any of the requested data relating to the customers' [period of
> investigation or "POI"] financing. Specifically, Customer N's response summarily
> stated that: "{t}he pre-acquisition, legacy financial records of Customer N are
> disorganized" and "{i}t would take company personnel significant time and effort
> to try to locate and decipher 2018 {POI} financial records . . . if they even exist."
> With respect to Customer M, Ancientree stated that "we are omitting Customer M's
> narrative and related exhibit{s} because they are not finalized." Thus, Customers
> M and N did not provide complete or verifiable non-use information, and – before

the verification process even began – less than half of Anciendree's customers provided a response to Commerce's [Export Buyer's Credit Program] questionnaire.

Three of the remaining 13 customers would not agree to verification. Customers F and G stated that they would not participate in Commerce's verification process prior to any verification arrangements being made. Customer H initially consented to verification but, two days prior to the scheduled start date, stated that it would no longer be participating.

Of the 10 remaining customers, we were unable to verify non-use for two companies (Customer B and Customer E). With respect to Customer B, Commerce officials arrived at the customer's location on September 18, 2023, and began examining the items set forth in the verification agenda that was circulated to Anciendree and the customer in advance. During the on-site verification process, a company official asked the Commerce team to step out of the conference room. At that time, a company official entered the verification room and took several key documents that Commerce officials had collected as exhibits. The company representative stated that Customer B would no longer be providing the information. The verification process was halted at this time.

Customer E did permit Commerce officials to conduct the verification process. However, during the verification procedure, Customer E failed to provide crucial documentation that was requested prior to verification. Specifically, Customer E did not provide the underlying loan agreement(s) and/or application(s) relating to the line of credit that was outstanding during the POI; this represents the type of documentation that would permit Commerce officials to analyze the basis for the loan(s) and any restrictions or requirements relating to the lending. Such information was requested in Commerce's [Export Buyer's Credit Program] Supplemental Questionnaire. Customer E provided "Change in Terms" agreements for the credit facility, which operated to extend the duration of the loan, but it did not provide the underlying loan documentation itself.[14] . . . These documents were

---

[14]    Regarding the significance of the underlying loan documentation, Commerce stated, by way of explanation:

This is significant, because the "Change in Terms" agreements incorporate by reference the underlying 2012 loan documentation. For instance, they reference the terms set forth in an underlying Promissory Note and Business Loan Agreement, *i.e.*, noting that "This Note is subject to and is governed by the terms of a Business Loan Agreement (the Loan Agreement) between Borrower and Lender." Similarly, Customer E's numerous draw requests under the line of credit reference the underlying documents, noting that such requests are made "{u}nder and pursuant to the terms of that certain Business Loan Agreement and Promissory Note dated February 13, 2012."

Second Remand Results at 8-9.

necessary for Commerce's analysis. Accordingly, in the verification agenda issued prior to the on-site verification process, we identified the loan agreement and application as key documentary support for Customer E's reporting. Nonetheless, these documents were not provided at verification, restricting Commerce's ability to examine the company's usage of the [Program].

After accounting for the difficulties identified above, we were unable to verify non-use of the [Program] for more than 70 percent of Ancientree's customers. Further, *while we found no explicit usage of the program for the remaining eight customers during the POI, these eight customers accounted for far less than Ancientree's claim of "approximately 90 {percent}" of POI sales*. Given that a clear majority of the customers that provided certifications of non-use in this proceeding declined, or otherwise were unable, to support such certifications with verifiable information, *we do not find that this level of completeness is sufficient to overcome [China's] non-cooperation, and to permit a finding of non-use here*.

