Slip Op. 25-74

UNITED STATES COURT OF INTERNATIONAL TRADE

```
—————————————————————————————         :
                                      :
DALIAN MEISEN WOODWORKING CO., LTD.,  :
                                      :
              Plaintiff,              :
                                      :
       and                            :
                                      :
                                      :    Before: Richard K. Eaton, Judge
CABINETS TO GO, LLC, and              :
THE ANCIENTREE CABINET CO., LTD.,     :
                                      :    Court No. 20-00110
                                      :
              Plaintiff-Intervenors,  :
                                      :
       v.                             :
                                      :
UNITED STATES,                        :
                                      :
              Defendant,              :
                                      :
       and                            :
                                      :
AMERICAN KITCHEN CABINET ALLIANCE,    :
                                      :
              Defendant-Intervenor.   :
—————————————————————————————         :
```

## <u>OPINION</u>

[U.S. Department of Commerce's Third Remand Results are sustained.]

Dated:  June 12, 2025

*Stephen W. Brophy* and *Jeffrey S. Neeley*, Husch Blackwell, LLP, of Washington, D.C., for Plaintiff Dalian Meisen Woodworking Co., Ltd.

*Alexandra H. Salzman*, deKieffer & Horgan, PLLC, of Washington, D.C., for Plaintiff-Intervenor The Ancientree Cabinet Co., Ltd. With her on the brief were *Gregory S. Menegaz* and *J. Kevin Horgan*.

*Mark R. Ludwikowski*, Clark Hill, PLC, of Washington, D.C., for Plaintiff-Intervenor Cabinets to Go, LLC.

*Ioana C. Meyer*, Trial Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, D.C., for Defendant the United States. With her on the brief were *Brian M. Boynton*, Principal Deputy Assistant Attorney General, *Patricia M. McCarthy*, Director, and *Tara K. Hogan*, Assistant Director. Of Counsel on the brief was *Fee Pauwels*, Attorney, Office of the Chief Counsel for Trade Enforcement & Compliance, U.S. Department of Commerce, of Washington, D.C.

*Luke A. Meisner*, Schagrin Associates, of Washington, D.C., for Defendant-Intervenor American Kitchen Cabinet Alliance. With him on the brief was *Christopher T. Cloutier*.

Eaton, Judge: This case involves the U.S. Department of Commerce's ("Commerce" or the "Department") final determination, as amended pursuant to court remand,[1] in the countervailing duty investigation of wooden cabinets and vanities from the People's Republic of China ("China"). *See Wooden Cabinets and Vanities and Components Thereof From the People's Republic of China: Final Affirmative Countervailing Duty Determination*, 85 Fed. Reg. 11,962 (Dep't of Commerce Feb. 28, 2020) ("Final Determination") and accompanying Issues and Decision Mem. (Feb. 21, 2020), PR[2] 846, ECF No. 33-6 ("Final IDM").

Before the court are Commerce's third remand results,[3] pursuant to the order in *Dalian Meisen Woodworking Co. v. United States*, 48 CIT __, 719 F. Supp. 3d 1322 (2024) ("*Dalian III*"), and the parties' comments and responses. *See Final Results of Redetermination Pursuant to Court Remand* (Nov. 12, 2024), PRR3 6, ECF No. 160-1 ("Third Remand Results"); *see also* Pl.-Int. The

---

[1]    The court has remanded this case three times. *See Dalian Meisen Woodworking Co. v. United States*, No. 20-00110, 2022 WL 1598896 (Ct. Int'l Trade May 12, 2022) (not reported in Federal Supplement); *Dalian Meisen Woodworking Co. v. United States*, No. 20-00110, 2023 WL 3222683 (Ct. Int'l Trade Apr. 20, 2023) (not reported in Federal Supplement); *Dalian Meisen Woodworking Co. v. United States*, 48 CIT __, 719 F. Supp. 3d 1322 (2024).

[2]    Record citations are to public and confidential documents on the original investigation record ("PR" and "CR"), the first remand record ("PRR1" and "CRR1"), the second remand record ("PRR2" and "CRR2"), and the third remand record ("PRR3" and "CRR3").

[3]    Commerce completed its remand results under "respectful protest." Final Results of Redetermination Pursuant to Court Remand at 7, PRR3 6, ECF No. 160-1.

Ancientree Cabinet Co., Ltd.'s Remand Cmts. ("Ancientree's Cmts."), ECF No. 164; Def.-Int.

American Kitchen Cabinet Alliance's Cmts. ("Alliance's Cmts."), ECF No. 163; Def. United

States' Resp. ("Def.'s Resp."), ECF No. 168; Def.-Int. American Kitchen Cabinet Alliance's

Resp., ECF No. 167; Pl.-Int. The Ancientree Cabinet Co., Ltd.'s Reply Cmts. ("Ancientree's

Reply"), ECF No. 169.

    For the following reasons, the court finds that Commerce has complied with the remand

order in *Dalian III* and that the Third Remand Results are supported by substantial evidence and

otherwise in accordance with law. The Third Remand Results are therefore sustained.

## BACKGROUND

    The factual and procedural history of this case, which can be found in the court's prior

opinions, is supplemented here. *See Dalian Meisen Woodworking Co. v. United States*,

No. 20-00110, 2022 WL 1598896 (Ct. Int'l Trade May 12, 2022) (not reported in Federal

Supplement) ("*Dalian I*"); *Dalian Meisen Woodworking Co. v. United States*, No. 20-00110, 2023

WL 3222683 (Ct. Int'l Trade Apr. 20, 2023) (not reported in Federal Supplement) ("*Dalian II*");

*Dalian III*, 48 CIT __, 719 F. Supp. 3d 1322.

## I.    Commerce's Final Determination and the *Dalian I* Remand Order

    During its countervailing duty investigation, which covered the period of January 1, 2018,

through December 31, 2018,[4] Commerce sent questionnaires to the Chinese government seeking

---

[4]    A parallel antidumping duty investigation of the subject merchandise covered part of the same period (July 1, 2018, through December 31, 2018) and ran concurrently with the countervailing duty investigation. *See Wooden Cabinets and Vanities and Components Thereof From the People's Republic of China: Initiation of Less-Than-Fair-Value Investigation*, 84 Fed. Reg. 12,587 (Dep't of Commerce Apr. 2, 2019); *Wooden Cabinets and Vanities and Components*

information about the Export Buyer's Credit Program (the "Program"). *See* Initial Questionnaire Issued to Government of China at 33-34, 36 (May 31, 2019), PR 443. The Program, which is administered by China's Export-Import Bank, is designed to promote the sale of Chinese exports by providing loans at preferential rates to foreign purchasers (including, at least potentially, those in the United States), directly or through third-party banks. The information Commerce asked for included operational information about the Program, e.g., the disbursement of funds through third-party banks, and revisions that China made to the Program in 2013. *See id.*

China provided some, but not all, of the operational information that Commerce sought. For example, while it provided the "Administrative Measures of Export Buyers' Credit of the Export-Import Bank of China . . . and Detailed Implementation Rules Governing Export Buyers' Credit of the Export-Import Bank of China," China failed to provide "a list of all partner/correspondent banks involved in disbursement of funds under the [Program]." Government of China's Initial Questionnaire Resp. at 71-72 (July 15, 2019), PR 505. Instead, China responded that Commerce's question asking for the bank information was "not applicable" because the Program was not used by respondents or their U.S. customers. *See id.*; *see also* Final IDM at 26-27.

With respect to the 2013 Program revisions,[5] China responded that the information was internal to the Export-Import Bank, not public, and not available for release, and further that it could not compel the Export-Import Bank to give the information to Commerce. *See* Final IDM at 26-27. China further responded that it "had confirmed that 'none of the U.S. customers of the

---

*Thereof From the People's Republic of China: Initiation of Countervailing Duty Investigation*, 84 Fed. Reg. 12,581 (Dep't of Commerce Apr. 2, 2019).

[5]     The revisions with respect to which Commerce asked for information pertained to an amendment that was apparently made to the Administrative Measures in 2013, which eliminated the minimum $2 million contract value requirement to apply for a loan under the Program. *See* Final IDM 24-25.

mandatory respondents has been provided with loans under this program,'" and, thus, answers to Commerce's questions relating to revisions to the Program were "not required." *Id.* at 26 (quoting Government of China's Initial Questionnaire Resp. at 70).

During the underlying investigation, Commerce verified questionnaire responses in China at the offices of Ancientree (and Plaintiff Dalian Meisen Woodworking Co., Ltd. ("Meisen")) from October 29, 2019, through November 15, 2019, as required by 19 U.S.C. § 1677m(i). *See* Final IDM at 2; *see also* 19 U.S.C. § 1677m(i)(1) ("The administering authority shall verify all information relied upon in making . . . a final determination in an investigation."). Though it was able to verify the "non-use" of some of the subsidies[6] under investigation, Commerce did not attempt to verify the respondents' claims that they neither used nor received a benefit under the Program. *See, e.g.*, Ancientree Verification Rep. at 9 (Jan. 7, 2020), PR 808; *see also* Final IDM at 31. Instead, Commerce stated that it was "unable to verify in a meaningful manner what little information there is on the record indicating non-use . . . with the exporters, U.S. customers, or at the China [Export-Import] Bank itself, given the refusal of [China] to provide the 2013 revision and a complete list of correspondent/partner/intermediate banks." Final IDM at 34.

Based on this claimed inability to verify non-use, Commerce found that factual gaps in the record existed with respect to the operation of the Program, requiring the use of "facts otherwise available."[7] *See* 19 U.S.C. § 1677e(a); Final IDM at cmt. 3.

---

[6]        Besides the Export Buyer's Credit Program, the other alleged subsidies under investigation included, for example, the alleged provision of certain materials, like standing timber, cut timber, and veneers, for less than adequate remuneration. *See* Final IDM at 5-8.

[7]        Commerce must use "facts otherwise available" if, during the investigation or administrative review, the Department determines that (1) "necessary information is not available on the record" or (2) "an interested party or any other person . . . withholds information that has been requested by [Commerce]," "fails to provide such information by the deadlines . . . or in the

Perhaps anticipating, or being actually aware, that China would fail to provide the requested information, Ancientree (one of the mandatory respondents) had placed on the record sworn declarations by its U.S. customers stating that they did not use the Program to make purchases from Ancientree during the period of investigation.[8] *See* Ancientree's Initial Section III Resp. at 27-28 & Ex. II-12 (July 11, 2019), PR 495-496, CR 189-190. By providing customer declarations of non-use, Ancientree sought to demonstrate that the Program had not conferred a "benefit" on the company—a statutory precondition to the imposition of countervailing duties.[9] Thus, Ancientree maintained that the operational information that China failed to provide (e.g., list of partner/correspondent banks) was irrelevant. No doubt Ancientree was familiar with case law indicating that a respondent could not be subject to the imposition of adverse facts available based on a gap created by the failure of a third party to answer questionnaires, where the requested information was available elsewhere on the record. *See, e.g.*, *GPX Int'l Tire Corp. v. United States*,

---

form and manner requested," "significantly impedes a proceeding," or "provides such information but the information cannot be verified." 19 U.S.C. § 1677e(a)(1)-(2).