*Id.* at 6-9 (emphasis added). It is worth noting that Commerce relied on its inability to verify non-usage of a majority of the number of Ancientree's customers rather than its ability to verify non-use with respect to a majority of Ancientree's sales by volume and by value. This may be because, "[a]lthough Commerce verified Ancientree's *overall* sales figures as part of the underlying investigation, it did not – and had no reason to – verify such figures on a *customer-specific* basis." *Id.* at 9 n.43 (emphasis added). Notwithstanding that the record does not contain verified sales data on a customer-specific basis for Ancientree, during oral argument, Defendant acknowledged that the eight U.S. customers whose non-use of the Program was verified represented 79% of Ancientree's sales by value. *See* Oral Argument (Apr. 17, 2024) (audio) at 7:20-35. But apparently, for Commerce, successful verification of 79% of sales by value did not amount to a "successful" verification as that word appeared in *Dalian II*'s remand order:

With respect to calculating a *pro rata* adjustment for Ancientree regarding the [Program], upon remand, the Court ordered that Commerce could elect to attempt verification of Ancientree's submissions and "if that is successful" should accept the *pro rata* adjustment proposed by Ancientree or conclude that the [Program] was not used at all. As detailed above, over 70 percent of Ancientree's customers – which accounted for a significant percentage of Ancientree's U.S. sales during the POI, by volume – declined or otherwise failed to be fully verified. Thus, Commerce concludes that verification of Ancientree's submissions *was not successful within*

> *the meaning of the Court's instructions* and it is, therefore, not necessary or appropriate to apply a *pro rata* adjustment as sought by Ancientree or to conclude that Ancientree did not use the [Program].

Second Remand Results at 9-10 (emphasis added). In other words, Commerce interpreted the word "successful" in the court's remand order to mean verification of some number more than eight of Ancientree's U.S. customers, or some greater percentage of Ancientree's customers than the roughly 30% that Commerce was able to verify. Having found that the non-use verification was unsuccessful, Commerce then found that it was not "necessary or appropriate" to apply a *pro rata* adjustment or find non-use of the Program, as directed in the court's remand order. *Id.* at 10; *see Dalian II*, 2023 WL 3222683, at *8.

In addition, Commerce concluded that because verification was "unsuccessful," the use of facts available was required because "there is a gap in the record that Ancientree has been unable to fill with verifiable information." Second Remand Results at 21. The gap in the record was identified as that which "result[ed] from the Government of China . . . withholding necessary information that was requested of it."[15] *Id.* at 2.

---

[15]    In the Final IDM, Commerce identified the gap more specifically:

> In short, because the [Chinese government] failed to provide Commerce with information necessary to identify a paper trail of a direct or indirect export credits from the China Ex-Im Bank, we would not know what to look for behind each loan in attempting to identify which loan was provided by the China Ex-Im Bank via a correspondent bank under the [Program]. This necessary information is missing from the record because such disbursement information is only known by the originating bank, the China Ex-Im Bank, which is a government-controlled bank. Without cooperation from the China Ex-Im Bank and/or the [Chinese government], we cannot know the banks that could have disbursed export buyer's credits to the company respondents' customers. Therefore, there are gaps in the record because the [Chinese government] refused to provide the requisite disbursement information.

Final IDM at 34.

Commerce further found that applying an adverse inference when selecting from among the facts available was appropriate because of China's "failure to provide necessary information on the [Program]" in response to Commerce's questionnaires. *Id.* at 21. Commerce found that, "despite [its] attempt to gather information following the *First Remand Order* [issued in *Dalian I*], and our subsequent attempt to verify necessary information following the *Second Remand Order* [issued in *Dalian II*], the record does not contain non-use information that overcomes the [Chinese government's] reporting failure." *Id.*

In making this finding, the Department stated, by way of explanation, that it rejected Ancientree's argument that "Commerce should apply a *pro rata* program rate for the [Program] or apply [adverse facts available] only to non-responsive customer imports (by setting up customer-specific rates), because each customer's use of the [Program] stands alone." *Id.*

In other words, Ancientree had argued that, because verification was successful with respect to some of its U.S. customers, there were two potential methods by which Commerce could adjust its rate: (1) "a *pro rata* adjustment based on the [period of investigation] sales of the customer"; or (2) "[i]f Commerce declines to *pro rate* the [adverse facts available] rate, Commerce could set up customer-specific rates for the case, with no [Program] subsidy rate included in the rate assigned to the customers that were successfully verified for non-use." *Id.* at 13-14.