[8]    Each declaration stated that the U.S. customer had "purchased subject wooden cabinets and vanities and components thereof from [Ancientree] during the period between January 1, 2018 and December 31, 2018"; had "not financed any purchases from [Ancientree] through the use of the Import-Export Bank of China's export buyer's credit program," and that the customer "has never used the Import Export Bank of China's financing (*i.e.*, 'Buyer's Credit program') in any way." *See* Ancientree's Initial Section III Resp. at Ex. II-12 (July 11, 2019), PR 495-496, CR 189-190.

[9]    Under the countervailing duty law, Commerce determines whether there is a subsidy, i.e., a financial contribution by an "authority" (such as a government) that confers a benefit to the recipient and is specific. *See* 19 U.S.C. § 1677(5)(B) (subsidy), (D) (financial contribution), (E) (benefit conferred), (5A) (specificity). "A benefit shall normally be treated as conferred where there is a benefit to the recipient, including . . . in the case of a loan, if there is a difference between the amount the recipient of the loan pays on the loan and the amount the recipient would pay on a comparable commercial loan that the recipient could actually obtain on the market." *Id.* § 1677(5)(E)(ii). Here, the benefit to Ancientree would result from its customers' cost of buying the subject wooden cabinets and vanities being reduced by their receiving preferential rates on loan proceeds used to buy the merchandise.

37 CIT 19, 58-59, 893 F. Supp. 2d 1296, 1332 (2013), *aff'd*, 780 F.3d 1136 (Fed. Cir. 2015); *Fine Furniture (Shanghai) Ltd. v. United States*, 36 CIT 1206, 1209, 865 F. Supp. 2d 1254, 1260 (2012), *aff'd*, 748 F.3d 1365 (Fed. Cir. 2014).

Commerce found that the customer declarations did not fill the gaps in the record left by China's failure to provide the requested operational information because, among other reasons, the declarations could not be verified without a "complete understanding" of how Program loans were distributed. *See* Final IDM at 30 ("Given the complicated structure of loan disbursements which can involve various banks for this program, Commerce's complete understanding of how this program is administrated is necessary to verify claims of non-use."); *see also* 19 U.S.C. § 1677m(i)(1) ("The administering authority shall verify all information relied upon in making . . . a final determination in an investigation."). Thus, Commerce found that, notwithstanding the non-use evidence, the declarations could not be verified,[10] the gaps in the record were not filled, and the use of facts available was required to fill those gaps.

---

[10]         In the Final IDM, Commerce identified the gap more specifically:

In short, because the [Chinese government] failed to provide Commerce with information necessary to identify a paper trail of a direct or indirect export credit[] from the China Ex-Im Bank, we would not know what to look for behind each loan in attempting to identify which loan was provided by the China Ex-Im Bank via a correspondent bank under the [Program]. This necessary information is missing from the record because such disbursement information is only known by the originating bank, the China Ex-Im Bank, which is a government-controlled bank. Without cooperation from the China Ex-Im Bank and/or the [Chinese government], we cannot know the banks that could have disbursed export buyer's credits to the company respondents' customers. Therefore, there are gaps in the record because the [Chinese government] refused to provide the requisite disbursement information.

Final IDM at 34.

In addition, Commerce found that China failed to cooperate to the best of its ability with its requests for information about the Program, and so applied adverse inferences when selecting from among the facts otherwise available.[11] *See* Final IDM at 36 (finding "that an adverse inference is warranted in the application of facts available . . . because [China] did not act to the best of its ability in providing the necessary information to Commerce"); *see also* 19 U.S.C. § 1677e(b)(1).

Based on adverse facts available, Commerce then concluded that the Program was countervailable, that Ancientree's U.S. customers used the Program to finance their purchases of the subject wooden cabinets and vanities, and that thus Ancientree had benefitted from the Program. *See* Final IDM at cmt. 3; *see also* Final Determination, 85 Fed. Reg. at 11,963 (listing subsidy rates). As an adverse facts available rate for the Program, Commerce selected 10.54% *ad valorem*, the highest rate determined for, what Commerce found to be, a similar program in the *Coated Paper* proceeding.[12] *See* Final IDM 37-38 (citing *Certain Coated Paper Suitable for High-*

---

[11]     Where Commerce determines that the use of facts available is required, it may apply adverse inferences to those facts if it makes the requisite additional finding that that party has "failed to cooperate by not acting to the best of its ability to comply with a request for information." 19 U.S.C. § 1677e(b)(1).

[12]     As will be discussed in greater detail *infra*, during the investigation segment of the parallel antidumping duty proceeding, Commerce reduced Ancientree's cash deposit rate to 0.00% to offset the 10.54% subsidy rate that Commerce assigned to the Program in the countervailing duty investigation, pursuant to 19 U.S.C. § 1677a(c)(1)(C). *See Wooden Cabinets and Vanities and Components Thereof From the People's Republic of China: Preliminary Affirmative Determination of Sales at Less Than Fair Value, Postponement of Final Determination and Extension of Provisional Measures*, 84 Fed. Reg. 54,106, 54,107 (Dep't of Commerce Oct. 9, 2019); *Wooden Cabinets and Vanities and Components Thereof From the People's Republic of China: Final Affirmative Determination of Sales at Less Than Fair Value*, 85 Fed. Reg. 11,953 (Dep't of Commerce Feb. 28, 2020), *as corrected by Wooden Cabinets and Vanities and Components Thereof From the People's Republic of China: Corrected Notice of Final Affirmative Determination of Sales at Less Than Fair Value*, 85 Fed. Reg. 17,855 (Dep't of Commerce Mar. 31, 2020) (correcting punctuation errors in company names).

*Quality Print Graphics Using Sheet-Fed Presses From the People's Republic of China*, 75 Fed.

Reg. 70,201, 70,202 (Dep't of Commerce Nov. 17, 2010) (amended final determination)).

In *Dalian I*, the court remanded Commerce's adverse facts available finding that

Ancientree (and Plaintiff Meisen) benefitted from the Program. *See Dalian I*, 2022 WL 1598896,

at *8-9. The court found that remand was required because Commerce's use of facts available was

not supported by substantial evidence, since the only actual record evidence was the

uncontroverted sworn U.S. customer declarations of non-use:

> Here, as in other cases,[13] to justify the substitution of relevant evidence placed on
> the record by cooperating respondents with facts available, Commerce has
> constructed an argument that is difficult to credit—*i.e.*, that operational information
> was withheld by China and therefore there are gaps regarding the use of the
> program. The problem with this argument is that the withheld information is (at
> best) only indirectly related to alleged actual use of the program by Meisen's and
> Ancientree's U.S. customers. Moreover, Commerce's argument that the operational
> information is necessary to verify the accuracy of the non-use information because

---

13      As the court has noted in prior opinions, the Program has been vigorously litigated
in cases before this Court. To date, the merits of these cases have yet to be reviewed by the Federal
Circuit. *See, e.g.*, *Dalian I*, 2022 WL 1598896, at *9 n.9 ("As noted in prior cases, Commerce has
never appealed this Court's rejection of the Department's facts otherwise available determination
in the context of the Export Buyer's Credit Program." (citing *Clearon Corp. v. United States*, 44
CIT __, __, 474 F. Supp. 3d 1339, 1353 n.13 (2020)). Commerce's appeal in *Risen Energy Co. v.
United States*, was voluntarily dismissed by the parties on July 9, 2024. Mandate Order, *Risen
Energy Co. v. United States*, No. 24-1524, (Fed. Cir. July 9, 2024), ECF No. 20. Though the
Program has been the subject of at least one decision by this Court since then, as of the date of this
opinion, no appeal of this issue has been filed. *See, e.g.*, *Yama Ribbons & Bows Co. v. United
States*, 48 CIT __, __, 719 F. Supp. 3d 1388, 1393 (2024) (sustaining Commerce's determination,
on remand, that "the [Program] was not used by Yama" and its revision of "Yama's overall
subsidy rate to exclude the 10.54 percent [adverse facts available] subsidy rate assigned to the
[Program]."). It is worth noting that most of the cases that have come before this Court, with
records similar to the record in this case, have directed Commerce to exclude the Program from its
subsidy calculations. *See, e.g.*, *id.*; *see also Risen Energy Co. v. United States*, 47 CIT __, __, 665
F. Supp. 3d 1335, 1344 (2023) ("At this stage, every piece of evidence presented to Commerce
and to the court supports the conclusion that Risen's sales were not aided by the [Program]. In the
face of substantial evidence of non-use from Risen and its customers, and no evidence of use
supported by actual evidence or any reasonable [adverse facts available] inference, Commerce
must not include a subsidy amount for [the Program]."); *see also id.* at __, 665 F. Supp. 3d at 1344
n.7 ("Commerce has . . . never found any evidence that any U.S. company has used the
[Program].").

> without it, verification is unreasonably burdensome using its typical procedure,
> rings hollow when Commerce fails to even try.

*Id.* at *8. It bears repeating that, unlike in reviews,[14] in investigations Commerce is directed by

statute to verify "all information relied upon in making . . . a final determination." 19 U.S.C.

§ 1677m(i)(1) ("The administering authority *shall* verify all information relied upon in

making . . . a final determination in an investigation." (emphasis added)); *see also* 19 C.F.R.

§ 351.307(b)(1)(i). The court thus directed that

> on remand, Commerce shall either (1) find a practical solution to verify the non-
> use information on the record, such as the reopening of the record to issue
> supplemental questionnaires to respondents and their U.S. customers; or
> (2) recalculate the countervailing duty rates for Meisen and Ancientree to exclude
> the subsidy rate for the Export Buyer's Credit Program, and recalculate the all-
> others rate accordingly.

*Dalian I*, 2022 WL 1598896, at *11. A remand proceeding commenced thereafter.