For the Department, neither method was feasible because (1) "Commerce was unable to verify the sales figures that form the basis of the pro rating sought by Ancientree,"[16] and (2) not

---

[16]    By way of explanation, Commerce stated:

We note that the customer-specific quantity and value figures that Ancientree provided in support of its proposed *pro rata* adjustment remain largely unverified. Although Commerce verified Ancientree's overall sales figures as part of the underlying investigation, it did not – and had no reason to – verify such figures on a customer-specific basis. During our verification of Ancientree's customers, we

all of "the customer-specific quantity and value figures that Ancientree provided in support of its proposed *pro rata* adjustment" matched the customer's own reporting. *Id.* at 9 n. 43, 21 n. 69.

Commerce thus continued to include a 10.54% subsidy rate for the Program, as adverse facts available, in the calculation of Ancientree's final countervailing duty rate of 13.33%. *See* Final Determination, 85 Fed. Reg. at 11,963.

## DISCUSSION

The court will sustain the Second Remand Results if Commerce has complied with the court's remand order in *Dalian II*, and its findings on remand are supported by substantial evidence and otherwise in accordance with law. *See* 19 U.S.C. § 1516a(b)(1)(B)(i). For the following reasons, the court finds that a third remand is necessary.

Ancientree argues that the court cannot sustain the Second Remand Results and should remand with instructions that Commerce "either find Ancientree did not benefit from the [Program] . . . or apply a pro rata adjustment or company-specific [Program] rate," relying primarily on the *Risen* line of cases.[17] Ancientree's Cmts. at 4, 18; *see also Risen Energy Co. v. United States*, 46 CIT __, 570 F. Supp. 3d 1369 (2022) ("*Risen I*"); *Risen Energy Co. v. United States*, No. 20-03912, 2023 WL 2890019 (Ct. Int'l Tr. Apr. 11, 2023) (not reported in Federal

---

examined the quantity/value of acquisitions from Ancientree. In some cases, the customer's reporting approximated the Ancientree figures; in others, the figures were not close to those reported by Ancientree.

Second Remand Results at 9 n.43.

[17]    The *Risen* cases involve the sixth administrative review of the countervailing duty order on crystalline silicon photovoltaic cells. The Court entered judgment on December 19, 2023. *See Risen Energy Co. v. United States*, No. 20-03912, 2023 WL 8788862 (Ct. Int'l Trade Dec. 19, 2023). On February 27, 2024, the United States filed an appeal at the Federal Circuit. Subsequently, the parties agreed to dismiss the appeal, and mandate was issued on July 9, 2024. *See Risen Energy Co. v. United States*, No. 20-03912, ECF Nos. 144, 145.

Supplement) ("*Risen II*"); *Risen Energy Co. v. United States*, 47 CIT __, 665 F. Supp. 3d 1335 (2023) ("*Risen III*"). For Ancientree, the Department cannot substantiate its use of adverse facts available to find that Ancientree used or benefitted from the Program. Ancientree argues that, as in *Risen*, "there is no information on this record to support any finding [of use] of the [Program] nor has there been any evidence in any review or investigation of any Order that this program has ever been used."[18] Ancientree's Cmts. at 5. Specifically, Ancientree asserts that, here, the Department "reviewed an extensive amount of information at each of these companies, and found no evidence of use of the [Program] at each." *Id.* at 6.