## II.    Commerce's First Remand Results and the *Dalian II* Remand Order

On remand, Commerce reopened the record and sought to verify non-use of the Program

by issuing a supplemental questionnaire. The supplemental questionnaire asked respondents to

---

[14]    In reviews, verification is required only if it is "timely requested by an interested party," and "no verification was made . . . during the 2 immediately preceding reviews and determinations under section 1675(a) of this title of the same order, finding, or notice," except "if good cause for verification is shown." 19 U.S.C. § 1677m(i)(3); *see also* 19 C.F.R. § 351.307(b)(1)(v). This was not always the case. Prior to the 1984 amendments to the statute, the Department "was required to verify information submitted by a foreign manufacturer during a section 751 administrative review." *Monsanto Co. v. United States*, 12 CIT 949, 951, 698 F. Supp. 285, 288 (1988) (citing *Al Tech Specialty Steel Corp. v. United States*, 6 CIT 245, 575 F. Supp. 1277 (1983), *aff'd*, 745 F.2d 632 (Fed. Cir. 1984)). The change in the law no longer requiring verifications in administrative reviews seems to have been a way to alleviate the administrative burden on Commerce, except in certain circumstances, as provided in the statute and regulations. *See id.* at 951, 698 F. Supp. at 288 ("Section 618 of the Trade and Tariff Act of 1984, codified at 19 U.S.C. § 1677e (Supp. IV 1986), relieves [Commerce] of the *burden of conducting verification* if verification occurred during either of the preceding two administrative reviews, unless good cause for verification is shown." (emphasis added)).

report "all loans/financing to each of your U.S. importers/customers that were received and/or outstanding during the period of investigation . . . regardless of whether you consider the financing to have been provided under the Export Buyer's Credit program," including non-traditional loans. *See, e.g.*, Remand Redetermination for the Countervailing Duty Investigation of Wooden Cabinets and Vanities and Components Thereof from the People's Republic of China: Export Buyer's Credit Suppl. Questionnaire, attach. at 1 (May 19, 2022), PRR1 1. Commerce asked that the parties "[s]ubmit the information requested in the ***Loan Template*** as an attachment to your response." *Id.* The loan template asked for: the names of lenders, the date of the loan agreement, the date of the loan receipt, the purpose of the loan, the initial loan amount, the currency of the loan, the life of the loan, the type of interest (i.e., fixed or variable rate), the interest rate specified in the agreement, the date of principal payments, amount of principal payments, dates of interest payment, amounts of interest paid, principal balance to which each interest payment applied, and the total number of days each payment covered, for each loan with interest payments during the period of investigation. *Id.*

In response to the supplemental questionnaire, Commerce received complete information for some, but not all, of Ancientree's U.S. customers. That is, Ancientree reported loan information for fifteen of its twenty-seven unaffiliated U.S. customers, which, according to the company, represented approximately 90% of its U.S. sales both by volume and by value during the period of investigation. *See* Ancientree Export Buyer's Credit Suppl. Questionnaire Resp. at 1 (June 13, 2022), PRR1 14, CRR1 6-15, ECF No. 97. Of the twelve U.S. companies whose loan information Ancientree failed to report, one had gone out of business. *Id.* With respect to the remaining eleven companies, representing approximately 10% of its U.S. sales both by volume and value,

Ancientree stated that despite its efforts, it could not reach, or could not convince, those companies to provide the loan information that Commerce requested. *Id.* at 1-2.

In the remand results pursuant to *Dalian I*, Commerce found that without *complete* responses for *all* U.S. customers it would be futile to attempt to verify *any* of the non-use information placed on the remand record. *See* Final Results of Redetermination Pursuant to Court Remand at 21 (Aug. 5, 2022), ECF No. 86-1 ("First Remand Results") ("The fact that the respondents in this remand did not provide complete responses for all their U.S. customers guaranteed that the record would remain incomplete as to usage information, thus, rendering futile any efforts to verify non-usage."). Because, for Commerce, the claims of non-use could not be verified, gaps in the record persisted.

In *Dalian II*, the court sustained Commerce's First Remand Results, in part,[15] and remanded its use of facts available with respect to Ancientree. The court held that substantial evidence did not support Commerce's finding that the use of facts available was required based on Commerce's claim that without complete loan information from all of Ancientree's U.S. customers, the Department could not verify any of the loan information that Ancientree had placed on the remand record. *Dalian II*, 2023 WL 3222683 at *6-7. Accordingly, the court ordered "that, on remand, Commerce attempt to verify Ancientree's submissions to the extent the Department finds appropriate . . . ." *Id.* at *8. A second remand proceeding commenced thereafter.

---

[15]    The court sustained Commerce's finding, based on adverse facts available, that Plaintiff Meisen used and benefitted from the Program. *Dalian II*, 2023 WL 3222683, at *8.

**III.    Commerce's Second Remand Results and the *Dalian III* Remand Order**

During the second remand proceeding, Commerce made efforts to verify the non-use information that Ancientree placed on the record in response to the supplemental questionnaire. As noted, Ancientree reported loan information for fifteen of its twenty-seven unaffiliated U.S. customers. For ten of the fifteen customers, Commerce was able to conduct in-person verification at the customers' offices. *See* Public Verification Reports of Customers A (PRR2 34), B (PRR2 43), C (PRR2 42), D (PRR2 35), E (PRR2 47), I (PRR2 39), J (PRR2 17), K (PRR2 18), L (PRR2 46), and O (PRR2 45).

Of these ten U.S. customers, Commerce "found no explicit usage of the [P]rogram for . . . eight customers during the [period of investigation]." Final Results of Redetermination Pursuant to Court Remand at 8-9 (Dec. 6, 2023), ECF No. 131 ("Second Remand Results"). Nonetheless, Commerce found that verification, as a whole, was unsuccessful because it was "unable to verify non-use of the [Program] for more than 70 percent of Ancientree's customers." *Id.* at 20. Commerce stated, by way of explanation, its reasons for finding that the verification was unsuccessful:

> At the outset, we note that – of Ancientree's 27 U.S. customers – 12 provided no response to Commerce's [Export Buyer's Credit Program] questionnaire when we reopened the record on remand. Further, while two additional customers (herein referred to as "Customer N" and "Customer M") nominally provided information, these submissions were plainly unresponsive and did not provide any of the requested data relating to the customers' [period of investigation or "POI"] financing. Specifically, Customer N's response summarily stated that: "{t}he pre-acquisition, legacy financial records of Customer N are disorganized" and "{i}t would take company personnel significant time and effort to try to locate and decipher 2018 {POI} financial records . . . if they even exist." With respect to Customer M, Ancientree stated that "we are omitting Customer M's narrative and related exhibit{s} because they are not finalized." Thus, Customers M and N did not provide complete or verifiable non-use information, and – before the verification process even began – less than half of Ancientree's customers provided a response to Commerce's [Export Buyer's Credit Program] questionnaire.

Three of the remaining 13 customers would not agree to verification. Customers F and G stated that they would not participate in Commerce's verification process prior to any verification arrangements being made. Customer H initially consented to verification but, two days prior to the scheduled start date, stated that it would no longer be participating.

Of the 10 remaining customers, we were unable to verify non-use for two companies (Customer B and Customer E). With respect to Customer B, Commerce officials arrived at the customer's location on September 18, 2023, and began examining the items set forth in the verification agenda that was circulated to Ancientree and the customer in advance. During the on-site verification process, a company official asked the Commerce team to step out of the conference room. At that time, a company official entered the verification room and took several key documents that Commerce officials had collected as exhibits. The company representative stated that Customer B would no longer be providing the information. The verification process was halted at this time.

Customer E did permit Commerce officials to conduct the verification process. However, during the verification procedure, Customer E failed to provide crucial documentation that was requested prior to verification. Specifically, Customer E did not provide the underlying loan agreement(s) and/or application(s) relating to the line of credit that was outstanding during the POI; this represents the type of documentation that would permit Commerce officials to analyze the basis for the loan(s) and any restrictions or requirements relating to the lending. Such information was requested in Commerce's [Export Buyer's Credit Program] Supplemental Questionnaire. Customer E provided "Change in Terms" agreements for the credit facility, which operated to extend the duration of the loan, but it did not provide the underlying loan documentation itself. . . .[16] These documents were necessary for Commerce's analysis. Accordingly, in the verification agenda issued prior to the on-site verification process, we identified the loan agreement and application as key documentary support for Customer E's reporting. Nonetheless,

----

[16]    Regarding the significance of the underlying loan documentation, Commerce stated, by way of explanation:

This is significant, because the "Change in Terms" agreements incorporate by reference the underlying 2012 loan documentation. For instance, they reference the terms set forth in an underlying Promissory Note and Business Loan Agreement, *i.e.*, noting that "This Note is subject to and is governed by the term[s] of a Business Loan Agreement (the Loan Agreement) between Borrower and Lender." Similarly, Customer E's numerous draw requests under the line of credit reference the underlying documents, noting that such requests are made "{u}nder and pursuant to the terms of that certain Business Loan Agreement and Promissory Note dated February 13, 2012."

Second Remand Results at 8.

these documents were not provided at verification, restricting Commerce's ability to examine the company's usage of the [Program].

After accounting for the difficulties identified above, we were unable to verify non-use of the [Program] for more than 70 percent of Ancientree's customers. Further, *while we found no explicit usage of the program for the remaining eight customers during the POI, these eight customers accounted for far less than Ancientree's claim of "approximately 90 {percent}" of POI sales*.[] Given that a clear majority of the customers that provided certifications of non-use in this proceeding declined, or otherwise were unable, to support such certifications with verifiable information, *we do not find that this level of completeness is sufficient to overcome [China's] non-cooperation, and to permit a finding of non-use here*.

*Id.* at 6-9 (emphasis added). It is worth noting that Commerce relied on its inability to verify non-usage of the Program for a majority of Ancientree's POI customers rather than its ability to verify non-use with respect to a majority of Ancientree's sales by volume and by value. This may be because, "[a]lthough Commerce verified Ancientree's *overall* sales figures as part of the underlying investigation, it did not – and had no reason to – verify such figures on a *customer-specific* basis." *Id.* at 9 n.43 (emphasis added). Notwithstanding that the record did not contain verified sales data on a customer-specific basis for Ancientree, during oral argument, Commerce acknowledged that the eight U.S. customers whose non-use of the Program was verified represented 79% of Ancientree's sales by value. *See* Oral Argument at 7:20-35 (Apr. 17, 2024). But apparently, for Commerce, successful verification of 79% of sales by value did not amount to a "successful" verification as that word appeared in *Dalian II*'s remand order:

With respect to calculating a *pro rata* adjustment for Ancientree regarding the [Program], upon remand, the Court ordered that Commerce could elect to attempt verification of Ancientree's submissions and "if that is successful" should accept the *pro rata* adjustment proposed by Ancientree or conclude that the [Program] was not used at all. As detailed above, over 70 percent of Ancientree's customers – which accounted for a significant percentage of Ancientree's U.S. sales during the POI, by volume – declined or otherwise failed to be fully verified. Thus, Commerce concludes that verification of Ancientree's submissions *was not successful within the meaning of the Court's instructions* and it is, therefore, not necessary or appropriate to apply a *pro rata* adjustment as sought by Ancientree or to conclude that Ancientree did not use the [Program].