In *Risen*, the Court ultimately held, after three remands, "[i]n the face of substantial evidence of non-use from Risen and its customers, and no evidence of use supported by actual evidence or any reasonable [adverse facts available] inference, Commerce must not include a subsidy amount for [the Export Buyer's Credit Program]" in the final countervailing duty rate for Risen. *See Risen III*, 47 CIT at __, 665 F. Supp. 3d at 1344 & n.9 (noting that, in that case, "Commerce confirm[ed] in briefs that it [was] not willing to consider a pro-rata approach"). In this case Ancientree insists that the court likewise "<u>order</u> the Department to either find non-use of the Export Buyer's Credit Program *in toto* or to assign a *pro-rata* [Program] rate [or company-specific Program rate] based on the record as developed to date." Ancientree's Cmts. at 18.

While the *Risen* line of cases is indeed persuasive with respect to Commerce's failure to find any American purchasers that used the Program, it is the case that those proceedings involved

---

18    The court notes this Court's observation in *Risen Energy Co. v. United States*, Consol. Court No. 22-00231 that "no use of this Program for exports to the United States has ever been uncovered." *Risen Energy Co. v. United States*, 47 CIT __, __, 658 F. Supp. 3d 1364, 1371 n.2 (2023) (granting Commerce's request for voluntary remand to reconsider its application of adverse facts available for an exporter's use of the Program in the eighth administrative review of the countervailing duty order on crystalline silicon photovoltaic cells).

reviews rather than investigations. Unlike in reviews,[19] in investigations Commerce is directed by statute to verify "all information relied upon in making . . . a final determination." 19 U.S.C. § 1677m(i)(1) ("The administering authority *shall* verify all information relied upon in making . . . a final determination in an investigation." (emphasis added)); 19 C.F.R. § 351.307(b)(1)(i). The *Risen* Court was persuaded that, because there was no affirmative evidence (either on the record of that case, or for that matter anywhere) that the Program had been used by American buyers, Commerce should be prohibited from finding otherwise. But again, *Risen* involved an administrative review where no verification was required.

For its part, Commerce argues that the court should sustain the Second Remand Results. For the Department, the Second Remand Results comply with the court's remand order because it attempted to verify Ancientree's submissions. *See* Def.'s Resp. at 8. "Ultimately, however, Commerce was unable to verify significant portions of the non-use information provided by Ancientree on behalf of its U.S. customers." *Id.* Since Commerce could conduct a complete in-person verification at only eight customer locations—i.e., approximately 30% of Ancientree's 27 U.S. customers—it considered its "attempt to verify" unsuccessful. For Defendant, "Commerce

---

[19]    In reviews, verification is required only if it "is timely requested by an interested party," and "no verification was made . . . during the 2 immediately preceding reviews and determinations under section 1675(a) of this title of the same order, finding, or notice," except "if good cause for verification is shown." 19 U.S.C. § 1677m(i)(3); 19 C.F.R. § 351.307(b)(1)(v). This was not always the case. Prior to 1984 amendments to the statute, the Department "was required to verify information submitted by a foreign manufacturer during a section 751 administrative review." *Monsanto Co. v. United States*, 12 CIT 949, 951, 698 F. Supp. 285, 288 (1988) (citing *Al Tech Specialty Steel Corp. v. United States*, 6 CIT 245, 575 F. Supp. 1277 (1983), *aff'd* 745 F.2d 632 (Fed. Cir. 1984)). The change in the law no longer requiring verifications in administrative reviews seems to have been a way to alleviate the administrative burden on Commerce, except in certain circumstances, as provided in the statute and regulations. *See id.* ("Section 618 of the Trade and Tariff Act of 1984, codified at 19 U.S.C. § 1677e (Supp. IV 1986), relieves ITA of the *burden of conducting verification* if verification occurred during either of the preceding two administrative reviews, unless good cause for verification is shown." (emphasis added)).

cannot rely on only a portion of a respondent's customers to verify non-usage of the Export Buyer's Credit Program because doing so would give respondents an incentive to evade scrutiny by providing responses only for those customers that do not use the Program." *Id.*

Thus, having found that its "attempt to verify" was unsuccessful, Commerce concluded that it was not compelled by the court's remand order to "either accept the *pro rata* adjustment proposed by Ancientree or conclude that the Export Buyer's Credit Program was not used at all." *Id.* at 6; *Dalian II*, 2023 WL 3222683, at *8. Moreover, Commerce did not calculate customer-specific rates for the companies whose non-use of the Program had been verified—an alternative method proposed by Ancientree. Rather, Commerce continued to apply adverse facts available to find that Ancientree's U.S. customers used the Program to purchase the subject merchandise, which conferred a benefit on Ancientree.