Second Remand Results at 9-10 (emphasis added). In other words, Commerce interpreted the word "successful" in the court's remand order to mean verification of some number of Ancientree's U.S. customers higher than eight, or some greater percentage of Ancientree's customers than the roughly 30% that Commerce was able to verify, instead of looking to the percentage of sales by value that could be verified (approximately 79%). Having found that the non-use verification was unsuccessful, Commerce then found that it was not "necessary or appropriate" to apply a *pro rata* adjustment or find non-use of the Program, as directed in the court's remand order. *Id.* at 10; *see Dalian II*, 2023 WL 3222683, at *8.

        In addition, Commerce concluded that because verification was "unsuccessful," the use of facts available was required because "there is a gap in the record that Ancientree has been unable to fill with verifiable information." Second Remand Results at 21. The gap in the record was identified as that which "result[ed] from the Government of China . . . withholding necessary information that was requested of it." *Id.* at 2.

        Commerce further found that applying an adverse inference when selecting from among the facts available was appropriate because of China's "failure to provide necessary information on the [Program]" in response to Commerce's questionnaires. *Id.* at 21. Commerce found that, "despite [its] attempt to gather information following the *First Remand Order* [issued in *Dalian I*], and our subsequent attempt to verify necessary information following the *Second Remand Order* [issued in *Dalian II*], the record does not contain non-use information that overcomes the [Chinese government's] reporting failure." *Id.*

        In making this finding, the Department stated, by way of explanation, that it rejected Ancientree's argument that "Commerce should apply a *pro rata* program rate for the [Program] *or apply [adverse facts available] only to non-responsive customer imports (by setting up*

*customer-specific rates), because each customer's use of the [Program] stands alone.*" *Id.*
(emphasis added).

In other words, Ancientree had argued that, because verification was successful with
respect to some of its U.S. customers, there were two potential methods by which Commerce could
adjust its rate: (1) "a *pro rata* adjustment based on the [period of investigation] sales of the
customer"; or (2) "*[i]f Commerce declines to* pro rate *the [adverse facts available] rate, Commerce
could set up customer-specific rates for the case, with no [Program] subsidy rate included in the
rate assigned to the customers that were successfully verified for non-use.*" *Id.* at 13-14 (emphasis
added).

For the Department, neither method was feasible because (1) "Commerce was unable to
verify the sales figures that form the basis of the pro rating sought by Ancientree," and (2) not all
of "the customer-specific quantity and value figures that Ancientree provided in support of its
proposed *pro rata* adjustment" matched the customer's own reporting.[17] *Id.* at 9 n.43, 21 n.69.

---

[17]        By way of explanation, Commerce stated:

We note that the customer-specific quantity and value figures that Ancientree
provided in support of its proposed *pro rata* adjustment remain largely unverified.
Although Commerce verified Ancientree's overall sales figures as part of the
underlying investigation, it did not – and had no reason to – verify such figures on
a customer-specific basis. During our verification of Ancientree's customers, we
examined the quantity/value of acquisitions from Ancientree. In some cases, the
customer's reporting approximated the Ancientree figures; in others, the figures
were not close to those reported by Ancientree.

Second Remand Results at 9 n.43.

Commerce thus continued to include a 10.54% subsidy rate for the Program, as adverse

facts available, in the calculation of Ancientree's total subsidy rate of 13.33%.[18] *See* Final

Determination, 85 Fed. Reg. at 11,963.

In *Dalian III*, the court sustained the Second Remand Results, in part,[19] and remanded

Commerce's use of adverse facts available with respect to Ancientree's sales to customers whose

claims of non-use of the Program to finance their purchases of subject merchandise had not been

verified:

---

[18]    The 13.33% rate included the 10.54% Program rate plus rates assigned to other subsidies that were found to have conferred a benefit on Ancientree during the period of investigation: Policy Loans to the Wooden Cabinets Industry (0.10%); Provision of Plywood for less-than-adequate remuneration or "LTAR" (0.01%); Provision of Sawn Wood and Continuously Shaped Wood for LTAR (0.01%); Provision of Particleboard for LTAR (1.15%); Provision of Fiberboard for LTAR (1.20%); Provision of Electricity for LTAR (0.26%); and "other subsidies" such as self-reported grants (0.06%). Final IDM at 5-7. These subsidies, which amounted to 2.79%, were added to the 10.54% Program rate to come up with Ancientree's total subsidy rate of 13.33%.

[19]    The court found that the statute directed the use of facts available with respect to sales to Ancientree's customers whose non-use was not verified because the unverified claims of non-use created a factual gap in the record:

> [I]n an investigation, Commerce must verify the information on which it relies in making its final determination. [19 U.S.C. § 1677m(i)(1).] With respect to [the sales to U.S. customers whose non-use could not be verified] . . . , a gap has been created because, although there is information of non-use on the record (the declarations), the information could not be verified, and Commerce may not rely on it when making its determination. A gap in the record exists with respect to these sales. Therefore, the use of facts available is directed by statute. *See, e.g.*, *id.* § 1677e(a)(2)(D) (directing that Commerce shall use "facts otherwise available" where, inter alia, a respondent "provides . . . information but the information cannot be verified").

*Dalian III*, 48 CIT at __, 719 F. Supp. 3d at 1337. The court went on to find that the application of an adverse inference was justified with respect to the same sales "based on China's failure to cooperate." *Id.* The court thus found: "(1) that a gap in the record exists with respect to Ancientree's U.S. customers whose claims of non-use of the Program to finance their purchases of subject merchandise were not verified; and (2) that the application of adverse facts available is authorized with respect to the facts of non-use based on China's failure to fully answer Commerce's questionnaires with respect to the Program." *Id.*

The statute requires Commerce to fill gaps in the administrative record with "facts otherwise available." 19 U.S.C. § 1677e(a). It further permits the application of an adverse inference "in selecting from among the facts otherwise available." *Id.* § 1677e(b)(1). Here, Commerce has found a gap in the record where there is not one in fact. With respect to a majority of sales by value, there is no non-use gap. Rather there is verified information of non-use upon which Commerce must rely. With respect to the verified information, in a related context, this Court has said "Commerce opened the door by requesting additional information already requested on subsidies and cannot shut that door simply because it does not like the relevant information submitted." *GPX Int'l Tire Corp.*, 37 CIT at 60, 893 F. Supp. 2d at 1333.

Because Commerce verified non-use of the Program by certain of Ancientree's U.S. customers but could not (or did not) with respect to others, the court will treat the use of countervailing duties differently for the sales to customers whose non-use of the Program was verified, from those sales where non-use was not verified. As a result of its verification efforts, Commerce now knows for sure that certain of Ancientree's U.S. customers did not use the Program. Based on this verification determination, with respect to the sales to those companies whose non-use of the Program has been verified, Commerce must eliminate the subsidy represented in the rate applied to those sales. Commerce now knows that their declarations of non-use were valid. There is no gap in the record. And *Commerce can base its determination of non-use on verified information in accordance with the statute* [i.e., 19 U.S.C. § 1677m(i)(1), which requires that Commerce "shall verify all information relied upon in making . . . a final determination in an investigation"].

This kind of distinction, i.e., separation of sales with respect to which verification was successful from those where it was not successful, is not entirely foreign to Commerce. Where Commerce has been able to verify non-use of the Program by a Chinese respondent's U.S. customers in past cases it has removed the Program subsidy rate from the respondent's total rate. *See, e.g.*, *Risen II*, 2023 WL 2890019, at *3 ("Commerce verified that [the U.S. importer of JA Solar, a Chinese exporter] received no loans or financing connected with the [Chinese government]," and thus "removed the previously applied [Export Buyer's Credit Program] subsidy rate from [the exporter's] total rate."); *Both-Well (Taizhou) Steel Fittings, Co. v. United States*, 46 CIT __, __, 589 F. Supp. 3d 1343, 1345 (2022) (sustaining Commerce's revision of the subsidy rate calculations for respondent where "Commerce determined there is no evidence that the [respondent's] customers applied for or used, directly or indirectly, the [Program] during the period of review; therefore, the use of facts available with an adverse inference was not warranted"). Thus, as to sales to customers whose non-use of the Program was verified, no gap in the record was created by China's refusal to provide requested information because other information was available on the record (indeed legally required verified information) confirming non-use. Since no gap was created, with respect to these sales, the use of facts available (let alone an adverse inference) was

not directed by statute. Indeed, the requirement of the use of verified information for an investigation determination directs the opposite result. *See* 19 U.S.C. § 1677m(i)(1).

*Dalian III*, 48 CIT at __, 719 F. Supp. 3d at 1336-37 (emphasis added). Accordingly, the court ordered:

> [O]n remand, for each customer whose non-use of the Program was verified Commerce must determine a customer-specific rate that excludes a subsidy amount for the Program, and recalculate Ancientree's total rate, and the all-others rate. The Department may determine its own method for complying with this order.

*Id.* at __, 719 F.Supp.3d at 1337-38. A third remand proceeding commenced thereafter.

## IV.    Commerce's Third Remand Results

In the Third Remand Results, Commerce (1) determined customer-specific subsidy rates to serve as the basis for liquidation; (2) recalculated the total subsidy rate for Ancientree; (3) recalculated the all-others rate; and (4) adjusted the customer-specific rate determined for customers whose non-use of the Program was verified to account for the export subsidy offset that had been granted in the parallel antidumping duty proceeding.

Commerce stated that it intended to instruct U.S. Customs and Border Protection ("Customs") to "revise the amount of [countervailing duty] cash deposits already collected" on entries of Ancientree's merchandise that are subject to this litigation,[20] using the rates recalculated on remand.[21] Third Remand Results at 12.

---

[20]    Liquidation of the entries subject to this litigation has been enjoined. *See* Order For Statutory Injunction Upon Consent (Oct. 11, 2023), ECF No. 127.

[21]    Commerce determined that the customer-specific rates calculated pursuant to *Dalian III* would apply only *retroactively* to revise the cash deposits already collected on imports subject to this litigation. Commerce clarified that it would not "rely on the [customer-specific rates] to establish *prospective* customers-specific cash deposit rates," because, among other reasons, the countervailing duty statute directs the determination of an "estimated individual countervailable

## A.   Determination of Customer-Specific Subsidy Rates

First, on remand, Commerce determined a subsidy rate of 2.79% that would apply to imports of subject merchandise sold to Ancientree's customers whose non-use of the Program had been verified. Commerce arrived at this 2.79% rate by subtracting the 10.54% Program rate from Ancientree's total subsidy rate of 13.33%.[22] *See* Third Remand Results at 10 (Table 2).