The court will order a third remand of this matter. While the facts here are much like those found in *Risen*, and while it remains the case that there appears to be no evidence that the Program has been used in the United States, the fact that this proceeding is an investigation matters. As noted, in an investigation, Commerce must verify all information relied upon in making a final determination. *See* 19 U.S.C. § 1677m(i)(1). Here, Commerce claims that it need not rely on the verified non-use of the Program for eight of Ancientree's U.S. customers, which represented approximately 79% of sales by value during the period at issue, because it was "unable to verify significant portions of the non-use information." Def.'s Resp. at 8. But this "all or nothing" approach is not called for by the statute. Nothing in the statutory directive that Commerce "shall verify all information relied upon in making . . . a final determination in an investigation" suggests that unless *all* information is verified, *none* of the information that is actually verified can be relied upon to make a final determination. But here instead of relying on the non-use information on the

record that the Department was able to verify, Commerce relied on adverse facts available as applied to all of Ancientree's U.S. sales.

The statute requires Commerce to fill gaps in the administrative record with "facts otherwise available." 19 U.S.C. § 1677e(a). It further permits the application of an adverse inference "in selecting from among the facts otherwise available." *Id.* § 1677e(b)(1). Here, Commerce has found a gap in the record where there is not one in fact. With respect to a majority of sales by value, there is no non-use gap. Rather there is verified information of non-use upon which Commerce must rely. With respect to the verified information, in a related context, this Court has said "Commerce opened the door by requesting additional information already requested on subsidies and cannot shut that door simply because it does not like the relevant information submitted." *GPX Int'l Tire Corp.*, 37 CIT at 60, 893 F. Supp. 2d at 1333.

Because Commerce verified non-use of the Program by certain of Ancientree's U.S. customers but could not (or did not) with respect to others, the court will treat the use of countervailing duties differently for the sales to customers whose non-use of the Program was verified, from those sales where non-use was not verified. As a result of its verification efforts, Commerce now knows for sure that certain of Ancientree's U.S. customers did not use the Program. Based on this verification determination, with respect to the sales to those companies whose non-use of the Program has been verified, Commerce must eliminate the subsidy represented in the rate applied to those sales. Commerce now knows that their declarations of non-use were valid. There is no gap in the record. And Commerce can base its determination of non-use on verified information in accordance with the statute.

This kind of distinction, i.e., separation of sales with respect to which verification was successful from those where it was not successful, is not entirely foreign to Commerce. Where

Commerce has been able to verify non-use of the Program by a Chinese respondent's U.S. customers in past cases it has removed the Program subsidy rate from the respondent's total rate. *See, e.g.*, *Risen II*, 2023 WL 2890019, at *3 ("Commerce verified that [the U.S. importer of JA Solar, a Chinese exporter] received no loans or financing connected with the [Chinese government]," and thus "removed the previously applied [Export Buyer's Credit Program] subsidy rate from [the exporter's] total rate."); *Both-Well (Taizhou) Steel Fittings, Co. v. United States*, 46 CIT __, __, 589 F. Supp. 3d 1343, 1345 (2022) (sustaining Commerce's revision of the subsidy rate calculations for respondent where "Commerce determined there is no evidence that the [respondent's] customers applied for or used, directly or indirectly, the [Program] during the period of review; therefore, the use of facts available with an adverse inference was not warranted"). Thus, as to sales to customers whose non-use of the Program was verified, no gap in the record was created by China's refusal to provide requested information because other information was available on the record (indeed legally required verified information) confirming non-use. Since no gap was created, with respect to these sales, the use of facts available (let alone an adverse inference) was not directed by statute. Indeed, the requirement of the use of verified information for an investigation determination directs the opposite result. *See* 19 U.S.C. § 1677m(i)(1).