For imports of subject merchandise sold to all other Ancientree customers (i.e., those whose non-use was not verified), Commerce found that the 13.33% rate would apply. *Id.*

## B.   Recalculation of Ancientree's Total Subsidy Rate

Next, on remand, Commerce recalculated Ancientree's total subsidy rate, reducing it from 13.33% to 5.06%. Commerce did this in two steps.

As step one, Commerce revised the Program rate for Ancientree from 10.54% to 2.27%. To arrive at this rate, Commerce pro-rated the 10.54% Program rate by applying an "adjustment factor" of 21.56%—i.e., the percentage of Ancientree's sales, by value, that were made during the period of investigation to its customers who failed to demonstrate non-use of the Program. *Id.* at 8-9. Commerce derived the 21.56% adjustment factor from information placed on the record by Ancientree in the second remand proceeding:

> [The 21.56%] figure is derived from Exhibit 1 of Ancientree's June 13, 2022 [supplemental questionnaire response]. Specifically, we determined that the . . . Customers . . . identified as Customers A, C, D, I, J, K, L, and O in the prior

---

subsidy rate for each exporter and producer individually investigated." Third Remand Results at 10, 11 n.48 (quoting 19 U.S.C. § 1671d(c)(1)(B)(i)(I)).

[22]     To repeat, 13.33% is the total subsidy rate determined for Ancientree in the Final Determination. *See* 85 Fed. Reg. at 11,963. It is the sum of the rates determined for all countervailable subsidies that were found to have conferred a benefit on the company during the period of investigation: Policy Loans to the Wooden Cabinets Industry (0.10%); Provision of Plywood for LTAR (0.01%); Provision of Sawn Wood and Continuously Shaped Wood for LTAR (0.01%); Provision of Particleboard for LTAR (1.15%); Provision of Fiberboard for LTAR (1.20%); Provision of Electricity for LTAR (0.26%); the Program, i.e., the Export Buyer's Credit Program (10.54%); and self-reported grants (0.06%). Final IDM at 5-7.

remand, cooperated and successfully demonstrated non-use. Using Exhibit 1, we summed the value of [period of investigation] sales for the *other* Ancientree customers, and then we divided the resulting value by Ancientree's total [period of investigation] sales to the United States. The resulting figure represents the adjustment factor [i.e., 21.56%].

Third Remand Results at 9 n.45. Commerce "multiplied [the 21.56% adjustment factor] by the total [Program] rate (of 10.54 percent) to arrive at the pro-rated Ancientree rate for the [Program], i.e., [2.27%]." *Id.*

Then, using Ancientree's revised Program rate of 2.27%, Commerce recalculated the company's total subsidy rate.[23] That is, Commerce added 2.27% to the rates of the other subsidy programs that were found to have conferred a benefit on Ancientree during the period of investigation.[24] *Id.* at 8. The sum of the rates equaled a total subsidy rate of 5.06% for Ancientree. *See id.* (Table 1).

### C.    Recalculation of the All-Others Rate

Commerce then recalculated the all-others rate using a simple average of the total subsidy rates determined for the mandatory respondents, including Ancientree's revised total subsidy rate of 5.06%:

In light of Ancientree's revised rate of 5.06 percent calculated in this remand redetermination, we have recalculated the all-others rate through a simple average of the rates for Ancientree, Meisen, and Rizhao Foremost Woodwork Manufacturing Company Ltd (the third mandatory respondent in the [countervailing duty] investigation), *i.e.*, (5.06 + 18.27 + 31.18) / 3 = 18.17 percent.

---

[23]    In the Final Determination, Commerce determined a total subsidy rate for Ancientree of 13.33%.

[24]    That is, Commerce found that Ancientree benefitted from the Program (at the revised rate of 2.27%); Policy Loans to the Wooden Cabinets Industry (0.10%); Provision of Plywood for LTAR (0.01%); Provision of Sawn Wood and Continuously Shaped Wood for LTAR (0.01%); Provision of Particleboard for LTAR (1.15%); Provision of Fiberboard for LTAR (1.20%); Provision of Electricity for LTAR (0.26%); and self-reported grants (0.06%). The sum of these percentages is 5.06%. Third Remand Results at 8 (Table 1).

Third Remand Results at 15. Thus, the all-others rate was reduced from 20.93% (determined in the Final Determination) to 18.17% (determined in the Third Remand Results).

### D.    Commerce's Adjustment of 2.79% Customer-Specific Rate to Account for Export Subsidy Offset in Parallel Antidumping Duty Proceeding

Then, Commerce adjusted the subsidy rate determined for customers whose non-use of the Program was verified (2.79%) *upward* to account for the export subsidy offset that had been granted in the parallel antidumping duty proceeding, as discussed below.

### 1.    Background on the "Export Subsidy" Offset Granted for the Program in the Antidumping Duty Proceeding

Countervailable subsidies take different forms.[25] "Export subsidies" are one kind of countervailable subsidy. 19 U.S.C. § 1677(5)(A), (5A)(B). "An export subsidy is a subsidy that is, in law or in fact, contingent upon export performance, alone or as 1 of 2 or more conditions." *Id.* § 1677(5A)(B). A subsidy is considered "contingent upon export performance" if the provision of the subsidy is tied to actual or anticipated exportation or export earnings. 19 C.F.R. § 351.514(a). Commerce considers China's Export Buyer's Credit Program an "export subsidy," and it would be difficult to argue otherwise. *See* Third Remand Results at 12 & n.53.

When Commerce countervails an export subsidy, such as the Program, the rate determined for the subsidy is applied in two ways. First, Commerce uses the rate to determine an individual subsidy rate for each mandatory respondent that is found to have benefitted from the subsidy during the period of investigation (or period of review, in an administrative review). That is, Commerce adds together the export subsidy rate (e.g., 10.54% for the Program) plus rates for any other subsidies that are found to have conferred a benefit on the respondent (e.g., provision of

---

[25]    Not all subsidies are countervailable, but some, including export subsidies, are. *See* 19 U.S.C. § 1677(5)(A), (5A)(B) (export subsidy), (5B)(A) (categories of non-countervailable subsidies). *See supra* note 9 for the statutory elements of a countervailable subsidy.

inputs for less-than-adequate-remuneration and other subsidies amounting to 2.79%). Their sum equals the respondent's individual subsidy rate (here, 13.33%). The individual subsidy rate is then used to set a cash deposit rate.

Second, where merchandise is subject to parallel countervailing and antidumping duty investigations, as is the case here, Commerce must "offset" the export subsidy in its less-than-fair-value determination, as provided in § 1677a(c)(1)(C) of the antidumping statute. That is, when Commerce makes its dumping determination, by comparing normal value (the price of the merchandise in the home market) and export price or constructed export price (the price of the merchandise sold in the United States), "[t]he price used to establish export price and constructed export price shall be . . . increased by . . . the amount of any countervailing duty imposed on the subject merchandise . . . to offset an export subsidy." 19 U.S.C. § 1677a(c)(1)(C); *see Risen Energy Co. v. United States*, 43 CIT __, __, 477 F. Supp. 3d 1332, 1347 (2020) ("When calculating the dumping margin, Commerce is statutorily required to increase the U.S. Price by the amount of any [countervailing duty] imposed on the subject merchandise to offset an export subsidy."). The purpose of the export subsidy offset is to "avoid the double application of duties." *Jinko Solar Co. v. United States*, 961 F.3d 1177, 1182 (Fed. Cir. 2020) (acknowledging Commerce's explanation that "the theory 'underlying [§ 1677a(c)(1)(C)] is that in parallel [antidumping duty] and [countervailing duty] investigations, if [Commerce] finds that a respondent received the benefits of an export subsidy program, [the statute] presume[s that] the subsidy contributed to lower-priced sales of subject merchandise in the United States.'").

Where Commerce offsets an export subsidy in an antidumping duty proceeding pursuant to 19 U.S.C § 1677a(c)(1)(C), the net effect is to reduce the antidumping cash deposit rate by the amount of the subsidy determined in the companion countervailing duty proceeding. *See, e.g.*,

*Wooden Cabinets and Vanities and Components Thereof From the People's Republic of China:*
*Final Affirmative Determination of Sales at Less Than Fair Value*, 85 Fed. Reg. 11,953, 11,961
(Dep't of Commerce Feb. 28, 2020) ("Final Dumping Determination") ("We normally adjust
[antidumping duty] cash deposit rates by the amount of export subsidies, where appropriate.").

The export subsidy rate does not disappear, however. Here, in the countervailing duty
investigation, Commerce determined the 10.54% rate for the Program in its affirmative
preliminary determination, published on August 12, 2019. *See Wooden Cabinets and Vanities and*
*Components Thereof From the People's Republic of China: Preliminary Affirmative*
*Countervailing Duty Determination, and Alignment of Final Determination With Final*
*Antidumping Duty Determination*, 84 Fed. Reg. 39,798 (Dep't of Commerce Aug. 12, 2019)
("Preliminary Countervailing Duty Determination") and accompanying Preliminary Decision
Mem. at 23 (Aug. 5, 2019), ECF No. 51 (including 10.54% Program rate in Ancientree's
preliminary subsidy rate as adverse facts available). As a result, Commerce directed Customs to
collect countervailing cash deposits on entries of Ancientree's subject merchandise made on or
after August 12, 2019, at a rate *that included* the 10.54% rate for the Program. Preliminary
Countervailing Duty Determination,  84 Fed. Reg. at 39,800.

On October 9, 2019, Commerce published its preliminary affirmative dumping
determination. *See Wooden Cabinets and Vanities and Components Thereof From the People's*
*Republic of China: Preliminary Affirmative Determination of Sales at Less Than Fair Value,*
*Postponement of Final Determination and Extension of Provisional Measures*, 84 Fed. Reg.
54,106 (Dep't of Commerce Oct. 9, 2019) ("Preliminary Dumping Determination"). In that
determination, Commerce offset the Program in accordance with 19 U.S.C. § 1677a(c)(1)(C).
Commerce first determined a preliminary estimated weighted-average dumping margin for

Ancientree of 4.49%. *Id.* at 54,107. Commerce then adjusted the 4.49% margin by subtracting the 10.54% Program rate found in the Preliminary Countervailing Duty Determination to arrive at an antidumping duty cash deposit rate of 0.00%. *Id.*; *see also* Third Remand Results at 12 ("Commerce reduced Ancientree's dumping margin to reflect Commerce's affirmative determination of export subsidies for the company, *i.e.*, the affirmative countervailing of the [Program]."). Thus, imports of Ancientree's merchandise were not subject to antidumping duty cash deposits, starting on October 9, 2019, on account of the export subsidy offset for the Program. They were, though, subject to countervailing duty cash deposits starting on August 12, 2019.