As to Ancientree's remaining U.S. sales, information regarding non-use was placed on the record, but this information has not been verified. Again, in an investigation, Commerce must verify the information on which it relies in making its final determination. *Id.* With respect to these sales, then, a gap has been created because, although there is information of non-use on the record (the declarations), the information could not be verified, and Commerce may not rely on it when

making its determination.[20] A gap in the record exists with respect to these sales. Therefore, the use of facts available is directed by statute. *See, e.g.*, *id.* § 1677e(a)(2)(D) (directing that Commerce shall use "facts otherwise available" where, inter alia, a respondent "provides . . . information but the information cannot be verified").

Moreover, the use of adverse facts available is authorized based on China's failure to cooperate. There is a good deal of law indicating that courts should be careful when applying adverse facts available to respondents based on the failure of unrelated actors who are not respondents themselves. *See, e.g.*, *Mueller Comercial de Mex. v. United States*, 753 F.3d 1227, 1235 (Fed. Cir. 2014) ("[I]f the cooperating entity has no control over the non-cooperating suppliers, a resulting adverse inference is potentially unfair to the cooperating party." (citing *SKF USA Inc. v. United States*, 630 F.3d 1365, 1375 (Fed. Cir. 2011)); *Changzhou Wujin Fine Chem. Factory Co. v. United States*, 701 F.3d 1367, 1378 (Fed. Cir. 2012) (where non-cooperating parties were unrelated to the respondent, "[d]eterrence is not relevant here, where the 'AFA rate' only impacts cooperating respondents. We find no support in our caselaw or the statute's plain text for the proposition that deterrence, rather than fairness or accuracy, is the 'overriding purpose' of the antidumping statute when calculating a rate for a cooperating party.").

Nonetheless, the Federal Circuit has upheld the imposition of adverse inferences against a cooperating Chinese respondent where the Chinese government has failed to cooperate with Commerce's requests for information in a countervailing duty proceeding, under the theory that "a remedy that collaterally reaches [the exporter] has the potential to encourage the government of

---

[20]    A difference between this case and the *Risen* cases is that, as noted, the *Risen* cases involved the final results of an administrative review, not the final determination in an investigation. *See, e.g.*, *supra* note 17. Thus, unlike in this case, in *Risen*, verification of the information relied upon by Commerce in reaching the final results of its review was not mandatory. *See* 19 U.S.C. § 1677m(i)(3).

China to cooperate so as not to hurt its overall industry." *Fine Furniture (Shanghai) Ltd. v. United States*, 748 F.3d 1365, 1373 (Fed. Cir. 2014). The court thus finds (1) that a gap in the record exists with respect to Ancientree's U.S. customers whose claims of non-use of the Program to finance their purchases of subject merchandise were not verified; and (2) that the application of adverse facts available is authorized with respect to the facts of non-use based on China's failure to fully answer Commerce's questionnaires with respect to the Program.

## CONCLUSION AND ORDER

Based on the foregoing, it is hereby

**ORDERED** that, on remand, for each customer whose non-use of the Program was verified Commerce must determine a customer-specific rate that excludes a subsidy amount for the Program, and recalculate Ancientree's total rate, and the all-others rate. The Department may determine its own method for complying with this order; it is further

**ORDERED** that Commerce's findings are sustained with respect to the remaining U.S. customers whose non-use was not verified; and it is further

**ORDERED** that Commerce's remand redetermination is due ninety (90) days from the date of this Opinion and Order; any comments to the remand redetermination shall be due thirty (30) days following the filing of the remand redetermination; and any responses to those comments shall be filed fifteen (15) days following the filing of the comments.

_____/s/ Richard K. Eaton_____
Judge

Dated: July 22, 2024
        New York, New York