On February 28, 2020, Commerce published the Final Determination in the countervailing duty investigation. Commerce determined a 13.33% total subsidy rate for Ancientree, which included the 10.54% rate for the Program plus other subsidy rates equaling 2.79%. *See* Final Determination, 85 Fed. Reg. at 11,963; *Wooden Cabinets and Vanities and Components Thereof from the People's Republic of China: Countervailing Duty Order*, 85 Fed. Reg. 22,134 (Dep't of Commerce Apr. 21, 2020). The Department directed Customs to collect a countervailing duty cash deposit of 13.33% in accordance with the Final Determination. *See* 85 Fed. Reg. at 22,135.

Also on February 28, 2020, Commerce published its final determination in the antidumping duty investigation. Final Dumping Determination, 85 Fed. Reg. at 11,955. Commerce determined a final estimated weighted-average dumping margin for Ancientree of 4.37%. *Wooden Cabinets and Vanities and Components Thereof From the People's Republic of China: Antidumping Duty Order*, 85 Fed. Reg. 22,126, 22,127 (Dep't of Commerce Apr. 21, 2020). Continuing to apply the export subsidy offset determined in the Preliminary Dumping Determination, Commerce adjusted the 4.37% margin by subtracting the 10.54% Program rate to arrive at a cash deposit rate of 0.00%. Final Dumping Determination, 85 Fed. Reg. at 11,961.

The first and second administrative reviews of the countervailing duty order and the first and second administrative reviews of the antidumping duty order followed in due course.

On the countervailing duty side, Ancientree did not participate in the first or second administrative reviews. *See* Third Remand Results at 11. Thus, the company's individual subsidy rate of 13.33% (which included the 10.54% rate for the Program), determined in the countervailing duty investigation, continued to apply to Ancientree during the periods covered by the two reviews. *See Wooden Cabinets and Vanities and Components Thereof From the People's Republic of China: Final Results and Partial Rescission of Countervailing Duty Administrative Review; 2019-2020*, 87 Fed. Reg. 51,967, 51,968 (Dep't of Commerce Aug. 24, 2022) (covering the period of review from August 12, 2019, to December 31, 2020); *Wooden Cabinets and Vanities and Components Thereof From the People's Republic of China: Final Results and Partial Recission of Countervailing Duty Administrative Review; 2021*, 88 Fed. Reg. 76,732 (Dep't of Commerce Nov. 7, 2023) (covering the period of review from January 1, 2021, to December 31, 2021).

On the antidumping side, Ancientree did not participate in the first administrative review. *See Wooden Cabinet and Vanities and Components Thereof From the People's Republic of China: Preliminary Results and Partial Rescission of the Antidumping Duty Administrative Review; 2019-2021*, 87 Fed. Reg. 27,090, 27,093 (Dep't of Commerce May 6, 2022) (rescinding review as to Ancientree). Thus, the offset continued at the rate of 10.54%, as did the antidumping duty rate of 4.37%, which, when offset, resulted in a 0.00% antidumping cash deposit rate. The 0.00% antidumping cash deposit rate continued to apply to Ancientree during the period covered by the first administrative review, i.e., October 9, 2019, through March 31, 2021. *Id.*; *see also Wooden Cabinet and Vanities and Components Thereof From the People's Republic of China: Final*

*Results and Partial Rescission of the Antidumping Duty Administrative Review; 2019-2021*, 87 Fed. Reg. 67,674, 67,675 (Dep't of Commerce Nov. 9, 2022).

Ancientree participated in the second administrative review of the antidumping duty order. *See Wooden Cabinet and Vanities and Components Thereof From the People's Republic of China: Final Results and Final Determination of No Shipments of the Antidumping Duty Administrative Review; 2021-2022*, 88 Fed. Reg. 76,729, 76,730 (Dep't of Commerce Nov. 7, 2023) ("Second Antidumping Administrative Review Final Results") (covering the period of review from April 1, 2021, to March 31, 2022). In that review, Commerce did not offset the Program pursuant to 19 U.S.C. § 1677a(c)(1)(C). *Id.* That is, Commerce did not increase U.S. price to account for the Program, and Ancientree did not ask for the offset. Commerce determined a final weighted-average dumping margin for Ancientree of 8.26%, which also served as the company's antidumping duty cash deposit rate. *Id.*

Commerce's failure to provide an offset in the Second Antidumping Administrative Review Final Results was appealed to this Court, in *The Ancientree Cabinet Co. v. United States*, Court No. 23-00262. Ultimately, the *Ancientree* Court held that Ancientree had failed to exhaust the export subsidy offset issue, by failing to raise it timely before Commerce, and found that no exception to the exhaustion requirement applied. The Court, therefore, sustained the final results. *See The Ancientree Cabinet Co. v. United States*, 48 CIT __, __, 736 F. Supp. 3d 1334, 1342 (2024) (judgment entered on Oct. 24, 2024, no appeal filed).

### 2.    Adjustment of 2.79% Customer-Specific Rate Determined in Third Remand Results to Account for Export Subsidy Offset

Against this background, Commerce found, in the Third Remand Results now before the court, that it must account for the offset that was made in the segments of the antidumping duty proceeding in which Ancientree's antidumping cash deposit rate was reduced to 0.00%. That is,

where Commerce had removed the 10.54% Program rate from the subsidy rate applicable to customers whose non-use of the Program was verified, it *added* the amount of the offset that was granted in the antidumping duty investigation to ensure the customers did not get both a reduction in their antidumping cash deposit rate because of the Program *and* a lower subsidy rate because of the removal of the Program rate from their subsidy rate:

> Importantly, we note that there exists an antidumping duty . . . order on cabinets from China, and Commerce also investigated Ancientree as a mandatory respondent in that parallel proceeding. When establishing Ancientree's cash deposit rate in the less-than-fair-value investigation, Commerce offset the company's preliminary and final dumping margins for export-contingent subsidies, pursuant to [19 U.S.C. § 1677a(c)(1)(C)]. Therefore, Commerce reduced Ancientree's dumping margin to reflect Commerce's affirmative determination of export subsidies for the company, *i.e.*, the affirmative countervailing of the [Program].

> Accordingly, to the extent that Ancientree's rate is recalculated in this [third] remand redetermination as a result of the Court's instructions, *we must account for the fact that a portion of the export subsidy offset has already been realized by Ancientree's customers/importers in the companion [antidumping duty] proceeding.*

Third Remand Results at 12 (emphasis added). In other words, to account for the offset that *decreased* Ancientree's antidumping duty rate to 0.00%, in the reviews that were completed after that investigation, Commerce *increased* the customer-specific subsidy rate for each customer whose non-use of the Program was verified by an amount equal to that offset. *See id.* at 10 (Table 2).

It is worth noting that Commerce did not adjust the customer-specific subsidy rate for the customers whose non-use of the Program was *not* verified because for those customers there was no need to account for (or "undo") the offset. The 10.54% Program rate was properly applied to them. Thus, customers whose non-use of the Program was not verified received a total subsidy rate of 13.33%, which included the 10.54% Program rate.

Thus, for the entries that were made between August 12, 2019 (the date of publication of the Preliminary Countervailing Duty Determination), and October 8, 2019 (the day before publication of the Preliminary Dumping Determination), Commerce found that because "there were no [antidumping duty] measures in effect, . . . the revised customer-specific subsidy rate can be applied for each customer, i.e., 13.33 percent (for customers found to have used the [Program]) or 2.79 percent[26] (for customers that demonstrated non-use of [Program])." Third Remand Results at 13. That is, because no preliminary dumping determination had been made during this period, no offset had been made. Thus, no offset needed to be taken into account, and the 13.33% and 2.79% revised rates could be applied to customers that were found, respectively, to have used the Program, or not used the Program.

For entries made between October 9, 2019 (the date of publication of the Preliminary Dumping Determination), and December 9, 2019 (the last day of the four-month period during which countervailing duty "provisional measures"[27] were in effect), an offset for the Program was applied during the antidumping duty investigation:

---

26      The 2.79% rate is equal to the sum of the rates determined for non-export subsidies that were found to have conferred a benefit on the company during the period of investigation (i.e., *excluding* the Program): Policy Loans to the Wooden Cabinets Industry (0.10%); Provision of Plywood for LTAR (0.01%); Provision of Sawn Wood and Continuously Shaped Wood for LTAR (0.01%); Provision of Particleboard for LTAR (1.15%); Provision of Fiberboard for LTAR (1.20%); Provision of Electricity for LTAR (0.26%); and self-reported grants (0.06%). These subsidies amounting to 2.79% are also included in the 13.33% rate. While part of the 13.33% rate used to calculate the cash deposit rate resulting from countervailable subsidies, these subsidies are not used to offset the antidumping duty rate. *See* 19 U.S.C. § 1677a(c)(1)(C) ("The price used to establish export price and constructed export price shall be . . . increased by . . . the amount of any countervailing duty imposed on the subject merchandise . . . to offset *an export subsidy*." (emphasis added)).

27      "Provisional measures" are a way of referring to the remedy that Commerce can provide in a preliminary determination, such as the posting of cash deposits. *See* 19 C.F.R. § 351.205(a) (providing that a preliminary determination is "the first point at which [Commerce] may provide a remedy (sometimes referred to as 'provisional measures') if [Commerce]

> Commerce had already applied a subsidy offset to Ancientree in the [antidumping duty] proceeding, which resulted in the company's [antidumping duty] cash deposit rate being reduced from 4.49 percent to 0.00 percent. Thus, Ancientree and its customers/importers received an offset of 4.49 percent to their [antidumping duty] cash deposits due to the (prior) countervailing of the [Program]. To account for this, and to ensure that the duties assessed for the customers in question are accurate, we have added the 4.49 percent offset value to the 2.79 percent (*i.e.*, the revised Ancientree rate, excluding [Program]) to arrive at an applicable rate of 7.28 percent [i.e., 4.49 percent plus 2.79%].

*Id.*; *see also* Preliminary Dumping Determination, 84 Fed. Reg. at 54,107 (antidumping cash deposit rate adjusted for export subsidy offset from 4.49% to 0.00%). Thus, for the period October 9, 2019, to December 9, 2019, Ancientree's customers whose non-use of the Program had been verified, and whose antidumping duty cash deposit rate had been reduced to 0.00%, had their subsidy rate increased by an amount equal to the offset so that they received a 7.28% subsidy rate.

For entries made between December 10, 2019, and April 16, 2020, Commerce found that a "gap period" was in effect. That is, "[p]rovisional measures based on the preliminary determination in the [countervailing duty] proceeding had expired, and the [countervailing duty] order had not yet published. Thus, cash deposits were not required during this period, and the applicable [countervailing duty] rate during the period was 0.00 percent." Third Remand Results at 13. That being the case, there was no offset with respect to the antidumping duty rate, and the subsidy rate to be applied to customers whose non-use of the Program was verified would be 2.79%, representing the subsidies other than the Program.

---

preliminarily finds that dumping or countervailable subsidization has occurred"); *id.* § 351.205(d) (providing for the posting of cash deposits if Commerce makes an affirmative preliminary determination of dumping or countervailable subsidies). Provisional measures may remain in effect for no more than four months. *See* 19 U.S.C. § 1671b(d). Provisional measures (countervailing duty cash deposits) were in effect in this case.

For entries made between April 17, 2020 (the day after countervailing duty provisional measures ended), and December 31, 2020 (the last day of the period of review in the first administrative review of the countervailing duty order), Commerce found:

> Ancientree and its customers/importers received an offset of 4.37 percent in the [antidumping duty] proceeding due to the [Program]. Again, to account for this, and to ensure that the duty liabilities assessed for the customers in question are accurate, we have added the 4.37 percent offset value to the 2.79 percent revised subsidy rate to arrive at an applicable subsidy rate of 7.16 percent.

*Id.* at 14; *see also* Final Dumping Determination, 85 Fed. Reg. at 11,955 (cash deposit rate adjusted for export subsidy offset from 4.37% to 0.00%). That is, Ancientree and its customers whose non-use of the Program was verified had received the 4.37% offset in the antidumping duty investigation, i.e., the result of the 10.54% Program rate being applied to them. So, here in the Third Remand Results, when Commerce removed the 10.54% Program rate from those customers' revised subsidy rate, it added the 4.37% offset to ensure the customers did not get both a reduction in their antidumping cash deposit rate because of the Program *and* a lower subsidy rate because of the removal of the Program rate from their subsidy rate. Thus, for the period April 17, 2020, to December 31, 2020, customers whose non-use of the Program had been verified received a 7.16% subsidy rate (i.e., 2.79% + 4.37% = 7.16%).

For entries made between January 1, 2021 (the first day of the period of review in the second administrative review of the countervailing duty order), and March 31, 2021 (the last day of the period of review in the second administrative review of the antidumping duty order), Commerce found:

> Ancientree and its customers/importers received an offset of 4.37 percent to the cash deposit rate in the [antidumping duty] proceeding. To ensure that the duties assessed for the customers in question are accurate, we added the 4.37 percent offset value to the 2.79 percent revised subsidy rate to arrive at [the] applicable subsidy rate of 7.16 percent.

Third Remand Results at 14; *see also* Final Dumping Determination, 85 Fed. Reg. at 11,955. Thus, as with the period April 17, 2020, to December 31, 2020, discussed above, for the period January 1, 2021, to March 31, 2021, customers whose non-use of the Program had been verified received a 7.16% subsidy rate.

Finally, for entries made between April 1, 2021 (the first day of the period of review in the second administrative review of the antidumping duty order), and December 31, 2021 (the last day of the period of review in the second administrative review of the countervailing duty order), Commerce found:

> Commerce did not apply an export subsidy offset in the parallel [antidumping duty] proceeding for Ancientree. Accordingly, the applicable customer specific rates are the [countervailing duty] investigation rates presented herein, with the [Program] rate included (13.33 percent) or without the [Program] rate included (2.79 percent), depending on whether the customer demonstrated non-use.

Third Remand Results at 14. That is, for the April 1, 2021, to December 31, 2021, period, no adjustment was made to the customer-specific rates of 13.33% (applicable to customers whose non-use of the Program had not been verified) or 2.79% (applicable to customers whose non-use was verified). Even though Ancientree participated in the second administrative review of the antidumping duty order, Commerce did not increase U.S. price to account for the Program in that review because the company failed to exhaust its administrative remedies. *See The Ancientree Cabinet Co.*, 48 CIT at __, 736 F. Supp. 3d at 1342.

In sum, on remand, Commerce (1) determined customer-specific rates to serve as the basis for liquidation; (2) recalculated the total subsidy rate for Ancientree; (3) recalculated the all-others rate; and (4) adjusted the customer-specific rate determined for customers whose non-use of the Program was verified to account for the export subsidy offset that had been granted in the parallel antidumping duty proceeding. Commerce stated that it would instruct Customs to apply the rates

determined on remand *retroactively* to revise the cash deposits previously made on entries made between August 12, 2019, and December 31, 2021, whose liquidation has been enjoined during this litigation.[28] Third Remand Results at 10-12 (citing 19 U.S.C. § 1671d(c)(1)(B)(i)(I)).

## DISCUSSION

The court will sustain the Third Remand Results if Commerce has complied with the court's remand order in *Dalian III*, and its findings on remand are supported by substantial evidence on the record and otherwise in accordance with law. *See* 19 U.S.C. § 1516a(b)(1)(B)(i). For the following reasons, the court sustains the Third Remand Results.

The parties state in their respective comments that Commerce has complied with the court's remand order in *Dalian III. See, e.g.*, Ancientree's Reply at 1 ("At the Court's instructions, the Department removed the [Export Buyer's Credit] program for the Customers that were successfully verified. . . . The Court should uphold the remand results."); Alliance's Cmts. at 1 (stating "Commerce's *Third Remand Redetermination* complies with the Court's *Third Remand Opinion*"); *see also* Def.'s Resp. at 16 (maintaining that "Commerce's Remand Redetermination complies with both its statutory obligations and the Court's *Third Remand Order*," and asking the court to sustain the Third Remand Results).

The court agrees. On remand, as directed by the court, Commerce determined, for customers whose non-use of the Program was verified, a subsidy rate (2.79%) that excluded a

---

[28]    Commerce noted that a new individual subsidy rate of 11.99% was established for Ancientree in the third administrative review of the countervailing duty order, which covered the period of review from January 1, 2022, through December 31, 2022. Third Remand Results at 15; *see Wooden Cabinets and Vanities and Components Thereof From the People's Republic of China: Final Results of Countervailing Duty Administrative Review; 2022*, 89 Fed. Reg. 88,962 (Dep't of Commerce Nov. 12, 2024). The 11.99% rate now serves as Ancientree's cash deposit rate.

subsidy amount for the Program. Additionally, Commerce recalculated Ancientree's Program rate

(2.27%) and total subsidy rate (5.06%), and revised the all-others rate (18.17%) accordingly. *See*

*supra* Parts IV.B and IV.C for calculations.

Then, Commerce adjusted the 2.79% subsidy rate (i.e., the rate for customers whose non-

use of the Program had been verified) by increasing that rate by the amount of any export subsidy

offset that was granted in certain segments of the antidumping duty proceeding. Third Remand

Results at 13-14; *see also supra* Part IV.D. Commerce found these the adjustments necessary to

determine accurate subsidy rates for the customers whose non-use had been verified. *See* Third

Remand Results at 13-14. Commerce also determined that it would direct Customs to revise the

amount of cash deposits already collected, on entries made from August 12, 2019, to December

31, 2021, to reflect the rates determined on remand.

Though neither Ancientree nor the Alliance disputes that Commerce has complied with the

court's order in *Dalian III*, each party argues, for different reasons, that the court should remand

this matter a fourth time. Neither party's arguments, however, convince the court that remand is

necessary.

## I.    Ancientree's Arguments in Favor of Remand Are Not Persuasive

The court first turns to Ancientree's arguments. Ancientree takes issue with the subsidy

rates applied to entries made during an eight-month period, from April 1, 2021, to December 31,

2021. During these eight months, the periods of review of the second administrative review of the

countervailing duty order and the second administrative review of the antidumping duty order

overlapped.

As stated in the Background section, for this eight-month period, Commerce determined that "the applicable customer-specific [countervailing duty] rates . . . are simply the [countervailing duty] investigation rates with the [Program] rate included (13.33 percent) or without the [Program] rate included (2.79 percent), depending on whether the customer demonstrated non-use." Third Remand Results at 21; *see also id.* at 10 (Table 2, Column H).

Moreover, Commerce concluded that no adjustment to the customer-specific rate of 2.79% was necessary because no export subsidy offset was made in the second administrative review of the antidumping duty order: "unlike the prior periods – in which Commerce was required to increase the [countervailing duty] rate to reflect the applicable export subsidy offset already applied in a parallel [antidumping duty] administrative review – the period of April 1, 2021, through December 31, 2021, does not necessitate an adjustment because no export subsidy offset was granted in the [antidumping duty] proceeding covering this time period." Third Remand Results at 21.

In so finding, Commerce rejected Ancientree's argument that it would be unlawful to apply the 10.54% Program rate to any of its customers, regardless of their use or non-use of the Program, because questions related to the argument Ancientree now makes have previously been considered by Commerce and litigated before this Court:

> Ancientree asserts that Commerce should remove the [Program] subsidy rate [of 10.54%] for *all* Ancientree customers during this April 1, 2021, through December 31, 2021 period, rather than only removing the [Program] rate for cooperating customers [i.e., those whose non-use was verified]. Specifically, Ancientree asserts that, pursuant to [19 U.S.C. § 1677a(c)(1)(C)], in [antidumping duty] proceedings, Commerce "is ordered to increase the U.S. sales price of subject merchandise by the amount of any export subsidy found countervailable in the companion countervailing Order" and because Commerce "has not made this adjustment for the [Program] in the antidumping . . . [Second Antidumping Administrative Review Final Results], then it is unlawful for [Commerce] to apply the [Program rate]" in this (*i.e.*, the [countervailing duty]) segment. We disagree. Importantly, as Ancientree notes, [19 U.S.C. § 1677a(c)(1)(C)] directs Commerce

to apply an export subsidy offset in determining the export price (and constructed export price) used to calculate an [antidumping duty] margin. This statutory directive is expressly limited to [antidumping duty] proceedings, not [countervailing duty] proceedings. As discussed above, the calculation of dumping margins in the parallel [antidumping duty] proceeding was the subject of separate litigation, in which the Court upheld Commerce's denial of an export subsidy offset because Ancientree failed to exhaust its administrative remedies before Commerce. The current ([countervailing duty]) litigation does not present an additional opportunity for Ancientree to seek redress in the parallel [antidumping duty] proceeding that is subject to separate litigation. As such, Commerce has made no changes to the customer-specific rates calculated for this overlapping period.

*Id.* at 21-22. In other words, for Commerce, Ancientree had an opportunity to argue that it was entitled to an export subsidy offset to the antidumping duty rate under the antidumping law in the *Ancientree* court action, where it lost. *See The Ancientree Cabinet Co.*, 48 CIT at __, 736 F. Supp. 3d at 1342. As a result of this loss, there is no basis for the adjustment that Ancientree now asks for, i.e., to remove the 10.54% Program rate from the total subsidy rates of customers whose non-use of the Program had not been verified.

Ancientree asks the court to find, as a matter of equity, that Commerce must exclude the 10.54% Program rate not only from the revised subsidy rates of those of its customers whose non-use of the Program was verified, but also for those whose non-use was not verified, to avoid the imposition of a double remedy and to calculate accurate margins. For Ancientree, this request is justified because Commerce was required to grant an export subsidy offset in the Second Antidumping Administrative Review Final Results under 19 U.S.C. § 1677a(c)(1)(C). *See* Ancientree's Cmts. at 3 ("As the antidumping review final results have been adjudicated and do not offset the [Program], the only way for the Department to fulfill the statutory directive [under 19 U.S.C. § 1677a(c)(1)(C) to avoid the double remedy is to adjust in this countervailing review. We submit that [the] Court should use it powers of equity to order this adjustment in compliance with the purpose of the law."). Ancientree's problem is that the issue was properly before the

*Ancientree* Court, and the Court found as a matter of law that the company had failed to exhaust its administrative remedies—a ruling that Ancientree did not challenge.

While the court "possess[es] all the powers in law and equity of, or as conferred by statute upon, a district court of the United States," 28 U.S.C. § 1585, it finds that equity does not require remanding the Third Remand Results based on Ancientree's arguments.

Ancientree does not deny that it failed to exhaust the export subsidy offset issue before Commerce in the second antidumping duty administrative review, as this Court held in *The Ancientree Cabinet Co. v. United States*. That is, it did not request the offset in a timely manner. And, here, as in *Ancientree*, the company has offered no excuse or explanation for this omission. *Ancientree*, 48 CIT at __, 736 F. Supp. 3d at 1341 ("Ancientree provides no excuse for its failure to include the [offset] issue in its case brief . . . ."). Ancientree could have appealed the *Ancientree* Court's holding, but it chose not to. It would appear, then, that Ancientree's request for equitable relief is an effort to undo the consequences of its own tardiness in the antidumping duty proceeding. Equity will not come to the company's aid here.

## II.    The Alliance's Arguments in Favor of Remand Are Not Persuasive

The court next turns to the Alliance's arguments. For the Alliance, although Commerce complied with the court's remand order in *Dalian III*, the Third Remand Results lack the support of substantial evidence and are not otherwise in accordance with law, and thus should be remanded. Alliance's Cmts. at 15 (requesting that the court "hold that Commerce's *Third Remand* [*Results* are] neither supported by substantial evidence nor in accordance with law and remand the redetermination back to the agency for further proceedings").

First, the Alliance argues that, unlike in the First and Second Remand Results, in the Third Remand Results Commerce unlawfully failed to address China's non-compliance with the Department's requests for information about the operation of the Program. For this reason, the Alliance contends that Commerce's Third Remand Results are unsupported by substantial evidence. Alliance's Cmts. at 11 ("Nowhere in the *Third Remand* [*Results*] does Commerce address [China's] failure to cooperate in the original investigation. Instead, Commerce's analysis is focused exclusively on the behavior of Ancientree's U.S. customers – who are not even interested parties to the proceeding. Thus, the *Third Remand* [*Results* are] not supported by substantial evidence.").

Next, the Alliance contends that the Third Remand Results are not in accordance with law to the extent Commerce determined customer-specific rates.[29] *Id.* at 14 ("The bottom line is that there is no legal basis in the statute, the regulations, or Commerce's practice to calculate customer-specific subsidy rates as Commerce has done in the *Third Remand* [*Results*]. Although it may have complied with [*Dalian III*], Commerce's decision to calculate and assess customer-specific subsidy rates is not in accordance with law and thus must be remanded."). The Alliance also challenges Commerce's recalculation of the all-others rate. *Id.* at 15.

Thus, for the Alliance, the court should have sustained the Final Determination, and never have issued the remand orders in *Dalian I*, *Dalian II*, or *Dalian III*.

The court denies the Alliance's request for a remand. As to the Alliance's substantial evidence arguments, it must be reiterated that prior to the Third Remand Results Commerce made its findings based on the idea that non-use could only be demonstrated if it knew the details of the

---

[29]    The customer-specific rates Commerce determined for different time periods, as described *supra* in Part IV.D.2, are found in Table 2 of the Third Remand Results.

Program's operation, but now we know that this is not the case. The non-use verification here showed that, with respect to certain of Ancientree's customers, not only was the use of adverse facts available not supported, but even the use of neutral facts available was not supported by substantial evidence because non-use was actually demonstrated by the evidence on the record. For those of Ancientree's customers where that was done, there were no gaps in the record.

The whole idea of the third remand was to give Commerce an opportunity to use verified information to complete its investigation. *See* 19 U.S.C. § 1677m(i)(1). China's failure to comply with Commerce's requests for information created a gap in the record with respect to whether Ancientree's U.S. customers had used the Program—a question of fact. With respect to certain of those customers the fact of non-use had been confirmed by verified information. Thus, there was no need for Commerce to mention China's answers to questionnaires in the Third Remand Results because the questions relating to the Program's use, that might have been settled by China's complying with Commerce's requests for information, were determined, in part, from other sources. *See, e.g.*, *GPX Int'l Tire Corp.*, 37 CIT at 58-59, 893 F. Supp. 2d at 1332; *Fine Furniture (Shanghai) Ltd.*, 36 CIT at 1209, 865 F. Supp. 2d at 1260.

As to those customers that did not or could not demonstrate non-use of the Program, gaps in the record were created. These gaps resulted from China's failure to answer Commerce's questionnaires, and they were not filled in by information on the record because of these customers' failure to demonstrate non-use. For these customers not only were facts available applied but adverse inferences were used to determine their rate, which in turn, affected Ancientree's rate. It is worth noting that the Alliance does not complain about the manner of Commerce's various adjustments in the Third Remand Results, and so they cannot be the subject of any appeal.

Moreover, the court is not persuaded by the Alliance's argument that the Third Remand Results are not in accordance with law. The law requires that Commerce rely on verified information in reaching its final determination, in accordance with 19 U.S.C. § 1677m(i)(1). As stated in *Dalian III*:

> [I]n an investigation, Commerce must verify all information relied upon in making a final determination. Here, Commerce claims that it need not rely on the verified non-use of the Program for eight of Ancientree's U.S. customers, which represented approximately 79% of sales by value during the period at issue, because it was "unable to verify significant portions of the non-use information." But this "all or nothing" approach is not called for by the statute. Nothing in the statutory directive that Commerce "shall verify all information relied upon in making . . . a final determination in an investigation" suggests that unless *all* information is verified, *none* of the information that is actually verified can be relied upon to make a final determination. But here instead of relying on the non-use information on the record that the Department was able to verify, Commerce relied on adverse facts available as applied to all of Ancientree's U.S. sales.

*Dalian III*, 48 CIT at __, 719 F. Supp. 3d at 1335-36 (citing 19 U.S.C. § 1677m(i)(1)).

Next, as noted in *Dalian III*, there is a great deal of law discouraging the use of the failure of a third party (such as China) to comply with questionnaires as a basis for applying adverse facts available. *See, e.g.*, *Mueller Comercial de Mex., S. de R.L. de C.V. v. United States*, 753 F.3d 1227, 1235 (Fed. Cir. 2014) ("[I]f the cooperating entity has no control over the non-cooperating suppliers, a resulting adverse inference is potentially unfair to the cooperating party." (citing *SKF USA Inc. v. United States*, 630 F.3d 1365, 1375 (Fed. Cir. 2011))); *Changzhou Wujin Fine Chem. Factory Co. v. United States*, 701 F.3d 1367, 1378 (Fed. Cir. 2012) (where non-cooperating parties were unrelated to the respondent, "[d]eterrence is not relevant here, where the 'AFA rate' only impacts cooperating respondents. We find no support in our caselaw or the statute's plain text for the proposition that deterrence, rather than fairness or accuracy, is the 'overriding purpose' of the antidumping statute when calculating a rate for a cooperating party."); *see also Risen Energy, Co.*

*v. United States*, 48 CIT __, __, 724 F. Supp. 3d 1356, 1361 (2024) ("Where a respondent is able to fill the gap caused by the noncooperation of another party, AFA may become inappropriate.").

      As to the use of customer-specific rates, the court found:

> [O]n remand, for each customer whose non-use of the Program was verified Commerce must determine a customer-specific rate that excludes a subsidy amount for the Program, and recalculate Ancientree's total rate, and the all-others rate. The Department may determine its own method for complying with this order.

*Dalian III*, 48 CIT at __, 719 F. Supp. 3d at 1337-38. As noted, distinguishing "sales with respect to which verification was successful from those where it was not successful, is not entirely foreign to Commerce. Where Commerce has been able to verify non-use of the Program by a Chinese respondent's U.S. customers in past cases it has removed the Program subsidy rate from the respondent's total rate." *Id.* at __, 719 F. Supp. 3d at 1336 (citations omitted). In the Third Remand Results, Commerce determined customer-specific rates that would only apply retroactively – not prospectively, as do cash deposit rates – and stated that it would instruct Customs to use those customer-specific rates to revise cash deposits made on entries whose liquidation has been enjoined pending the outcome of this litigation. Commerce explained that it would not "rely on the [customer-specific rates] to establish *prospective* customers-specific cash deposit rates," because, among other reasons, the countervailing duty statute directs the determination of an "estimated individual countervailable subsidy rate for each exporter and producer individually investigated." Third Remand Results at 10-11 (citing 19 U.S.C. § 1671d(c)(1)(B)(i)(I)).

      Finally, as was noted in *Risen Energy Co. v. United States*, in all the cases of this kind that have been brought before this Court, there has been placed on the record only evidence of non-use of the Program and no evidence of actual use. *Risen Energy Co. v. United States*, 47 CIT __, __, 665 F. Supp. 3d 1335, 1344 (2023) ("At this stage, every piece of evidence presented to Commerce and to the court supports the conclusion that Risen's sales were not aided by the [Program]."); *see*

*also id.* at __, 665 F. Supp. 3d at 1344 n.7 ("Commerce has . . . never found any evidence that any U.S. company has used the [Program].").

That being the case, and because the Alliance otherwise agrees with Ancientree and the Department that the Third Remand Results comply with the court's order in *Dalian III*, the court finds no basis for remanding this matter a fourth time.

## CONCLUSION

Because Commerce has complied with the remand order in *Dalian III*, and the Third Remand Results are supported by substantial evidence and otherwise in accordance with law, the court sustains the Third Remand Results. Judgment shall be entered accordingly.

_____/s/ Richard K. Eaton_____
Judge

Dated: _____June 12, 2025_____
        New York, New York